**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **UNITED STATES OF AMERICA** *ex rel*. **FRED MAXEY CLONINGER,**<br><br>               **Plaintiff,**<br><br>       **v.**<br><br>**DYNCORP INTERNATIONAL INC.;**<br>**DYNCORP INTERNATIONAL LLC;**<br>**DELTA TUCKER HOLDINGS, INC.;**<br>**AND NORTHROP GRUMMAN**<br>**CORPORATION,**<br><br>               **Defendant.** | **Civil Action No. 1:14-cv-00581 (RJL)** |

**NORTHROP GRUMMAN CORPORATION'S**
**MOTION TO DISMISS THE FIRST AMENDED COMPLAINT**

Pursuant to Federal Rules of Civil Procedure 8(a), 9(b) and 12(b)(6), defendant Northrop

Grumman Corporation respectfully moves to dismiss this action. The grounds for this motion are

set forth in the accompanying memorandum.

Respectfully submitted,

      /s/ *Anne B. Perry*

**Anne B. Perry (D.C. Bar No. 447930)**
**Jonathan S. Aronie (D.C. Bar No. 443151)**
**Ryan E. Roberts (D.C. Bar No. 1002825)**
**SHEPPARD MULLIN RICHTER &**
**HAMPTON**
**2099 Pennsylvania Ave., NW, Suite 100**
**Washington, DC 20006-6081**
**Tel. (202) 747-1900**
**Fax (202) 747-1901**
**aperry@sheppardmullin.com**
**jaronie@sheppardmullin.com**

reroberts@sheppardmullin.com

**Jamie S. Gorelick (D.C. Bar No. 913384)**
**Madhu Chugh (D.C. Bar No. 992122)**
**WILMER CUTLER PICKERING HALE**
**AND DORR LLP**
**1875 Pennsylvania Avenue NW**
**Washington, DC 20006**
**Tel. (202) 663-6000**
**Fax  (202) 663-6363**
**Jamie.Gorelick@wilmerhale.com**
**Madhu.Chugh@wilmerhale.com**

*Attorneys for Northrop Grumman Corporation*

Dated: February 6, 2017

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **UNITED STATES OF AMERICA** *ex rel*. **FRED MAXEY CLONINGER,** | |
| **Plaintiff,** | |
| **v.** | **Civil Action No. 1:14-cv-00581 (RJL)** |
| **DYNCORP INTERNATIONAL INC.; DYNCORP INTERNATIONAL LLC; DELTA TUCKER HOLDINGS, INC.; AND NORTHROP GRUMMAN CORPORATION,** | |
| **Defendant.** | |

## NORTHROP GRUMMAN CORPORATION'S MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

**Anne B. Perry (D.C. Bar No. 447930)**
**Jonathan S. Aronie (D.C. Bar No. 443151)**
**Ryan E. Roberts (D.C. Bar No. 1002825)**
**SHEPPARD MULLIN RICHTER & HAMPTON**
**2099 Pennsylvania Ave., NW, Suite 100**
**Washington, DC 20006-6081**
**Tel. (202) 747-1900**
**Fax (202) 747-1901**
**aperry@sheppardmullin.com**
**jaronie@sheppardmullin.com**
**reroberts@sheppardmullin.com**

**Jamie S. Gorelick (D.C. Bar No. 913384)**
**Madhu Chugh (D.C. Bar No. 992122)**
**WILMER CUTLER PICKERING HALE AND DORR LLP**
**1875 Pennsylvania Avenue NW**
**Washington, DC 20006**
**Tel. (202) 663-6000**
**Fax  (202) 663-6363**

**Jamie.Gorelick@wilmerhale.com**
**Madhu.Chugh@wilmerhale.com**

*Attorneys for Northrop Grumman Corporation*

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................. i

TABLE OF AUTHORITIES ..................................................................................... iii

SUMMARY OF ARGUMENT ................................................................................... 1

FACTUAL BACKGROUND ..................................................................................... 5

    A.    The CNTPO Program and CNGS Contract .................................... 5

    B.    Property Management Under the CNGS Contract ......................... 5

    C.    DynCorp's Alleged Property Management Issues .......................... 7

    D.    The Alleged DynCorp Fraudulent Actions and Cover-Up ........... 8

    E.    Northrop Grumman's Remedial Actions ....................................... 9

    F.    The Government's Knowledge of DynCorp's Property
        Management Problems .................................................................... 12

    G.    Relator's Contract Is Not Renewed ............................................... 13

LEGAL STANDARD ............................................................................................... 14

ARGUMENT ............................................................................................................ 15

I.    Count I Fails to State a Claim Under the False Claims Act ...................... 15

    A.    Count I Fails to State a Claim that Northrop Grumman
        Knowingly Submitted a False Claim for Payment in Violation of
        31 U.S.C. § 3729(a)(1)(A) ............................................................... 16

        1.    Relator Fails to Allege Northrop Grumman Acted with the
            Requisite Scienter ................................................................ 16

        2.    Relator Fails to Allege Actual Falsity ................................. 21

        3.    Relator's Allegations Against Northrop Grumman Fail to
            Meet the Materiality Requirement of the FCA ................... 22

    B.    Count I Fails to State a Claim that Northrop Grumman Made
        False Statements or Created False Records in Violation of 31
        U.S.C. § 3729(a)(1)(B) ................................................................... 24

C.     **Count I Fails to State a Claim that Northrop Grumman Knowingly Made False Statements to Avoid Transmitting Property to the Government in Violation of 31 U.S.C. § 3729(a)(1)(G)** ............................................... 25

D.     **Count I Fails to State a Claim that Northrop Grumman Failed to Deliver Property in Violation of 31 U.S.C. § 3729(a)(1)(D)** ........................... 25

E.     **Count I Fails to State a Plausible Claim that Northrop Grumman Knowingly Conspired in Violation of 31 U.S.C. § 3729(a)(1)(C)**................... 26

II.     **Count I Fails to Allege Fraud with the Particularity Required by FRCP 9(b)**.................................................................................................................. 28

A.     **Relator Fails to Allege that False Claims Were Made with Particularity**........................................................................................ 28

B.     **Relator Fails to Allege Northrop Grumman's Involvement in the Alleged Scheme with Particularity** ....................................................... 30

C.     **Relator Fails to Allege the Loss of Property with Particularity** .................... 33

III.     **Count III Fails to Meet the Requirements of FRCP 12(b)(6) Because It Fails to State a Valid Claim for Relief that Northrop Grumman Retaliated Against Relator Under the False Claims Act** ............................................... 35

IV.     **Count V Fails to Satisfy the Requirements of FRCP 12(b)(6) Insofar as It Does Not State a Valid Claim for Relief that Northrop Grumman Committed Tortious Interference with Relator's Relationship with DynCorp**.................................................................................................. 38

A.     **Relator Does Not Plead Facts Alleging a Valid Contractual Relationship** ....................................................................................... 39

B.     **There Was No Valid Business Expectancy Under Virginia Law with Which Northrop Grumman Could Have Interfered** ............................... 39

C.     **Relator Does Not Allege Facts Consistent with Intentional Interference By Improper Methods** .................................................... 41

**CONCLUSION** .................................................................................................. 43

# TABLE OF AUTHORITIES

Page(s)

<u>Cases</u>

*Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*
   367 F.3d 212 (4th Cir. 2004) ............................................................................ 39-40

*\*Ashcroft v. Iqbal*
   556 U.S. 662 (2009)...............................................................................14, 20, 22

*\*Bell Atl. Corp. v. Twombly*
   550 U.S. 544 (2007)................................................................................................14

*Chaves v. Johnson*
   335 S.E.2d 97 (1985) ............................................................................................42

*Commercial Bus. Sys., Inc. v. Halifax Corp.*
   484 S.E.2d 892 (Va. 1997).....................................................................................40

*\*EEOC v. Skanska USA Bldg., Inc.*
   550 F. App'x 253 (6th Cir. 2013) ..........................................................................36

*Humane Soc'y of the U.S. v. Vilsack*
   797 F.3d 4 (D.C. Cir. 2015) ...................................................................................14

*Lewis-Gale Med. Ctr., LLC v. Alldredge*
   710 S.E.2d 716 (Va. 2011).....................................................................................42

*\*Maximus, Inc. v. Lockheed Info. Mgmt. Sys. Co.*
   493 S.E.2d 375 (Va. 1997).......................................................................38, 41, 42

*Morrow v. United States*
   723 F. Supp. 2d 71 (D.D.C. 2010) ..................................................................20, 22

*Mruz v. Caring, Inc.*
   991 F. Supp. 701 (D.N.J. 1998) .............................................................................36

*\*Pencheng Si v. Laogai Research Found.*
   71 F. Supp. 3d 73 (D.D.C. 2014) .......................................................22, 24, 25, 27, 28

*Phrasavang v. Deutsche Bank*
   656 F. Supp. 2d 196 (D.D.C. 2009) .......................................................................30

*Priority Auto Grp., Inc. v. Ford Motor Co.*
   757 F.3d 137 (4th Cir. 2014) .................................................................................42

*\*Saliba v. Exxon Corp.*
   865 F. Supp. 306 (W.D. Va. 1994), *aff'd*, 52 F.3d 322 (4th Cir. 1995) ...........40, 41

*Schaecher v. Bouffault
   772 S.E.2d 589 (Va. 2015)..................................................................................38

*Shirvinski v. United States Coast Guard
   TRJ, 2010 WL 4279254 (E.D. Va. Oct. 25, 2010), aff'd, 673 F.3d 308
   (4th Cir. 2012)...................................................................................40, 41

*Southprint, Inc. v. H3, Inc.
   208 F. App'x 249 (4th Cir. 2006) ........................................................................39

*United States ex rel. Abou-Hussein v. Sci. Applications Int'l Corp.
   No. 2:09-1858-RMG, 2012 WL 6892716 (D.S.C. May 3, 2012), aff'd, 473 F.
   App'x 851 (4th Cir. 2012) ..................................................................................36

United States ex rel. Barrett v. Columbia/HCA Healthcare Corp.
   251 F. Supp. 2d 28 (D.D.C. 2003) ....................................................................26

*United States ex rel. Bender v. N. Am. Telecomms., Inc.
   750 F. Supp. 2d 1 (D.D.C. 2010), aff'd, 499 F. App'x 44 (D.C. Cir. 2013)...............15, 28, 30

United States ex rel. Conteh v. IKON Office Sols., Inc.
   27 F. Supp. 3d 80 (D.D.C. 2014) ......................................................................15

United States ex rel. Fago v. M&T Mortg. Corp.
   518 F. Supp. 2d 108 (D.D.C. 2007) ..................................................................23

*United States ex rel. Folliard v. Govplace
   930 F. Supp. 2d 123 (D.D.C. 2013), aff'd, 764 F.3d 19 (D.C. Cir. 2014)...........................15

*United States ex rel. Harper v. Muskingum Watershed Conservancy Dist.
   842 F.3d 430 (6th Cir. 2016) .................................................................. 25-26, 28

United States ex rel. Morgan v. Sci. Applications Int'l Co.
   604 F. Supp. 2d 245 (D.D.C. 2009) ..................................................................36

*United States ex rel. Siewick v. Jamieson Sci. & Eng'g, Inc.
   214 F.3d 1372 (D.C. Cir. 2000) ........................................................................16

*United States ex rel. Tran v. Computer. Scis. Corp.
   53 F. Supp. 3d 104 (D.D.C. 2014) ....................................................................28

United States ex rel. Williams v. Martin-Baker Aircraft Co.
   389 F.3d 1251 (D.C. Cir. 2004) ....................................................................29, 30

United States v. Krizek
   111 F.3d 934 (D.C. Cir. 1997) ..........................................................................16

*United States v. Sci. Applications Int'l Corp.*
   626 F.3d 1257 (D.C. Cir. 2010) ................................................................. 16, 20, 22-23

*Universal Health Servs., Inc. v. United States ex rel. Escobar*
   136 S. Ct. 1989 (2016) ................................................................................22, 23, 24

*Vander Boegh v. EnergySolutions, Inc.*
   772 F.3d 1056 (6th Cir. 2014) ...............................................................................36

<u>Statutes and Rules</u>

False Claims Act, 31 U.S.C. §§ 3729-3733 .......................................................... *passim*

   31 U.S.C. § 3729(a)(1)(A) ................................................................16, 25, 27, 28

   31 U.S.C. § 3729(a)(1)(B) ...............................................................24, 25, 27, 28

   31 U.S.C. § 3729(a)(1)(C) ...........................................................................26, 28

   31 U.S.C. § 3729(a)(1)(D) .......................................................25, 26, 27, 28

   31 U.S.C. § 3729(a)(1)(E) ...............................................................................27

   31 U.S.C. § 3729(a)(1)(G) ......................................................................25, 28

   31 U.S.C. § 3729(b) .........................................................................................16

   31 U.S.C. § 3729(b)(4) ....................................................................................23

   31 U.S.C. § 3730(h) ...................................................................................35, 36

   31 U.S.C. § 3730(h)(1) ...................................................................................37

   31 U.S.C § 3731(b) .........................................................................................35

Fed. R. Civ. P. 8(a) ...........................................................................1, 2, 14, 20, 28

Fed. R. Civ. P. 9(b) ..............................................1, 3, 15, 16, 23, 28, 29, 30, 31

Fed. R. Civ. P. 12(b)(6).........................................1, 2, 4, 14, 26, 28, 35, 38

Other Authorities

Restatement (Second) of Torts § 766, cmt. b (1979)......................................................42

Legislative Authorities

S. Rep. No. 110-507, 110th Cong., 2d Session (Sept. 25, 2008).................................36

## SUMMARY OF ARGUMENT

Pursuant to Federal Rules of Civil Procedure ("FRCP") 8(a), 9(b) and 12(b)(6), defendant Northrop Grumman Corporation ("Northrop Grumman") respectfully moves to dismiss, with prejudice, the three counts against Northrop Grumman (Counts I, II, and V) in relator Fred Maxey Cloninger's First Amended Complaint ("FAC"). The FAC does not meet the standards articulated by the FRCP to plead (a) a plausible claim of a violation of the False Claims Act ("FCA") or even all elements of a violation of the FCA, (b) the particularity of the alleged elements of a violation of the FCA by Northrop Grumman, (c) a valid claim for retaliation, and (d) a valid claim for tortious interference with Relator's employment contract with DynCorp.

The central allegations in the FAC are that ***DynCorp***, as a subcontractor to Northrop Grumman, did not perform the property management record keeping elements of its subcontract in accordance with its terms and the Federal Acquisition Regulation ("FAR"), mismanaged Government property in its performance of a subcontract it received from Northrop Grumman, and concealed its mismanagement from Northrop Grumman by falsifying records in its internal proprietary system to which Northrop Grumman did not have access. Relator also alleges that when Northrop Grumman discovered DynCorp's mismanagement, Northrop Grumman sought to correct the problems and eventually replaced DynCorp. Despite these alleged facts, Relator contends that not only DynCorp, but also Northrop Grumman, violated the FCA.

To allege a violation of the FCA, a Relator must plead facts supporting findings, among other things, that Northrop Grumman "knowingly" submitted or created false claims and that the alleged falsity was material, or that Northrop Grumman knowing failed to deliver Government property in its possession, or that the defendants were co-conspirators. The FAC does not contain allegations reflecting that the required elements of its FCA claims are even plausible.

Count I of the FAC alleges that ***Northrop Grumman*** violated the FCA by failing to meet the property management record keeping requirements of its contract. However, when allegations specific to the conduct of Northrop Grumman are analyzed against the requirements of FRCP 8(a) and FRCP 12(b)(6), Count I cannot survive. Rather than depicting Northrop Grumman as a company that knowingly ignored its obligations under its contract with the Government, or took actions to conceal DynCorp's performance shortfalls, or even acted in concert with DynCorp, Relator alleges facts showing Northrop Grumman acting as a responsible contractor who (1) was victimized by a subcontractor, DynCorp, who concealed its problems in maintaining adequate records of, and delivering all, Government property from Northrop Grumman, (2) undertook to correct DynCorp's performance failures once discovered, (3) ultimately replaced DynCorp because DynCorp failed to correct its performance shortcomings, and (4) bore the cost of correcting DynCorp's failures. Specifically, Relator alleges that

- Northrop Grumman issued a subcontract to DynCorp that contained very specific requirements for compliant performance in relation to the handling of Government-and-contractor acquired property;

- DynCorp concealed its allegedly noncompliant performance from Northrop Grumman and the Government by falsifying records in a proprietary system to which Northrop Grumman did not have access;

- Northrop Grumman monitored DynCorp's performance and continuously pressed DynCorp to meet the performance requirements of its subcontract;

- Northrop Grumman refused to pay DynCorp and, hence, pass costs on to the Government, for the services of a third party engaged by DynCorp to cure its own performance failures;

2

- Northrop Grumman undertook its own efforts to fix the shortcomings of DynCorp's performance;

- The Government was aware that DynCorp was not performing its property management obligations well, but did not cease making payments; and

- Ultimately, unable to obtain compliant performance, Northrop Grumman replaced DynCorp.

These allegations are completely inconsistent with Northrop Grumman having knowingly submitted any false claims. For example, Relator does not allege that Northrop Grumman had knowledge of DynCorp's purported falsification of information in DynCorp's proprietary system. At best, Relator alleges that DynCorp's performance issues caused Northrop Grumman unwittingly to breach its contract with the Government because its subcontractor provided poor services. A breach of contract does not provide a valid basis for an FCA claim.

In trying to mitigate the absence of facts linking Northrop Grumman to any wrongdoing, Relator summarily casts DynCorp and Northrop Grumman as a single and unified entity, the "Defendants." The merger of these two entities, however, is inconsistent with the specific facts pled with respect to Northrop Grumman's actions as the prime contractor. The alleged facts make it implausible that the parties possibly acted in a unified manner. Indeed, Relator's allegations set forth a pattern of conduct by Northrop Grumman that is irreconcilable with Relator's allegation that Northrop Grumman conspired with DynCorp to defraud the Government.

Similarly, in summarily referring to Northrop Grumman and DynCorp as a single unified entity, Count I of the FAC also fails to meet the particularity standard under FRCP 9(b) as related to Northrop Grumman. Northrop Grumman is almost entirely absent from Relator's

account of how allegedly the "Defendants' Fraudulent Conduct And Reckless Disregard For Contractual And Legal Obligations On The CNTPO Program Violated The FCA." *See* FAC ¶¶ 85-224. Although Relator makes a few isolated allegations regarding Northrop Grumman's failure to adhere to Relator's preferred inventory management practices, none of these satisfy Relator's burden to plead, with particularity, Northrop Grumman's participation in the alleged scheme. For example, Relator fails to set forth facts of Northrop Grumman's alleged fraudulent scheme, the content of the fraudulent representations, or even a link of the alleged scheme to claims for payment. Additionally, absent from the FAC are any particularized allegations regarding what property was lost as a result of DynCorp's property management practices or even what Government property Northrop Grumman did not deliver to the Government. Furthermore, Relator does not identify any particular claims for payment, the amounts that were allegedly false, by whom they were submitted, or when these claims were submitted.

Finally, Relator does not allege facts supporting any showing of materiality as required by the FCA because he alleges that the Government was aware of the alleged property management problems but never alleges the Government declined to pay invoices.

Count III of the FAC, that Northrop Grumman retaliated against Relator, also warrants dismissal pursuant to FRCP 12(b)(6) because Relator – a DynCorp employee – has failed to allege he had any type of a relationship with Northrop Grumman entitling him to whistleblower protection under the FCA.

Count V of the FAC, that Northrop Grumman committed tortious interference with Relator's contractual relationship with DynCorp by allegedly directing DynCorp to terminate his employment, should similarly be dismissed under FRCP 12(b)(6) because Relator admits that there was no contract with which Northrop Grumman could have tortuously interfered. Rather,

when Northrop Grumman replaced DynCorp due to its poor performance, Relator alleges that his prior employer, DynCorp, chose not to *renew* Relator's employment.

Consequently, accepting all of Relator's factual allegations as true, Relator has not plead sufficient facts alleging a plausible claim that Northrop Grumman violated the FCA or that Northrop Grumman tortiously interfered with Relator's employment relationship.

## FACTUAL BACKGROUND

### A.  The CNTPO Program and CNGS Contract

On August 24, 2007, the U.S. Army Space and Missile Defense Command, acting on behalf of the Counter-Narcoterrorism Technology Program Office ("CNTPO"), awarded Contract No. W9113M-07-D-0007 to Northrop Grumman ("CNGS Contract").[1] FAC ¶¶ 37-38. Under the CNGS contract, Northrop Grumman supported the Government's counter-narcotics operations in Afghanistan, to counteract the narcotics trade that finances many terrorist organizations. *Id.* ¶¶ 34, 40. During the term of the CNGS Contract, Northrop Grumman was awarded multiple "Task Orders" detailing specific services to be performed, including, but not limited to, counter-narcotics flight operations, flight training, and logistical support services. *Id.* ¶¶ 42-43. Northrop Grumman entered into a subcontract with DynCorp (the "Subcontract") to perform services under some of these Task Orders, some of which included management of the property. *Id.* ¶ 41.

### B.  Property Management Under the CNGS Contract

Relator alleges Northrop Grumman imposed clear contractual requirements in the Subcontract mandating that DynCorp manage government property in accordance with the requirements of the CNGS Contract and applicable regulations. FAC ¶ 59 ("Each Statement of

---

[1] Specifically, the CNGS Contract was awarded to Northrop Grumman's TASC division.

Work ("SOW") issued by Northrop to DynCorp states clearly that DynCorp is required to maintain strict accountability for all Government-owned property in its possession"); *see also id.* ¶ 60 (describing DynCorp's contractual duties, including "implement[ing] a supply chain management and aviation maintenance program," and "establish[ing] accountability and security procedures to minimize pilferage, loss and damage of material"). Property to be managed included both Government Furnished Equipment ("GFE") and Contractor Acquired Property ("CAP"). *Id.* ¶¶ 70-72.  DynCorp was also required "to develop and implement a new management information system, called MIS, that it would turn over to the Afghan government at the end of the program." *Id.* ¶¶ 82-83.

Relator alleges that Northrop Grumman issued the Subcontract to a company that the Government had already determined possessed the ability and systems to manage Government property correctly. Specifically, Relator alleges DynCorp already possessed a "government certified management information system," named DynMRO. *Id.* ¶ 80. DynMRO was designed to be a "central repository of all underlying procurement, supply chain, and property management transactions occurring on a government program, as required by FAR," providing users "all information" regarding property tracked by the system. *Id.* ¶ 81. However, "[b]ecause DynCorp considered DynMRO to be proprietary software, it would not allow other contractors (including Northrop) access to the system or even to use data in the system." *Id.* ¶ 82. As a result, Northrop Grumman did not have access to DynCorp's certified property management system and only DynCorp and the Government who, as Relator alleges, reviewed, approved, and certified DynMRO, were permitted access.

Although DynCorp was primarily responsible for property management, the FAC reflects that Northrop Grumman, in good faith, managed DynCorp's performance. For example, because

it did not have access to DynCorp's proprietary software management system (DynMRO),

Northrop Grumman continuously sought and received from DynCorp property management

records, expected delivery dates, and equipment locations so as to ensure that DynCorp was

fulfilling its contractual obligations. *See, e.g.*, *id.* ¶ 171 (Northrop Grumman requested that

DynCorp to provide list of Aircraft Ground Support Equipment); *id.* ¶¶ 282, 358, 361 (Northrop

Grumman repeatedly requested a copy of DynCorp's property book); *id.* ¶ 195 (after learning of

DynCorp's performance shortfalls, Northrop Grumman provided a 2011 delivery manifest to

relator to ensure the items were included in DynMRO).

### C.  DynCorp's Alleged Property Management Issues

Relator alleges a series of performance shortfalls in DynCorp's property management

practices over the course of the CNGS Contract, claiming that "DynCorp's entire property

management system for CNTPO was completely broken and dysfunctional." FAC ¶ 96.

Relator's key allegations include that:

- DynCorp had poor practices for receiving property that led to property being lost.
  *Id.* ¶¶ 98-109. In particular, Relator alleges that DynCorp employees failed to
  maintain chain of custody records, *id.* ¶ 102, or tracked property through "ad hoc
  private recording system[s]" that were not FAR compliant, *id.* ¶ 103.

- Sufficient resources were not devoted to property management, with the result
  that DynCorp employees were not performing their assigned duties or did not
  understand the proper procedures. *Id.* ¶¶ 111-119.

- DynCorp's property management systems, DynMRO and MIS, were not
  "adequate to the task of tracking the Government's property." *Id.* ¶ 150; *see*
  *generally id.* ¶¶ 148-182. Relator alleges that MIS was not being used to track

property at all, and that the system was ultimately scrapped, providing no value to the Government. *Id.* ¶¶ 161, 166. Relator also alleges that DynMRO was riddled with "incomplete and inaccurate data," and that it was unable to process Cyrillic characters, rendering it "virtually useless" in tracking Russian-acquired property. *Id.* ¶¶ 173, 182.

As a result of these issues, Relator generally alleges that millions of dollars' worth of Government property was lost, including four "push packs," *id.* ¶¶ 193-203, aircraft parts, *id.* ¶¶ 204-211, fuel, *id.* ¶¶ 212-218, and salvageable surplus property, *id.* ¶¶ 219-224. It is unclear from the FAC, however, what property was allegedly not used for the Government's benefit in performing the CNGS Contract, because Relator recognizes that at least some portion of this property was "being used elsewhere in the program." *Id.* ¶ 199. Relator's basic allegation appears to be that because the property was not properly tracked, it is unclear whether all the property was being properly used for the Government's benefit. *See, e.g.*, *id.* ¶ 201; *see also id.* ¶ 218 ("Relator estimates that DynCorp's lax oversight allowed a considerable percentage of that amount to be diverted to other, unapproved uses.").

### D.  The Alleged DynCorp Fraudulent Actions and Cover-Up

Although most of Relator's allegations regarding DynCorp's property management practices merely address performance issues, Relator alleges a few instances of affirmatively fraudulent property management practices on the part of DynCorp, generally involving falsification of data. For example, Relator alleges one scheme by which DynCorp would "falsify property records to indicate that the property had been delivered in Afghanistan before it was even shipped, for the purpose of expediting payment from the Government before payment was due to the vendor." FAC ¶ 134. Relator does not allege that Northrop Grumman was aware of this scheme; indeed, Relator alleges it was concealed from Northrop Grumman. For example,

because Northrop Grumman did not have access to the DynMRO system, Northrop Grumman had no way to know whether DynCorp falsified records therein. *Id.* ¶ 82. Relator alleges another scheme by which DynCorp would falsify data underlying "Equipment Backorder Status Reports" being sent to the Government. *Id.* ¶ 191. Relator alleges that after the Government expressed concern that only 40% of property was being delivered on time, DynCorp began changing the due dates in DynMRO, making it appear that no property was being delivered late.  *Id*. Again, Relator does not allege that Northrop Grumman had insight into the alleged falsification of data. Indeed, just as "DynCorp's false reporting had the effect of hiding from the Air Force and NSRWA key data that would have caused them to discover rampant problems in DynCorp's property management," *id.* ¶ 192; *see also id.* ¶¶ 103-109, 111-119, 122, 124-147, 149-165, 172-175, 179-182, 183-191, these same tactics would have precluded Northrop Grumman from gaining knowledge.

### E.  Northrop Grumman's Remedial Actions

Relator alleges that in late 2012, he relayed at least some of these issues to both DynCorp and Northrop Grumman management. Relator admits that Northrop Grumman and DynCorp initially agreed to "prepare a Corrective Action Plan to address the property management deficiencies and identify losses to the Government," but then broadly claims that "the companies ultimately sabotaged Relator's efforts and refused to report the losses to the Government." FAC ¶ 228. This broad conclusion that Northrop Grumman intended to conceal the losses from the Government is inconsistent with Relator's allegations about Northrop Grumman's continued imposition of corrective action demands on DynCorp, Relator's concession that Northrop Grumman specifically advised DynCorp that if Government property were lost, DynCorp would be required to compensate the Government for that loss, and Northrop Grumman's ultimate replacement of DynCorp. *E,g.*, *id.* ¶ 230 (Northrop Grumman "instructed Relator to inform

9

DynCorp senior management … that DynCorp is directly responsible for any Government property that cannot be properly accounted for and they better be ready to write a check for anything they can't locate, and it looks like it's going to be a big check.").

Relator alleges that, from December 2012 to January 2013, he prepared—along with DynCorp employee Melissa Smith—a Corrective Action Plan recommending that DynCorp clean up the data in its property management system and then perform a complete physical inventory to verify the data. *Id.* ¶ 231. Relator alleges that the plan was presented to Northrop Grumman in January 2013, and that he continued to meet with Northrop Grumman officials on a semi-weekly basis regarding the plan, at their request. *Id.* ¶ 234. Relator admits that Northrop Grumman officials were happy with the plan, but claims that Northrop Grumman official Doug Burpee "expressed concern with making disclosures … to the Government" and that he wanted to wait to disclose "until Northrop Grumman and DynCorp were 'farther down the road' to fixing the issues." *Id.* ¶ 236. As part of this effort, DynCorp agreed to engage the independent Buffalo Group to provide needed resources—approximately 8-10 personnel—to address inventory issues. *Id.* ¶ 233. At Northrop Grumman's insistence, DynCorp paid the $150,000 cost without billing the Government. *Id.* ¶¶ 233, 363 & n.6.

Relator then alleges that Deputy Program Manager Randy Munger, upon returning to Afghanistan, rejected the proposed Corrective Action Plan and ordered CNTPO staff to perform what Relator termed the "Munger Inventory" during February and March 2013. *Id.* ¶¶ 253-254. Relator alleges that the "Munger Inventory" was "brazenly non-compliant" with the FAR and was "intended to hide the losses that had resulted to the Government." *Id.* ¶ 260. However, Relator does not claim that this inventory was ever submitted to the Government or used in any way. *Id.* ¶¶ 272, 288.

Instead, according to Relator, this inventory was overtaken by a subsequent DynCorp effort to produce a "Property Book," in response to a March 2013 request from the Government. *Id.* ¶ 283. Relator alleges that this effort was deficient in several ways. Relator first alleges that the Property Book would include only GFE that could be found in the inventory, with no effort to identify property that had been lost, on the expectation that the Government had not kept records of everything it originally provided. *Id.* ¶¶ 294-296. Relator also alleges that with respect to CAP, he was prevented from fixing the many errors in the DynMRO database and from updating the database with items that DynCorp could not locate. *Id.* ¶ 314. Finally, Relator makes a series of allegations against DynCorp logistics manager Joan Albaugh, among others, regarding falsification and manipulation of the DynMRO system. *Id.* ¶¶ 331-349. Importantly, none of these actions are even alleged to have involved Northrop Grumman.

Given the serious issues with the data in the DynMRO system, however, this deficient Property Book was never provided to the Government. Instead, Relator was allegedly tasked with producing a so-called "Manual Property Book" so that DynCorp could meet the Government's June 2013 deadline. *Id.* ¶ 322. This Manual Property Book was not produced as a report from DynMRO, but was created on an Excel spreadsheet, allowing errors to be "corrected and updated more quickly." *Id.* ¶ 323. Relator alleges that Northrop Grumman approved this plan, on the condition that DynCorp would clean up the data in DynMRO to provide a complete and accurate Property Book by September 2013. *Id.* ¶ 358. Northrop Grumman warned DynCorp "that a new Corrective Action Plan would be issued in the event that DynCorp could not produce a compliant Property Book by the September 30, 2013 deadline." *Id*. Relator alleges that the Manual Property Book was not FAR compliant, and that it included only a fraction of the items that should have been included; nevertheless, he alleges that it was delivered to the Government.

*Id.* ¶ 361. Relator does not explain whether, and for what purpose, the Government relied upon this Manual Property Book. Moreover, Relator alleges that, as late as August 2013, he "believed that DynCorp was still planning to submit a compliant Property Book, disclose any remaining deficiencies, and identify losses to the Government in an Accountability Report." *Id.* ¶ 409.

Relator also concedes that Northrop Grumman was unsatisfied with DynCorp's corrective actions. Hence, in July 2013, Northrop Grumman took the significant step of hiring a new subcontractor—Honeywell—to take over property management functions from DynCorp. *Id.* ¶ 413. Honeywell's first step was to conduct a "floor to ceiling" inventory of all property—both GFE and CAP—and would generate a Property Book from that inventory. *Id.* ¶ 427. Relator alleges that this inventory was problematic because it would exclude items for which DynCorp and Northrop Grumman "were accountable but could not account for." *Id.* ¶ 428. Relator never alleges, however, that Northrop Grumman misrepresented the nature of the Honeywell inventory to the Government or what property, if any, was not included in the final inventory.

### F.  The Government's Knowledge of DynCorp's Property Management Problems

As Relator explains, the CNGS Contract was performed in Afghanistan at a Government facility with Government oversight, and as a result, the Government became aware of many of these issues. *See, e.g.*, FAC ¶¶ 2-3. On multiple occasions, the Government asked for property records, and, when it was unable to locate property, it sought information as to why it could not be located or was not yet on site ready for use. For example, Relator alleges that "Air Force personnel [would] ask[] a Northrop manager why a particular piece of equipment necessary to the mission was unavailable. The Northrop manager would then ask a DynCorp mechanic or technician, who would say that he had requested the item, often some time ago." *Id.* ¶ 98. Relator also alleges that in February or March 2013, "the Air Force began threatening to issue a

Corrective Action Plan regarding Northrop and DynCorp's failure to provide multiple fully-functioning Avionics test labs." *Id.* ¶ 123.

Relator alleges that the Air Force knew that items were not being delivered on time, noting that "the Air Force began asking Northrop why the delivery of so many items was past due." *Id.* ¶ 187. Unable to get its needs fulfilled under the CNGS Contact, Relator further alleges the Air Force purchased the needed and missing items from another contractor. *Id.* ¶ 147. Relator also alleges that the Government was aware that fuel was being stolen. *Id.* ¶¶ 215-216. Further, Relator alleges that the Government knew DynCorp was having difficulties producing a compliant property book and, thus, granted DynCorp additional time in 2013 to provide the documentation. *Id.* ¶ 286.

### G. Relator's Contract Is Not Renewed

Relator was hired by DynCorp, assigned a job by DynCorp, paid by DynCorp, trained by DynCorp, and reported to DynCorp. *E.g.*, *id.* ¶¶ 85-88.

> Relator was ***hired by defendant DynCorp*** as Logistics Manager in October 2012.  In that position, he was responsible for overseeing procurement and supply of aviation support components for the Department of Defense ("DoD") CNTPO Program operating in Afghanistan.  He was based in Afghanistan and reported to managers in Afghanistan and in Huntsville, Alabama, and Fort Worth, Texas.  Approximately twenty-five logistics employees were designated to report to him.  Relator was in charge of property management for DynCorp and Northrop's work on the CNTPO program during this time period.

*Id.* ¶ 20 (emphasis added); *see also id.* ¶ 85 ("Relator began working for DynCorp on September 27, 2012, as the Logistics Manager on the CNTPO program…"). Relator does not allege that Northrop Grumman was a party to DynCorp's hiring of Relator, negotiating his salary, agreeing to any payment of bonuses or stock options plans, insurance benefits, or health insurance or even of training him. Rather, all of these acts are attributed solely and exclusively to DynCorp. In

other words, Northrop Gruman did not control any of the terms or conditions of Relator's employment. DynCorp also provided all the training for Relator. *Id.* ¶¶ 87-90.

Similarly, all Relator's alleged discussions regarding his employment, its terms and conditions, potential future opportunities, and termination, occurred solely and exclusively with DynCorp personnel. *Id.* ¶¶ 401, 417, 418, 422, 435-437. Moreover, all the jobs for which he allegedly applied were for DynCorp and none for Northrop Gruman. *E.g.*, *id.* ¶¶ 436-438.

Further, Relator was not terminated. Rather, as alleged, DynCorp simply declined to **renew** the contract he had with DynCorp because his "'position had been eliminated.' Accordingly, his contract was not going to be renewed; his last day of work would be September 30, 2013." *Id.* ¶ 422.

## LEGAL STANDARD

Rule 12(b)(6) of the Federal Rules of Civil Procedure authorizes a party to seek dismissal of an action for failure to state a claim upon which relief can be granted. *See* Fed. R. Civ. P. 12(b)(6). To survive a motion to dismiss under Rule 12(b)(6), in conjunction with Federal Rule of Civil Procedure 8(a), a relator must plead facts sufficient to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* Although assumed to be true, factual allegations still must "be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "Determining a claim's plausibility is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Humane Soc'y of the U.S. v. Vilsack*, 797 F.3d 4, 8 (D.C. Cir. 2015) (quoting *Iqbal*, 556 U.S. at 679).

14

Rule 9(b) of the Federal Rules of Civil Procedure requires that complaints alleging FCA claims "state with particularity the circumstances constituting fraud or mistake." To satisfy Rule 9(b), Relator is required to "set out the details of the specific scheme, supply the time, place, and content of false representations, and link that scheme to claims for payment." *United States ex rel. Bender v. N. Am. Telecomms., Inc.*, 750 F. Supp. 2d 1, 8 (D.D.C. 2010), *aff'd*, 499 F. App'x 44 (D.C. Cir. 2013). In other words, Relator must "provide a defendant with notice of the who, what, when, where, and how with respect to the circumstances of the fraud." *United States ex rel. Conteh v. IKON Office Sols., Inc.*, 27 F. Supp. 3d 80, 86, 88 (D.D.C. 2014) (internal citations omitted) (dismissing case because Relator merely identified individuals with whom he discussed legal requirements as related to the contract "without also connecting these individuals to the allegedly fraudulent submissions."). "'[T]he pleader [must] ... state the time, place and content of the false misrepresentations, the fact misrepresented ... [,] what was retained or given up as a consequence of the fraud,'" and "identify individuals allegedly involved in the fraud." *Id.* at 85 (second and third alterations in original).

## ARGUMENT

## I.      Count I Fails to State a Claim Under the False Claims Act

In the first count of the FAC, Relator alleges that Northrop Grumman violated six out of seven of the subsections of 31 U.S.C. § 3729. Relator, however, has failed to plead sufficient facts to state a claim under any of the six subsections. Liability under the FCA does not arise unless falsity, scienter, and materiality are each established. *See, e.g.*, *United States ex rel. Folliard v. Govplace*, 930 F. Supp. 2d 123, 127, 136-37 (D.D.C. 2013) (defendant not liable under the FCA where the Government failed to establish scienter and finding the defendant's reliance on the expertise and "underlying processes and procedures" of its subcontractor was not

negligent), *aff'd*, 764 F.3d 19 (D.C. Cir. 2014). Relator fails to plead sufficient allegations

supporting any of these elements.

### A. Count I Fails to State a Claim that Northrop Grumman Knowingly Submitted a False Claim for Payment in Violation of 31 U.S.C. § 3729(a)(1)(A)

#### 1. Relator Fails to Allege Northrop Grumman Acted with the Requisite Scienter

The FAC fails to state a plausible scheme by which Northrop Grumman ***knowingly***

submitted, or caused to be submitted, false invoices to the Government. Under the FCA, a

defendant acts "'knowingly' if he '(1) has actual knowledge of the information; (2) acts in

deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of

the truth or falsity of the information.'" *United States ex rel. Siewick v. Jamieson Sci. & Eng'g,*

*Inc.*, 214 F.3d 1372, 1376 (D.C. Cir. 2000) (quoting 31 U.S.C. § 3729(b)). The scienter

requirement ensures that "FCA liability attaches only for false or fraudulent claims and not for

accidental or even negligent breaches of contract." *United States v. Sci. Applications Int'l Corp.,*

626 F.3d 1257, 1261 (D.C. Cir. 2010). While scienter can extend to "reckless disregard," the

"best reading of the [False Claims] Act defines reckless disregard as an extension of gross

negligence," in fact, as an "extreme version of ordinary negligence." *United States v. Krizek*, 111

F.3d 934, 942 (D.C. Cir. 1997). Moreover, Relator may not piece together scraps of innocent

knowledge held by various Northrop Grumman officials to impute knowledge to the company as

a whole.  *See, e.g.*, *Sci. Applications Int'l*, 626 F.3d at 1275 (holding no circuit that has applied

the "collective knowledge" theory to the FCA). The FAC fails to state a plausible scheme by

which Northrop Grumman knowingly submitted, or caused to be submitted, false invoices to the

Government because the contentions, fairly read, negate such scienter.

*First*, Relator alleges a variety of fraudulent actions by DynCorp, and DynCorp alone.

Relator acknowledges Northrop Grumman imposed clear contractual requirements mandating

that DynCorp manage government property in accordance with the applicable regulations. *See* FAC ¶¶ 59-60. To meet these contractual requirements, Relator alleges DynCorp proposed, and actually used, its Government-certified and proprietary property management system. *Id.* ¶ 80. Relator further alleges that, despite Northrop Grumman's imposition of clear contractual requirements, DynCorp's systems were unable to meet these requirements: "both DynMRO and MIS were flawed tools. MIS never became operational; and DynMRO, though operational, never adequately tracked government property." *Id.* ¶ 84; *see also id.* ¶¶ 177-192. To conceal these flaws, Relator alleges "DynCorp devised a scheme to systematically falsify records in DynMRO." *Id.* ¶ 122; *see also id.* ¶ 201 (stating DynCorp employee "Ms. Albaugh falsified DynMRO"). The FAC is replete with similar allegations of DynCorp alone crafting and producing inaccurate data:

- "DynCorp devised a scheme to systematically falsify records in DynMRO to make it appear that procured items had been delivered in Afghanistan when they had in fact only been received at the DynMRO QCC warehouse in Texas." *Id.* ¶ 122.

- "DynCorp set out to provide a list of only one third of the AGSE that the Government had requested." *Id.* ¶ 172.

- "DynCorp failed both to receive the fuel properly and to track it as required by FAR." *Id.* ¶ 214.

- "DynCorp came up with a plan to produce a document that was meant to appear to be a compliant Property Book but was actually designed to conceal the property for which Defendants could not account." *Id.* ¶ 287.[2]

---

[2]   Although Relator states "Defendants" could not account for this property, he makes no allegation Northrop Grumman was responsible for tracking this property (except via DynCorp) or knew of DynCorp's plan. FAC ¶ 287.

- "DynCorp decided that in the Property Book the only GFE listed would be GFE that could be found in inventory." *Id*. ¶ 294.

- "DynCorp leaders were fully aware and approved of the decision not to produce a fully compliant Property Book." *Id*. ¶ 298.

- DynCorp employees "Scott Rauer, Ray Nelson, and Mark Fisher instructed Relator to begin preparing a 'Manual' Property Book." *Id*. ¶ 322. After completing his work, "Relator knew that his MPB was not even a remotely complete record of everything NSRWA had entrusted to DynCorp." *Id*. ¶ 330.

While Relator alleges DynCorp had poor and deceptive practices, these claims are devoid of any factual allegations that Northrop Grumman knew of, let alone participated in, the alleged scheme.

*Second*, Relator's allegations that DynCorp actively sought to conceal its property management issues defeat any inference that Northrop Grumman had knowledge of the scheme. DynCorp's alleged course of fraudulent conduct involved manipulating DynMRO to provide false information to the Government. As Relator alleges, this "false reporting had the effect of hiding from the Air Force and NSRWA key data that would have caused them to discover rampant problems in DynCorp's property management." *Id.* ¶ 192. This false reporting, however, also had the effect of concealing property management issues from Northrop Grumman who, unlike the Government, had *no* access to DynCorp's proprietary DynMRO software system, and thus no way to detect or audit any issues therein. *Id.* ¶ 82. Northrop Grumman reasonably had to rely on DynCorp and the Government to ensure that DynMRO—DynCorp's "government certified management information system"—was working properly and not being used to perpetrate a fraud. *Id.* ¶ 80.

18

In addition to Northrop Grumman's structural inability to evaluate the integrity of the data DynCorp was providing, Relator alleges that DynCorp officials actively sought to limit information being provided to Northrop Grumman. For example, when Relator allegedly attempted to bring certain property management issues to Northrop Grumman's attention in February 2013, Relator claims that DynCorp manager Mark Fisher told Relator he "wished Relator had not done that (*i.e.*, told Mr. Munger about the DynMRO data issues)." *Id.* ¶ 249. Northrop Grumman cannot be charged with knowledge of a scheme that DynCorp actively concealed.

*Third*, Relator alleges Northrop Grumman lacked knowledge of any fraudulent conduct or false statements before late November or early December, 2012—more than four years after contract performance began. *See id.* ¶ 227 ("During weekly senior management meetings and other conversations in late November and early December 2012, Relator relayed the problems that he was finding in the property management system to Northrop's team in Afghanistan, including Deputy Program Manager Randy Munger and Logistics Managers Julie Sorenson and Jose Rodriguez."). Despite alleging facts concerning DynCorp's alleged scheme, and actions taken by DynCorp employees, Relator makes no allegation that Northrop Grumman was aware of the nature of the scheme or the possibility of fraud. Relator's claims against Northrop Grumman for conduct before late November 2012 must be rejected wholesale.

*Fourth*, Relator alleges that when Northrop Grumman learned of DynCorp's performance problems, it took remedial action to attempt to bring DynCorp's performance into compliance with the CNGS Contract and regulatory requirements. *E.g.*, *id.* ¶ 199 (instructing DynCorp to find any missing property); *id.* ¶¶ 250, 261, 265 (taking steps to mitigate any potential harm to the Government by performing a preliminary inventory shortly after learning of DynCorp's

problems; *id*. ¶ 230 (advising DynCorp that they would be responsible for compensating the

Government for any property that was lost; *id*. ¶ 240 (requiring DynCorp to hire subcontractor

assistance at no additional cost to the Government; *id*. ¶¶ 234, 358 (taking remedial actions of its

own, including issuing a corrective action plan); *id*. ¶ 413 (replacing DynCorp with a competent

subcontractor to fix DynCorp's property management shortfalls).

     *Fifth,* the various pieces of innocent knowledge Relator alleges Northrop Grumman

employees possessed cannot be pieced together to impute knowledge or recklessness to Northrop

Grumman as a whole. Viewing the allegations in the light most favorable to Relator, at best

Relator alleges a handful of Northrop Grumman employees possessed knowledge of DynCorp's

property management challenges. These pieces of individual knowledge cannot be used to argue

Northrop Grumman had knowledge of or recklessly disregarded DynCorp's allegedly fraudulent

behavior, especially where Relator alleges DynCorp concealed its fraudulent activity in its

proprietary system from Northrop Grumman and, that when Northrop Grumman otherwise

learned of performance shortfalls, it took several remedial actions, including replacing DynCorp.

*See Sci. Applications Int'l*, 626 F.3d at 1275.

     Overall, to the extent Relator's allegations can be connected to a legal theory of liability,

Relator's contentions against Northrop Grumman, at best, amount to nothing more than mere

disagreement with Northrop Grumman's subcontractor management and a contention that it is

somehow possible that Northrop Grumman's actions potentially could have violated the FCA.

The Supreme Court, however, explicitly requires a plaintiff to demonstrate that the alleged

misconduct was plausible, not merely possible. *Iqbal*, 556 U.S. at 678; *see also* Fed. R. Civ. P.

8(a).  But both "judicial experience" and "common sense" suggest that there is an "obvious

alternative." *See Iqbal*, 556 U.S. at 679; *Morrow v. United States*, 723 F. Supp. 2d 71, 77

(D.D.C. 2010). Northrop Grumman's actions did not involve a knowing participation in a fraudulent scheme that resulted in the knowing submission of a false claim. Rather, the "more likely explanation[s]," which Relator's factual allegations support, is that Northrop Grumman worked diligently and in good faith to oversee DynCorp's property management program and deliver a property book to the Government in accordance with the applicable contractual and regulatory requirements.

### 2.      Relator Fails to Allege Actual Falsity

To state a claim, Relator must plead facts alleging that Northrop Grumman actually made a false statement to the Government. As discussed, the bulk of the allegations in the FAC relate to a scheme by DynCorp to conceal property management issues—a scheme into which Northrop Grumman had no insight. In an effort to avoid this gap in allegations, Relator attempts to insert Northrop Grumman into the scheme by alleging a supposed cover-up that would shield lost property from the Government. On closer scrutiny, however, it is apparent that the alleged cover-up simply consisted of Northrop Grumman attempting to remedy DynCorp's property management problems, and that Relator's inference of fraud arises out of his idiosyncratic interpretation of unspecified regulatory and contract provisions.

The pleaded facts, even when viewed in the light most favorable to Relator, allege that when Northrop Grumman first discovered the magnitude of DynCorp's property management issues in 2012, Northrop Grumman took reasonable steps to attempt to the remedy the problem and ensure the Government would be made whole. As Relator alleges, Northrop Grumman instructed DynCorp to find any missing property, FAC ¶ 199, advised DynCorp that they would be responsible for compensating the Government for any property that was lost, *id.* ¶ 230, and took remedial actions of its own, including issuing a corrective action plan, *id.* ¶¶ 234, 358.

21

The core of Relator's theory against Northrop Grumman is that it sought to hide lost property from the Government by conducting misleading inventories that included only property that could be found. In particular, Relator attempts to cast the replacement contractor's (Honeywell's) comprehensive "floor to ceiling" inventory as part of the alleged fraudulent scheme. *See id.* ¶ 413. This allegation is not plausible. Instead, both "judicial experience" and "common sense" suggest that there is an "obvious alternative." *See Iqbal,* 556 U.S. at 679; *Morrow*, 723 F. Supp. 2d at 77. The only plausible explanation for Honeywell's all-inclusive inventory is that it was done to identify and catalogue government property at the outset of the new contractor's work on the program. Relator offers no explanation for his nonsensical expectation that Honeywell would assume responsibility for property management without first identifying and cataloging the property being used on the program. To view this inventory as part of the fraudulent scheme, one would need to conclude, without any pled facts, that Honeywell was also enlisted to engage in an alleged grand conspiracy to defraud the Government without reason, cause, or purpose.

### 3. Relator's Allegations Against Northrop Grumman Fail to Meet the Materiality Requirement of the FCA

To state a cause of action under the FCA, Relator must plead facts alleging the false claim was material to the Government's decision to make payment. *See, e.g.*, *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 2003 (2016); *Pencheng Si v. Laogai Research Found.*, 71 F. Supp. 3d 73, 86 (D.D.C. 2014) ("all plaintiffs bringing private actions under the FCA were, and are, required to allege that the allegedly false claim was material to the government's decision to make the payment at issue."). The FCA materiality prong requires Relator to "prove by a preponderance of the evidence that compliance with the legal requirement in question is material to the government's decision to pay." *Sci. Applications*

*Int'l,* 626 F.3d at 1271. To that end, "[a] false statement is material if it has a natural tendency to influence agency action or is capable of influencing agency action." *United States ex rel. Fago v. M&T Mortg. Corp.*, 518 F. Supp. 2d 108, 118 (D.D.C. 2007) (internal quotation marks omitted) (relator failed to plead facts demonstrating the Government relied upon any specific material misrepresentations in deciding to pay defendant's invoices); *see also* 31 U.S.C. § 3729(b)(4) (defining material as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property."). Relator has failed to meet this standard.

*First*, Relator fails to allege that Northrop Grumman's alleged non-compliance with proper inventory practices was material to the Government's decision to pay invoices. Relator alleges that Northrop Grumman and DynCorp submitted non-compliant inventories to the Government (albeit without specifying what regulatory or contractual provisions were violated), but makes no allegations regarding whether, or to what extent, the Government reviewed or relied upon those inventories.[3]

*Second*, Relator fails to rebut the strong presumption that regulatory and contractual requirements are not material when the government "regularly pays a particular claim in full despite its actual knowledge that certain requirements were violated." *Universal Health Services*, 136 S. Ct. at 2003. Relator openly acknowledges the Government was aware of DynCorp's property management shortcomings and failure to meet the terms of its subcontract. *See, e.g.*, FAC ¶ 123 (Air Force began threatening to issue a Corrective Action Plan); ¶ 125 (noting the Air Force was irate about issues with avionic test labs over a period of five years); ¶ 147 (stating the Air force "decided not to wait any longer on DynCorp for a functioning Avionics test lab"); *id.* ¶ 187 (Air Force asking why delivery of many items was past due); *id.* ¶ 215 (Government

---

[3] Of course, any inventory never submitted to the Government or relied upon by any party, such as the "Munger Inventory," could not possibly be material to the Government's decision to pay.

directed military personnel on how to curtail fuel theft); *id.* ¶¶ 285-286 (Northrop Grumman told Contracting Officer Trudeau they needed time to produce a property book).

Despite the Government's knowledge of DynCorp's performance issues, Relator makes no allegation that the Government refused to pay any invoice including charges for property, fuel, or property management services. To the contrary, Relator, by his allegations, effectively concedes that the Government recognized the difficulty of property management in an active warzone, and addressed issues by seeking to remedy the problem, not withholding payment. For example, while Relator alleges theft of fuel under DynCorp's watch, the Government did not cease paying DynCorp's invoices for fuel, but rather provided instructions to personnel on-site on methods to help curtail fuel theft. *Id.* ¶ 215. Under *Universal Health Services, Inc.*, this is strong evidence that the performance issues were not material.

At best, Relator's claims of mismanagement amount to no more than a breach of contract claim. However, "[t]he FCA's materiality requirement is demanding," and the FCA is not "a vehicle for punishing garden-variety breaches of contract or regulatory violations." *Universal Health Servs.*, 136 S. Ct. at 1994, 2003.

**B. Count I Fails to State a Claim that Northrop Grumman Made False Statements or Created False Records in Violation of 31 U.S.C. § 3729(a)(1)(B)**

To state a claim under 31 U.S.C. § 3729(a)(1)(B), a plaintiff must allege that (1) the defendant made or used a record or statement; (2) the record or statement was false; (3) the defendant knew it was false; and (4) the record or statement was material to a false or fraudulent claim. *Pencheng Si*, 71 F. Supp. 3d at 87.  Courts have held that the language in 31 U.S.C. § 3729(a)(1)(B) is "designed to prevent those who make false records or statements [in order] to get claims paid or approved from escaping liability solely on the ground that they did not *themselves* present a claim for payment or approval." *Id.*

24

This claim fails for the same reasons set forth above: Northrop Grumman was not aware of any false statements; Relator fails to identify any actually false statements; and no material false statements were made. Furthermore, § 3729(a)(1)(B) is not meant for these circumstances. Section 3729(a)(1)(B) was drafted to attach liability to defendants who did not submit claims for payment to the Government. *Pencheng Si*, 71 F. Supp. 3d at 87. As the prime contractor, Northrop Grumman submitted invoices to the Government. Therefore, Relator has failed to allege facts that support a finding of liability under this section against Northrop Grumman.

### C. Count I Fails to State a Claim that Northrop Grumman Knowingly Made False Statements to Avoid Transmitting Property to the Government in Violation of 31 U.S.C. § 3729(a)(1)(G)

A cause of action under 31 U.S.C. § 3729(a)(1)(G), which covers so-called "reverse false claim[s]," arises when "a defendant knowingly mak[es] a false statement in order to *avoid* having to pay the government when payment is otherwise due." *Pencheng Si*, 71 F. Supp. 3d at 88 (D.D.C. 2014). There must be an actual "obligation" to pay the Government, and the relator must provide "details about the source of the alleged obligation" and "specify the *parameters* of that obligation." *Id*. at 96.

This claim fails largely for the same reasons as Relator's claim under § 3729(a)(1)(A). In addition, Relator fails to provide any details regarding the alleged "obligation," providing no basis to evaluate this claim. Therefore, Relator has not plead sufficient facts to state a claim against Northrop Grumman under 31 U.S.C. § 3729(a)(1)(G).

### D. Count I Fails to State a Claim that Northrop Grumman Failed to Deliver Property in Violation of 31 U.S.C. § 3729(a)(1)(D)

Stating a claim under 31 U.S.C. § 3729(a)(1)(D) requires Relator to allege plausible facts that (1) the defendant had possession, custody, or control of property or money used, or to be used, by the government, and (2) knowingly delivered less than all of that property. *United States*

*ex rel. Harper v. Muskingum Watershed Conservancy Dist.*, 842 F.3d 430, 438 (6th Cir. 2016) (dismissing conversion claim where Relator relied on conclusory allegations and failed to plead facts demonstrating plaintiff knowingly delivered less than all of the property entrusted to it by the Government); *see also United States ex rel. Barrett v. Columbia/HCA Healthcare Corp.*, 251 F. Supp. 2d 28, 36 (D.D.C. 2003) (holding defendant was not liable for withholding property because Relator failed to show a difference between the property entrusted to the defendant and the amount of property eventually returned to the Government).

Relator fails to plead the essential facts to state a claim under 31 U.S.C. § 3729(a)(1)(D). Relator makes vague allegations about a "large pile of equipment" at the base in Kabul consisting of "surplus and unserviceable equipment." FAC ¶¶ 221-223. Relator provides no detail on who was in possession of the property, and even fails to allege that the pile of equipment was related to the CNGS Contract. To the contrary, Relator admits that "[t]he pile grew much larger after the completion of the G-222 contract," a contract entirely unrelated to this case or Northrop Grumman. *Id.* ¶ 221.  Similar to the plaintiff in *United States ex rel. Harper*, Relator has failed to allege sufficient facts that Northrop Grumman had possession of property and failed to deliver all that property to the Government. 842 F.3d at 436-38. Therefore, Relator has failed to state a claim under FRCP 12(b)(6) that Northrop Grumman violated 31 U.S.C. § 3729(a)(1)(D).

### E.   Count I Fails to State a Plausible Claim that Northrop Grumman Knowingly Conspired in Violation of 31 U.S.C. § 3729(a)(1)(C)

To state a cause of action for conspiracy under 31 U.S.C. § 3729(a)(1)(C), Relator must allege (1) that "an agreement existed to have false or fraudulent claims allowed or paid," (2) "that each alleged member of the conspiracy 'joined that agreement,'" and (3) that "one or more conspirators knowingly committed one or more overt acts in furtherance of the object of the

conspiracy." *Pencheng Si*, 71 F. Supp. 3d at 89, 98 (dismissing conspiracy claim where a single defendant was the "driving force behind the alleged illegality" and the plaintiff failed to allege facts showing the other defendants "separately agreed to join any conspiracy to defraud the government"). General civil conspiracy principles apply. *Id*. at 98. Additionally, there must be an underlying violation of the FCA (§ 3729 (a)(1)(A)-(B) & (D)-(E)), to support a finding of liability. *Id.*

Here, Relator's theory that Northrop Grumman and DynCorp collectively engaged in a conspiracy to conceal DynCorp's property management problems simply is implausible on its face. To effectuate this purported fraudulent scheme, together DynCorp and Northrop Grumman would have had to (1) jointly devise a scheme to cause the Government to pay for parts it never received; (2) implement its scheme while working side-by-side with Government personnel on a government site in Afghanistan; (3) collaborate exceptionally closely over the course of contract performance to perpetrate the fraud; (4) either enlist or somehow trick the Buffalo Group and Honeywell, the two other contractors assisting with property management during this period; and (5) conceal their activities from at least two federal auditing agencies who came on site in Afghanistan—DCAA and DCMA. This is a deeply implausible theory.

Relator has pled no facts alleging any agreement existed between Northrop Grumman and DynCorp to submit false claims to the Government. To the contrary, the facts alleged by Relator show the absence of a conspiracy, with Northrop Grumman mandating compliant performance, instituting measures to ensure it, and, ultimately, unable to obtain the level of performance it believed was required, replacing DynCorp and ensuring the Government was not bearing the costs or liability for lost or undelivered property. *See* Factual Background, *supra.*

27

Relator has not plead facts alleging that Northrop Grumman joined any agreement to commit fraud. As such, this claim should fail under both FRCP 12(b)(6) and FRCP 8(a).

## II.       Count I Fails to Allege Fraud with the Particularity Required by FRCP 9(b)

Relator's 118-page FAC contains a laundry list of allegations regarding DynCorp's property management issues and supposed efforts to conceal those issues from the Government. But to actually state a claim against Northrop Grumman, Relator must allege plausible facts that "(1) [Northrop Grumman] submitted or caused to be submitted a claim to the government, (2) the claim was false, and (3) [Northrop Grumman] knew the claim was false." *United States ex rel. Tran v. Computer Scis. Corp.*, 53 F. Supp. 3d 104, 121-22 (D.D.C. 2014) (internal quotation marks and alterations omitted).[4] Bare legal conclusions will not suffice; in order "to satisfy FRCP 9(b), a FCA relator must state the time, place, and contents of the false representations, the facts misrepresented, and what was obtained or given up as a consequence of the fraud." *U.S. ex rel. Bender*, 750 F. Supp. 2d at 5 (dismissing complaint against one defendant where Relator failed to allege particular facts demonstrating that specific defendant violated the False Claims Act). As set forth below, Relator has failed to allege with particularity what false claims were made, Northrop Grumman's involvement in the alleged scheme, and the damages incurred.

### A.       Relator Fails to Allege that False Claims Were Made with Particularity

As noted, to plead an FCA claim, Relator is required to allege that false claims were submitted to the Government. Nowhere in the FAC does Relator identify any particular claims

---

[4] This test applies to claims brought under 31 U.S.C. § 3729(a)(1)(A).  Relator also cites several other subsections of § 3729, but the analysis of those provisions is not meaningfully different. *See, e.g.*, *Pencheng Si v. Laogai Research Found.*, 71 F. Supp. 3d 73 (D.D.C. 2014) (using similar standard to analyze claims under § 3729(a)(1)(B), § 3729(a)(1)(C), and § 3729(a)(1)(G)); *United States ex rel. Harper v. Muskingum Watershed Conservancy Dist.*, 842 F.3d 430 (6th Cir. 2016) (using similar standard to analyze claim under § 3729(a)(1)(D)).

for payment, the amounts that were allegedly false, by whom they were submitted, or when these claims were submitted. Relator merely alleges, in a conclusory manner, that every invoice submitted was false: "Each voucher or invoice that Defendants submitted or caused to be submitted to the United States claiming costs associated with property management was an affirmative false statement that such costs were payable pursuant to the terms of the prime Contract and task orders thereunder, and the FAR/DFARS provisions referenced therein." FAC ¶ 367.

This allegation does not provide Northrop Grumman "sufficient information to allow for preparation of a response." *United States ex rel. Williams v. Martin-Baker Aircraft Co.*, 389 F.3d 1251, 1257 (D.C. Cir. 2004). The FAC is bereft of any information regarding the content of the allegedly false claims and what Northrop Grumman may have certified or promised to the Government. This is particularly problematic here because Relator does not allege that property management services were not provided, but only that they were not performed in a manner he views as compliant with the terms of Northrop Grumman's contract.

It is apparent from the FAC that Relator lacks some of the most basic information regarding the program, including to what particular task orders his allegations relate, FAC ¶¶ 37-43, the nature of DynCorp's subcontract, *id.* ¶¶ 41-42, and how the property management issues were resolved after the hiring of Honeywell. *Id.* ¶ 427. This lack of detailed factual allegations may be understandable given Relator's very limited time working on the contract—Relator was hired by DynCorp in October 2012 and his contract was not renewed by DynCorp less than one year later, in September 2013, *id.* ¶¶ 20, 22, 422. But lack of knowledge does not cure a failure to satisfy Rule 9(b).

29

**B.**  **Relator Fails to Allege Northrop Grumman's Involvement in the Alleged Scheme with Particularity**

Much of the FAC casts DynCorp and Northrop Grumman as a single unified entity of "Defendants" engaged in allegedly fraudulent behavior. However, "[i]t is insufficient to allege a scheme against one defendant and merely ascribe similar behavior to another." *United States ex rel. Bender,* 750 F. Supp. 2d at 6. The defendants are separate and must be treated as so – particularly where, as here, there is no evidence that the parties acted as co-conspirators. Plaintiffs must "specify which defendant or defendants committed each allegedly fraudulent act, instead [of] pleading fraud generally as to all of the defendants." *Phrasavang v. Deutsche Bank*, 656 F. Supp. 2d 196, 206 (D.D.C. 2009) (holding that generalized pleading, without identifying individual defendants, does not conform with Rule 9(b) because "it fails to give sufficient notice to the defendants as to what their role was in the alleged fraud."); *see also United States ex rel. Williams*, 389 F.3d at 1257 (dismissing complaint which "fail[ed] to identify with specificity who precisely was involved in the fraudulent activity").

With respect to the allegations set forth in section VII of the FAC (¶¶ 85-224)—namely, that "Defendants' Fraudulent Conduct and Reckless Disregard for Contractual and Legal Obligations on the CNTPO Program Violated the FCA and Caused Millions of Dollars of Damage to the United States"—Northrop Grumman is almost entirely absent from Relator's account. Relator makes a few isolated allegations regarding Northrop Grumman's failure to adhere to Relator's preferred inventory management practices, but none of these satisfy Relator's burden to plead, with particularity, Northrop Grumman's participation in the alleged scheme:

- Relator alleges that "the basic dynamic was that DynCorp and Northrop personnel knew that there were rampant problems, but nobody wanted to 'own' the problems and take responsibility for addressing them." *Id.* ¶ 120. This generalized

claim, which is unsupported by names, dates, or the content of conversations, does not satisfy Rule 9(b).

- Relator alleges that he raised concerns about the tracking of aircraft parts to two DynCorp managers, and was told that the issue was "'not his concern'" and that "Northrop claimed that [the DynCorp employee responsible for the warehouse] reported to Northrop managers only." *Id.* ¶ 159. Based on this, Relator concludes that "[i]t was apparent that Northrop did not want Relator looking further into this subject." *Id.* This is not a reasonable inference; it is entirely appropriate for a prime contractor to take ultimate responsibility for the performance of program staff. In any event, this hearsay allegation regarding the statements of *DynCorp* employees does not support a claim against Northrop Grumman.

- Relator alleges that two Northrop Grumman managers and a DynCorp manager instructed him not "to list items in DynMRO that could not be found, because then Defendants would be responsible to the Government for the lost items." *Id.* ¶ 200. But Relator fails to identify the date or circumstances of this conversation and which items could not be found.

- Relator alleges that when he tried to research certain aircraft part orders, Northrop Grumman told him that a different DynCorp employee "was in charge of those orders" and that "Relator should not dig into problems related to those orders." *Id.* ¶ 210. This exchange can be readily explained as Northrop Grumman directing

Relator to do his own job, and not to interfere with someone else's. Relator's insinuation of fraud is not a replacement for a factual allegation.[5]

With respect to the allegations set forth in section VIII of the FAC (¶¶ 225-365)—namely, that "Defendants Deliberately Concealed from the Government Their Loss and Wastage of Millions of Dollars of Government Property"—Relator fails to allege any fraudulent conduct by Northrop Grumman that led to the submission of any false claims to the Government. As with the rest of the FAC, the bulk of Relator's allegations concern alleged misconduct by DynCorp, and DynCorp alone. *See, e.g., id.* ¶¶ 331-349 (regarding DynCorp's inputting "falsified data" in DynMRO). To the extent Relator's allegations do relate to Northrop Grumman, Relator fails to allege any connection with a claim submitted to the Government. For example, Relator alleges that a Northrop Grumman employee, Randy Munger, had an inventory performed that Relator believed was insufficient. *E.g., id.* ¶¶ 260-272. However, Relator does not allege that this led to the submission of false records or invoices. To the contrary, Relator alleges that this inventory was never relied upon or used. *Id.* ¶ 288. Relator also alleges that Northrop Grumman approved DynCorp's decision to submit a "Manual Property Book" to the Government. *Id.* ¶¶ 350-365. But Relator does not allege that Northrop Grumman was aware the data was falsified and provides no detail regarding what was communicated to the Government. As the FAC demonstrates, the Manual Property Book was merely a provisional inventory provided to the Government while Honeywell prepared a complete inventory—and Relator does not allege that the Government was informed otherwise. *E.g., id.* ¶ 358.

---

[5] There are a few more allegations involving Northrop Grumman in this section, but all *support* an inference that Northrop Grumman was unaware of any scheme to defraud the Government, and was attempting to remedy any property management issues. *See, e.g.*, FAC ¶ 98 (Northrop Grumman asked DynCorp to locate unavailable equipment); *id.* ¶ 108 (Northrop Grumman asked DynCorp to locate property that was supposed to have been delivered); *id.* ¶ 207 (Northrop Grumman changed warehouse access codes to secure property).

### C.      Relator Fails to Allege the Loss of Property with Particularity

Notably absent from the FAC are any particularized allegations regarding what property was lost as a result of DynCorp's property management practices. Instead, Relator repeatedly speculates—without any factual support—that property which was not tracked according to Relator's standards must have been lost or stolen.[6]

For example, Relator alleges in a conclusory manner that "Defendants have not disclosed to the Government that the four push packs, valued at a total of tens of millions of dollars, were rendered without value due to the failure of Defendants to properly manage the Government's property." *Id.* ¶ 203. However, Relator also alleges that Northrop Grumman instructed DynCorp to find any items removed from a push pack and there are no allegations that the parts that were missing were not otherwise being used in performing the contract, that they were not later located, what value of the total was thereby diminished, or that the Government did not know that there were parts missing from the push packs. *Id.* ¶ 199. Indeed, Plaintiff admits that the parts were being "put to other purposes" on the program. *Id.* ¶ 197. Additionally, while Relator alleges the accountability for the items was lost at one point in time, he does not allege that the property was not later found, for example, during the course of the complete inventory that was undertaken by Honeywell when it replaced DynCorp or the Government when performance ended and the possession of the property was transferred to the new contractor. *E.g.*, *id.* ¶ 427.

---

[6] Relator also alleges that the Government sustained a loss of $100 million because property management "essentially was not being performed at all" in the first five years of the program when Relator was not employed by DynCorp. FAC ¶ 167. This speculative allegation and calculation provides no basis to support a finding of falsity or materiality, particularly where Relator recognizes that the employees billed to property management positions were regularly performing other tasks on the program in order to carry out the Government's mission and does not allege that the Government was informed differently.  *Id.* at ¶ 115.

Relator also alleges, for example, that the warehouse of the Government's aircraft parts was not properly secured and that he informed Northrop Grumman, who he alleges took steps to secure the warehouse, albeit not to the extent Relator opines was required. *Id.* ¶ 207. Relator does not allege, however, which aircraft parts were allegedly lost as a result, if any. *Id.* ¶¶ 204-211. The FAC merely summarily concludes that in his "experience on the CNGS project, Defendants' loss of accountability for Government-furnished aircraft parts under the CNGS contract caused losses, wastage, and over-ordering of millions of dollars of aircraft parts, all paid for by the Government." *Id.* ¶ 211. What was actually lost, wasted, or over ordered is not identified, and who lost, wasted, or did the over ordering is not identified with any particularity, especially with regard to Northrop Grumman.

Similarly, Relator alleges that DynCorp did not properly account for surplus and unserviceable property. *Id.* ¶ 224. Relator alleges that, during his tenure with DynCorp, the Defendants "never followed the procedures for reclaiming surplus property" and a "large pile of equipment" consisting of "surplus and unserviceable equipment" grew by the weeks. *Id.* ¶¶ 221-223. Relator further alleges that, during his limited tenure, only "a few initial batches of unserviceable equipment, mainly printers and small equipment components, were processed" for reclamation. *Id.* ¶ 224. He then simply asserts that the "total value of unprocessed items of surplus and unserviceable equipment was approximately $3-4 million." *Id.* Not only does Relator fail to tie this surplus and unserviceable property to any claim, let alone a false claim of loss to the Government, but also, he fails to allege what items were surplus, what items were unserviceable, under what contract or task order the surplus or unserviceable items were purchased, when the items were purchased, or why, if the parts were unserviceable, any value was lost. In fact, Relator appears to allege that the surplus property was ordered under a different

and unrelated DynCorp contract, which he identifies as "G-222." *Id.* ¶ 223. Moreover, he does not allege that the surplus and unserviceable property was not later transferred to the Government, put to use, or salvaged.

In the end, while Relator identifies property for which DynCorp allegedly lost accountability for some period of time, he has not pled facts alleging the "representative examples" of vague categories of parts and equipment were ordered under the CNTPO program, let alone under which task order or invoice, or what parts and equipment were lost, whether or how they were tied to any particular invoice or claim, or who at Northrop Grumman acted in a manner that caused the loss, or played any role in its alleged loss, or that Northrop Grumman created any record that was false, let alone submitted a false claim to the Government, related to the unidentified property.[7]

### III.  Count III Fails to Meet the Requirements of FRCP 12(b)(6) Because It Fails to State a Valid Claim for Relief that Northrop Grumman Retaliated Against Relator Under the False Claims Act

Relator has failed to state a valid claim for relief that meets the requirements of FRCP 12(b)(6) against Northrop Grumman. The FCA retaliation provision protects "[a]ny employee, contractor, or agent" from being "discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against." 31 U.S.C. § 3730(h). The FCA whistleblower provisions do not apply to Relator because he has not alleged any employment, agent, or independent contractor relationship with Northrop Grumman. Accordingly, Relator cannot seek relief under the FCA against Northrop Grumman for the alleged retaliation.

---

[7] Notably, as the initial Complaint was filed on April 8, 2014, all claims prior to April 8, 2008 are barred by the statute of limitations. 31 U.S.C § 3731(b).

Courts have repeatedly interpreted the phrase "[a]ny employee, contractor, or agent" strictly and literally, and have declined opportunities to expand the FCA's protections to those without an employment, contractual, or agency relationship with the alleged employer.[8] For instance, in *United States ex rel. Abou-Hussein v. Science Applications International Corp.* ("*SAIC*"), No. 2:09-1858-RMG, 2012 WL 6892716 (D.S.C. May 3, 2012), *aff'd*, 473 F. App'x 851 (4th Cir. 2012), the court refused to find an employment, contractual, or agency relationship between relator and government contractors where the contractors (SAIC and Sentek) were alleged to have acted "through" relator's actual employer (the U.S. Government). Similarly, in *Vander Boegh v. EnergySolutions, Inc.*, 772 F.3d 1056 (6th Cir. 2014), the court drew on a large body of "case law and legislative history" and refused to read § 3730(h) broadly enough that it encompassed applicants. *Id.* at 1062-63 (citing *Mruz v. Caring, Inc.*, 991 F. Supp. 701, 708-09 (D.N.J. 1998)) (limiting "employee" to the "employment relationship" under the plain language; *United States ex rel. Morgan v. Sci. Applications Int'l Co.*, 604 F. Supp. 2d 245, 250 (D.D.C. 2009) (observing that liability does not extend to non-employers).

In analogous contexts where courts have allowed retaliation claims to go forward against non-traditional employers, the court has examined closely the employer/employee relationship. For instance, in *EEOC v. Skanska USA Building, Inc.*, 550 F. App'x 253, 256 (6th Cir. 2013), the court required a careful analysis of the essential attributes of the complainant's relationship with the alleged employer ("Entities are joint employers if they 'share or co-determine those matters

---

[8] The words "contractor" and "agent" were recently added to this provision to "correct a loophole" and "assist individuals who are not technically employees within the typical employer/employee relationship, *but nonetheless have a contractual or agent relationship with an employer*." S. Rep. No. 110-507, 110th Cong., 2d Session (Sept. 25, 2008) (emphasis added). Both cases discussed herein (*Science Applications Int'l Corp.* and *EnergySolutions*) post-date this amendment, and both hold that the amendment should not affect a strict reading of the provision.

governing essential terms and conditions of employment.' . . . To determine whether an entity is the plaintiff's joint employer, we look to an entity's ability to hire, fire or discipline employees, affect their compensation and benefits, and direct and supervise their performance.").

Given this interpretation of the FCA's retaliation provision and the presumption against implying an employer-employee relationship in other contexts, it would be improper to now expand the scope of § 3730(h) to allow a claim brought by a subcontractor's employee to go forward against a prime contractor where Relator has not alleged a direct employment or agency relationship with that prime contractor. Relator was not an employee, agent, or independent contractor of Northrop Grumman. Relator's statement that "For purposes of 31 U.S.C. § 3730(h)(1), Relator was a contractor of Northrop," FAC ¶ 464, is a legal conclusion offered without any supporting analysis or evidence. Indeed, all of the allegations offered by Relator are inconsistent with a finding that such a relationship existed. Relator does not allege that he entered into an employment, contractual, or agent relationship with Northrop Grumman at any time. Relator was hired by DynCorp, paid by DynCorp, trained by DynCorp, and reported to DynCorp, and does not claim that Northrop Grumman was privy to his instruction. *Id.* ¶¶ 20, 85-87.

Moreover, Relator does not allege facts that would permit the conclusion that Northrop Grumman controlled the "essential terms and conditions" of Relator's employment in such a way as to transform Relator into Northrop Grumman's employee. The very details that Relator recounts of the alleged retaliation confirm that there was no employee, agent, or contractual relationship between Relator and Northrop Grumman. All of Relator's alleged discussions regarding his employment, its terms, and potential future jobs occurred with DynCorp personnel. *See, e.g.*, *id.* ¶ 401 (recounting alleged communications with Mr. Rauer, VP of DynCorp Military

Aviation, and Mr. Fisher, DynCorp CNTPO Project Manager); *id.* ¶ 417 (recounting alleged

communications with Mr. Fisher); *id.* ¶ 418 (recounting alleged communications with Mr.

Fisher); *id.* ¶ 422 (recounting alleged communications with Mr. Fisher); *id.* ¶ 435 (recounting

alleged communications with Mr. Fisher regarding Mr. Rauer); *id.* ¶ 436 (recounting alleged

communications with Mr. Rauer, Mr. Myles, Senior VP of DynCorp Aviation, and Mr. Fatum,

DynCorp VP of Human Resources); and *id.* ¶ 437 (recounting alleged communications with

unnamed DynCorp recruiters).

This Court should decline Relator's invitation to broadly and unnecessarily expand the

scope of FCA's retaliation provision beyond "employee[s], contractor[s], or agent[s]" and

dismiss Count III.

## IV.     Count V Fails to Satisfy the Requirements of FRCP 12(b)(6) Insofar as It Does Not State a Valid Claim for Relief that Northrop Grumman Committed Tortious Interference with Relator's Relationship with DynCorp

Count V of the FAC—that Northrop Grumman tortiously interfered with Relator's

employment relationship—fails to state a valid claim for relief under Virginia law. Under

Virginia law, tortious interference with contract is comprised of the following elements: (1) the

existence of a valid contractual relationship or business expectancy, (2) knowledge of the

relationship or expectancy on the part of the interferer, (3) intentional interference inducing or

causing a breach or termination of the relationship or expectancy, and (4) resultant damage to the

party whose relationship or expectancy has been disrupted. *Schaecher v. Bouffault*, 772 S.E.2d

589, 602 (Va. 2015). Where a relator alleges interference with a business expectancy (rather than

an extant contractual relationship), he must also show that the alleged intentional interference

was via "improper methods." *Maximus, Inc. v. Lockheed Info. Mgmt. Sys. Co.*, 493 S.E.2d 375,

378 (Va. 1997).

Here, Relator's employment was not terminated at the direction of Northrop Grumman. Northrop Grumman did not control whether DynCorp renewed Relator's contract. Northrop Grumman's sole involvement was in not renewing DynCorp's contract for the work. Relator fails to set out facts in the FAC that would allow the Court to draw inferences that any of the elements of tortious interference are met. Accordingly, the Court must dismiss Count V as well.

### A.      Relator Does Not Plead Facts Alleging a Valid Contractual Relationship

Although Relator recounts that he "had a valid employment relationship with DynCorp," FAC ¶ 483, and that "Northrop was aware of the employer/employee relationship between DynCorp and Relator," *id.* ¶ 484, the allegations that Relator relies on for the basis of Count V are not consistent with interference with that employment relationship. As Relator himself asserts, Northrop Grumman replaced DynCorp with Honeywell due to DynCorp's performance shortcomings. *Id.* ¶ 429. Relator admits his contract was not thereafter renewed, yet without any factual basis Relator attempts to cast his non-renewal as a termination: in one paragraph he admits "his position had been eliminated" and therefore "his contract was not going to be renewed," *id.* ¶ 422, but in the next alleges Northrop Grumman "directed that DynCorp terminate Relator," *id.* ¶ 423. However, since there was no contract, termination is a logical impossibility.

### B.      There Was No Valid Business Expectancy Under Virginia Law with Which Northrop Grumman Could Have Interfered

Relator has not alleged facts that are consistent with a valid business expectancy under Virginia law. To prove the existence of a business expectancy, Relator "must demonstrate an objective expectation of future business." *Southprint, Inc. v. H3, Inc.*, 208 F. App'x 249, 253 (4th Cir. 2006). In other words, "mere proof of [Relator's] belief and hope that a business relationship will continue is inadequate to sustain the cause of action" because Relator must allege "a probability of future economic benefit, not a mere possibility." *Am. Chiropractic Ass'n v. Trigon*

*Healthcare, Inc.*, 367 F.3d 212, 228 (4th Cir. 2004) (quoting *Commercial Bus. Sys., Inc. v. Halifax Corp.*, 484 S.E.2d 892, 897 (Va. 1997)) (finding lack of evidence of business expectancy in patients continuing to seek treatment with a probability of future economic benefit).

In particular, the failure to renew a contract generally is not viewed as a valid business expectancy in Virginia. In *Saliba v. Exxon Corp.*, the Government hired Saliba pursuant to an agreement that set a fixed term of three months at $12,000 per month, providing no further employment beyond the contract term. 865 F. Supp. 306, 308-09 (W.D. Va. 1994), *aff'd*, 52 F.3d 322 (4th Cir. 1995). The Government did not renew Saliba's contract at the end of the three months. The court found "no evidence of a valid contractual relationship or business expectancy" at the end of the contract term. *Id.* at 311-12. The court reasoned that there was "no evidence as to why the contract was not 'renewed,' nor is there even any evidence of discussions between Saliba and the Government about continuing the relationship beyond the three months." *Id.* at 312.  Thus, "[a]ny further relationship with the Government was terminable at will, or prospective, at best." *Id.* In *Shirvinski v. United States Coast Guard*, plaintiff Shirvinski contended he had a valid business expectancy beyond the expiration of a subcontract term based on testimony that the Coast Guard "contemplated keeping him on the Project." No. 1:09-CV-896 AJT TRJ, 2010 WL 4279254, at *7 (E.D. Va. Oct. 25, 2010), *aff'd*, 673 F.3d 308 (4th Cir. 2012). The court held that this testimony alone was not sufficient to create "the requisite certainty required to establish a business expectancy." *Id.*

In short, Virginia courts have held that a valid business expectancy beyond the expiration of a fixed contract must be proven with probability, or certainty, of future economic benefit. Mere possibility that the employment relationship will continue beyond the term of the contract is not sufficient to support a finding of a business expectancy.

Relator relies on a series of vaguely positive oral statements—that Relator was "golden" and "did not need to 'worry,'" FAC ¶ 418—to ask the Court to infer that a forthcoming contract was a certainty, when no such certainty existed. The facts recounted in the FAC are even more damaging to Relator than in *Saliba*, where there was "no evidence as to why the contract was not 'renewed.'" 865 F. Supp. at 312. Here, as described in the FAC at ¶¶ 418-423, the evidence is consistent with Northrop Grumman recognizing a problem and bringing in a new subcontractor to assist with correcting performance, thus obviating Relator's position. As in *Shirvinski*, vague consideration that Relator might be retained beyond the contract term is insufficient to create "the requisite certainty required to establish a business expectancy." 2010 WL 4279254, at *7.

### C. Relator Does Not Allege Facts Consistent with Intentional Interference By Improper Methods

Under Virginia law, if the alleged intentional interference is with an at will contract or business expectancy, the interference must have been via "improper methods." *Maximus*, 493 S.E.2d at 378. Improper methods are those means that are "inherently illegal or tortious." *Id.* at 414. Nowhere in Relator's FAC do facts consistent with such an allegation emerge.

As an initial matter, Relator presents no direct evidence that Northrop Grumman played any role in DynCorp's non-renewal decision. Instead, Relator's allegations are third-hand accounts of conversations for which he presents no other support. Relator alleges that Mr. Fisher, DynCorp CNTPO Project Manager, related to him that Northrop Grumman directed DynCorp to "terminate" Relator. FAC ¶ 423. Relator presents no support, however, for the proposition that any Northrop Grumman employee actually made this statement. *Id.* Even assuming that such a conversation did take place—that a Northrop Grumman employee directed DynCorp not to renew Relator's contract—such an action would at most amount to a "refusal to deal"—a

situation notably excluded from tortious interference. Restatement (Second) of Torts § 766, cmt.

b (1979) (noting that the cause of action does not apply to a "mere refusal to deal").[9]

If alleging interference with an at will contract or business expectancy, a plaintiff must

allege "improper methods" under Virginia law:

> Methods of interference considered improper are those means that are illegal or independently tortious, such as violations of statutes, regulations, or recognized common-law rules. Improper methods may include violence, threats or intimidation, bribery, unfounded litigation, fraud, misrepresentation or deceit, defamation, duress, undue influence, misuse of inside or confidential information, or breach of a fiduciary relationship....  Methods also may be improper because they violate an established standard of a trade or profession, or involve unethical conduct. Sharp dealing, overreaching, or unfair competition may also constitute improper methods."

*Lewis-Gale Med. Ctr., LLC v. Alldredge*, 710 S.E.2d 716, 721 (Va. 2011).

Here, at best, Relator rests his "improper methods" allegation solely on the supposed

retaliatory aspect of Northrop Grumman's actions under the FCA. FAC ¶ 423. As described

above, these allegations are without merit. Under Virginia law, when a defendant is "engaged in

the lawful exercise of [its] statutory and contractual rights which incidentally may have

interfered with the [plaintiff's] private negotiations[, such conduct] is not actionable and will not

support recovery for tortious interference with contractual relations." *Priority Auto Grp., Inc. v.

Ford Motor Co.*, 757 F.3d 137, 144 (4th Cir. 2014) (internal citation omitted) (alterations in

original) (dismissing interference by improper methods where the defendant's actions were "no

more wrongful conduct than [defendant] exercising its right of first refusal"). Northrop

Grumman had a right to replace DynCorp based on its poor performance. FAC ¶ 401. Such

lawful action cannot form the basis of an "improper methods" argument under Virginia law.

---

[9] Virginia courts follow the law as stated in § 766, *see, e.g.*, *Chaves v. Johnson*, 335 S.E.2d 97, 102-03 (1985); and *Maximus, Inc. v. Lockheed Info. Mgmt. Sys. Co.*, 493 S.E.2d 375, 378 (1997).

Relator has not alleged any activity consistent with the Virginia tort of intentional interference. Relator's argument is not logically consistent with intentional interference with an existing business relationship. And even taking Relator's FAC in the light most favorable to him, Relator cannot make out a claim for intentional interference in a valid business expectancy because he alleged neither a legally valid expectancy nor intentional interference via improper methods. Accordingly, Count V must be dismissed for failure to state a claim upon which relief can be granted.

## CONCLUSION

For the reasons set forth above, defendant Northrop Grumman Corporation respectfully requests the Court dismiss with prejudice Counts I, III, and V of Relator's First Amended Complaint because the alleged facts are inconsistent with liability under the FCA and, thus, a further amendment of the complaint would be futile.

Respectfully submitted,

   /s/ *Anne B. Perry*

**Anne B. Perry (D.C. Bar No. 447930)**
**Jonathan S. Aronie (D.C. Bar No. 443151)**
**Ryan E. Roberts (D.C. Bar No. 1002825)**
**SHEPPARD MULLIN RICHTER &**
**HAMPTON**
**2099 Pennsylvania Ave., NW, Suite 100**
**Washington, DC 20006-6081**
**Tel. (202) 747-1900**
**Fax (202) 747-1901**
**aperry@sheppardmullin.com**
**jaronie@sheppardmullin.com**
**reroberts@sheppardmullin.com**

**Jamie S. Gorelick (D.C. Bar No. 913384)**
**Madhu Chugh (D.C. Bar No. 992122)**
**WILMER CUTLER PICKERING HALE**
**AND DORR LLP**

**1875 Pennsylvania Avenue NW**
**Washington, DC 20006**
**Tel. (202) 663-6000**
**Fax  (202) 663-6363**
**Jamie.Gorelick@wilmerhale.com**
**Madhu.Chugh@wilmerhale.com**

*Attorneys for Northrop Grumman Corporation*

Dated: February 6, 2017

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on February 6, 2017, the foregoing Motion, Memorandum, and proposed Order, which was filed through the ECF system, will be sent electronically to the following attorneys for Relator.

**Avi Lev Kumin**
KATZ, MARSHALL & BANKS, LLP
1718 Connecticut Avenue, NW
Sixth Floor
Washington, DC 20009
(202) 299-1140
Fax: (202) 299-1148
Email: kumin@kmblegal.com

**David Henry Thompson**
COOPER & KIRK, PLLC
1523 New Hampshire Ave, NW
Washington, DC 20036
(202) 220-9600
Fax: (202) 220-9601
Email: dthompson@cooperkirk.com

**Charles Justin Cooper**
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, NW
Washington, DC 20036
(202) 220-9660
Fax: (202) 220-9601
Email: ccooper@cooperkirk.com

**Harold Smith Reeves**
COOPER & KIRK, PLLC
1523 New Hampshire Ave, NW
Washington, DC 20036
(202) 220-9600
Fax: 202-393-5719
Email: hreeves@cooperkirk.com

**Colette Gianna Matzzie**
PHILLIPS & COHEN, LLP
2000 Massachusetts Avenue, NW
1st Floor
Washington, DC 20036
(202) 833-4567
Fax: (202) 833-1815
Email: cmatzzie@phillipsandcohen.com

**Vincent John Colatriano**
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, DC 20036
(202) 220-9600
Fax: (202) 220-9601
Email: vcolatriano@cooperkirk.com

/s/ Anne B. Perry
**Anne B. Perry (D.C. Bar No. 447930)**
**SHEPPARD MULLIN RICHTER &**
**HAMPTON**
**2099 Pennsylvania Ave., NW, Suite 100**
**Washington, DC 20006-6081**
**Tel. (202) 747-1900**
**Fax (202) 747-1901**
**aperry@sheppardmullin.com**