IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


FRED MAXEY CLONINGER            )
U.S.A. EX REL.,                 )
                                )
        Plaintiff,              )       CV No. 14-581
                                )
                                )       Washington, D.C.
        vs.                     )       August 2, 2017
                                )       3:00 p.m.
DYNCORP INTERNATIONAL, INC.,    )
ET AL.,                         )
                                )
        Defendants.             )
_____)


TRANSCRIPT OF ORAL ARGUMENT
BEFORE THE HONORABLE RICHARD J. LEON
UNITED STATES SENIOR DISTRICT JUDGE


APPEARANCES:

For the Plaintiffs:         Charles J. Cooper
                            Vincent J. Colatriano
                            Harold Reeves
                            David Thompson
                            COOPER & KIRK, PLLC
                            1523 New Hampshire Avenue, NW
                            Washington, D.C. 20036
                            (202) 220-9660
                            ccooper@cooperkirk.com

                            Colette Gianna Matzzie
                            PHILLIPS & COHEN LLP
                            2000 Massachusetts Avenue, NW
                            Washington, D.C. 20036
                            (202) 833-4567
                            cmatzzie@phillipsandcohen.com

APPEARANCES CONTINUED

For the Plaintiff:              Adam Herzog
                               Avi Lev Kumin
                               KATZ, MARSHALL & BANKS, LLP
                               1718 Connecticut Avenue, NW
                               Sixth Floor
                               Washington, D.C. 20009
                               (202) 299-1140
                               herzog@kmblegal.com

Court Reporter:                William P. Zaremba
                               Registered Merit Reporter
                               Certified Realtime Reporter
                               Official Court Reporter
                               U.S. Courthouse
                               333 Constitution Avenue, NW
                               Room 6511
                               Washington, D.C. 20001
                               (202) 354-3249


Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription

P R O C E E D I N G S

1

2       DEPUTY CLERK:  All rise.  The United States

3  District Court for the District of Columbia is now in

4  session, the Honorable Richard J. Leon presiding.  God save

5  the United States and this Honorable Court.  Please be

6  seated and come to order.

7           Your Honor, calling Civil Case No. 14-581, Fred

8  Maxey Cloninger versus DynCorp International, Inc., et al.

9           Will counsel for the parties please approach the

10  lectern and identify yourself for the record and the party

11  or parties that you represent, please.

12           MR. COOPER:  Good afternoon, Judge Leon.

13  Chuck Cooper with Cooper and Kirk.  I represent the relator

14  in this False Claims Act case, Mr. Max Cloninger.

15           If the Court would like, I'll introduce my

16  colleagues as well.

17           THE COURT:  Uh-huh.

18           MR. COOPER:  Yes.

19           With me from my law firm, Cooper and Kirk, is

20  Vince Colatriano, Harold Reeves, David Thompson.

21           THE COURT:  I've seen him before.

22           MR. COOPER:  And our friends and colleagues from

23  the Phillips and Cohen firm, Colette Matzzie, Adam Herzog,

24  and Avi Kumin.

25           THE COURT:  Welcome.

1          MR. COOPER:  And Mr. Cloninger is in the

2    courtroom, and if the Court pleases, I'd like to introduce

3    him as well.

4          THE COURT:  Sure.

5          MR. COOPER:  Mr. Cloninger?

6          THE COURT:  Welcome.

7          MR. COOPER:  One other thing, if I may.

8    Plaintiff's side would like to divide its argument, with the

9    Court's permission, and Mr. Colatriano would present our

10   argument on the substantive False Claims Act matters, and

11   Mr. Kumin on the retaliation claim.

12         THE COURT:  Well, you'll have a half hour, that's

13   all you'll have.  You can divide it as you see fit.

14         MR. COOPER:  Very well.  Thank you, Your Honor.

15         MR. ROMAN:  Good afternoon, Your Honor.

16         Steve Roman from the law firm of Blank Rome

17   representing DynCorp International, LLC, DynCorp

18   International, Inc., and Delta Tucker Holdings, along with

19   my colleagues, David Nadler and Lyndsay Gorton of the Blank

20   Rome firm.

21         THE COURT:  Welcome.

22         MS. PERRY:  Good afternoon, Your Honor.  My name

23   is Anne Perry, and I'm with the law firm of Sheppard Mullin,

24   and we represent Northrop Grumman.

25         And with me I have my colleagues from my office,

1    Ryan Roberts, Ariel Debin, and co-counsel Madhu Chugh from

2    Wilmer Hale, and a representative from -- and a

3    representative, Melissa Cox, counsel from Northrop Grumman.

4            THE COURT:  Welcome.

5            All right, Counsel.  We'll hear from the moving

6    parties first.  Northrop Grumman will have 15 minutes.

7    DynCorp will have 15 minutes.  But they can have five

8    minutes each on rebuttal at the end.

9            The plaintiffs will be a half an hour total.

10           So we'll hear from Northrop Grumman first.

11           MS. PERRY:  Your Honor, may it please the Court.

12           This case is about DynCorp performing its property

13   management responsibilities in an allegedly substandard

14   manner under a subcontract to Northrop Grumman.

15           It is brought by a former DynCorp employee, whose

16   employment contract with DynCorp was not renewed.

17           Northrop Grumman was the prime contractor with the

18   United States Government under a contract to provide

19   aircraft maintenance, flight support training,

20   counternarcotic operation support in bases, various bases in

21   Afghanistan, military bases.

22           Although the vast majority of the allegations in

23   the amended complaint concern the conduct of DynCorp,

24   relator includes three counts against Northrop Grumman.

25           These counts, Count 1, raises five False Claims

1    Act allegations allegedly committed by Northrop Grumman.

2    Count 3 alleges that Northrop Grumman retaliated against the

3    relator under the Whistleblower Protection.  And Count 5

4    alleges that Northrop Grumman created tortious interference

5    under Virginia law.

6           Northrop Grumman respectfully requests that the

7    Court dismiss all three counts against Northrop Grumman with

8    prejudice.

9           It's important to frame the motion based on the

10   principal facts alleged in the first amended complaint

11   against Northrop Grumman.  And it's especially important

12   here because, in the opposition, there are references to

13   allegations that really relate only to DynCorp conduct, but

14   are attributed also to Northrop Grumman and a conundrum of

15   defendants.

16          So generally, what the first amended complaint

17   alleges is that Northrop Grumman issued a subcontract to

18   DynCorp that contained very specific requirements that it

19   comply with the property management obligations, and it

20   awarded this contract to a company that had a

21   government-certified software property management system

22   that was compliant with applicable regulations.

23          It acknowledges that Northrop Grumman did not have

24   access to this proprietary system, which is called DynMRO,

25   because it is proprietary.

1          And while one could argue that Northrop could

2     therefore rely on this government-certified system in order

3     to ensure that it had a subcontract to perform well, it also

4     alleges that Northrop Grumman did, in fact, ask for

5     artifacts printed out of DynMRO, like the property book,

6     which is alleged in the complaint as a simple printout that

7     takes a few minutes to do.

8          It also had other property management oversight

9     that it conducted over DynCorp.

10         The complaint alleges, however, that

11    notwithstanding its government-certified system, DynCorp

12    didn't perform the obligations under the contract in

13    accordance with the manner that relator believes should have

14    been done.

15         And it also alleges that DynCorp committed

16    falsifications within that proprietary system, right, the

17    system to which Northrop didn't have access, but they

18    falsified, allegedly, certain records.

19         It acknowledges, however, that when Northrop

20    Grumman learned through its management of DynCorp, that

21    there were problems, Northrop took remedial action, a whole

22    series of remedial actions.

23         It also alleges that when it was undertaking these

24    remedial actions, DynCorp declined to allow the costs to be

25    passed on to the United States Government.

1    It further acknowledges that the remedial actions

2  consisted not only of seeking DynCorp to perform its

3  property management functions and to fix the problems that

4  it identified, but that it also undertook its own analysis,

5  certainly analyses, to determine just the extent to which

6  there may be problems in the property management.

7    One of these was what the relator refers to

8  sometimes as the "Munger inventory," and another as a

9  "whitewash inventory."  This inventory, Mr. Munger was an

10  employee of Northrop Grumman.  And this was in a physical

11  inventory that Mr. Munger asked to be performed once it

12  learned that there were problems.

13    Now, the relator has a whole series of allegations

14  on other inventories that were done, basically alleging that

15  a physical inventory isn't the proper way to do an

16  inventory; and that if you don't have a good system and you

17  don't know exactly what you're looking for, it's going to

18  serve to conceal.

19    But there's nothing in the allegations to connect

20  either the inventories to a claim for payment or, to

21  Northrop Grumman's knowledge, that a physical inventory,

22  which is how normal inventories are done, laying your eyes

23  on the property, versus the records that you have.  That

24  would identify, under normal circumstances, property that

25  was lost, property that was, perhaps, in the wrong place.

1    And so that's not an unreasonable way to conduct an

2    inventory.

3           Relator disagrees and thinks that there's another

4    way, but it cited no particular regulatory regime that would

5    require something other than a physical inventory, or that

6    would render it anything, even if it wasn't perfect, somehow

7    indicative of fraud, rather than just someone trying to

8    remedy the problem.

9           It also alleges, Your Honor, that the contract

10   required the development of a management information system

11   called an MIS in the complaint.  And it alleges that one of

12   the false schemes was that this particular module on this

13   system was never turned on, notwithstanding the fact that

14   they have charged the contract.

15          But what the amended complaint also alleges is

16   that DynCorp spent about $5 million developing this, right?

17   So if those costs were charged, they were actual costs.

18          It alleges Northrop Grumman had a

19   cost-reimbursement contract.  So costs that were incurred

20   would be paid by the government, as long as reasonable,

21   allocable, and allowable.

22          The only thing that it alleges with regard to the

23   MIS is that a particular module wasn't turned on.  But it

24   doesn't allege that it ever put their billings -- that for

25   labor hours that weren't used in development or in any use

1    of the system.

2           Moreover, the amended complaint affirmatively

3    alleges a multitude of facts showing that Northrop Grumman

4    wasn't concealing DynCorp's poor performance from the

5    government.

6           And the fact that the government knew that there

7    were performances issues leaps off the pages of the

8    complaint.  It alleges that the government was telling the

9    parties how to curtail the theft of fuel; it knew that

10   certain items weren't being delivered; in fact, covered when

11   it went to buy its own avionics test sets and the like.

12          It further alleges that, ultimately, Northrop

13   Grumman replaced DynCorp, because it felt it couldn't get

14   compliant performance.  And it brought in a third party,

15   Honeywell, into Afghanistan.  So obviously, with government

16   approval.  Contractors aren't allowed to bring people into

17   Afghanistan onto military bases without it.

18          And then it -- again, the allegations regarding

19   the bringing of Honeywell is that Honeywell did what's

20   called the floor-to-ceiling inventory, which, again, is

21   physical inventory, which, again, is claimed to be

22   indicative of fraud, because it's alleged that that's not

23   the way they should have done an inventory.

24          But, again, a disagreement on the manner in which

25   one would conduct an inventory, at most, states a

1   breach-of-contract claim and not some kind of intent to

2   conceal.

3          If you look at the allegations when you pull them

4   out just about Northrop Grumman, it actually reads as if it

5   is pleading the defense of Northrop Grumman from alleged

6   fraud by its subcontractor.  And, in fact, the facts

7   contradict any claim, any reasonable inference of a claim of

8   fraud by Northrop Grumman, which is why we believe that the

9   facts dictate dismissal, and dismissal with prejudice.

10         We move to dismiss under Count 1 with prejudice,

11  because we believe it fails to satisfy any of the three

12  requirements.

13         With regard to Federal Rule of Civil Procedure

14  8(a) and 12(b)6, the complaint does not state a claim upon

15  which the relief can be granted, because the amended

16  complaint affirmatively negates essential elements of the

17  claim.  This isn't our argument.  This is the plain language

18  out of the complaint.  Haven't introduced anything new, just

19  the allegations in the complaint.

20         So aside from the legal conclusions in the

21  complaint, the allegations regarding Northrop Grumman's

22  conduct are inconsistent with showing that Northrop acted

23  with any knowledge, deliberate ignorance, or reckless

24  disregard of any wrongdoing.  I mean, the only -- the

25  closest thing they have to wrongdoing is alleged

1    falsification of records in DynMRO, a system to which it did

2    not have access.

3            It also acknowledges, as I briefly mentioned, that

4    once Northrop learned, it took remedial actions.  And while

5    one might not agree with all the remedial actions they

6    undertook, it's not irrational that a prime contractor being

7    responsible would do just these types of actions.

8            Further, the complaint doesn't link any actual

9    falsehood to a claim for payment and thus hasn't alleged

10   falsity.

11           In the opposition, relator claims that Northrop

12   violated the False Claims Act under the implied

13   certification theory.  But even under that theory, liability

14   only exists if a claim is not merely a request for payment

15   but also makes specific representations about the goods or

16   services provided.

17           And in the complaint and in the opposition to the

18   motion to dismiss, the relator admits that, in fact, there

19   was no such representation, because all Northrop Grumman did

20   was submit an invoice detailing the cost that it incurred,

21   backup for those costs, and then the government would pay

22   those costs with a reasonable fee.

23           There's no allegation that in a laundry list of

24   obligations Northrop had to do under the contract, which

25   included the operations and the maintenance, that it had to

1   make any specific representations about how many people were

2   doing what particular type of work, or what particular type

3   of work was done in any particular period of time for an

4   invoice.

5          It also fails to allege that Northrop's actions

6   were material to a government claim.  In fact, the relators

7   offered nothing to overcome the strong presumption that when

8   the government knows about performances problems and yet

9   continues to pay, there's a presumption against materiality.

10          And, again, the amended complaint does not allege

11   that Northrop alleged a violation of a contractual or a

12   regulatory provision, that was an express condition of

13   payment under its cross-reimbursement contract, or that the

14   government routinely fails to pay invoices if

15   property-management services under a large contract aren't

16   performed perfectly.

17          While relator attempts to insert Northrop into

18   DynCorp's alleged fraudulent conduct through various

19   inventories that it did after it learned that DynCorp wasn't

20   performing, relator fails to connect those inventories to

21   any claim for payment.  In fact, with respect to the

22   whitewash inventory, Mr. Munger's inventory, it

23   affirmatively claims it never submitted it to the government

24   and it wasn't relied on for any purpose.

25          We also posit, Your Honor, that the amended

1   complaint fails to state any cause of action for conspiracy,

2   because there is no allegation that there was an agreement

3   to have a false or fraudulent claim allowed or paid.

4        In fact, the allegations reflect Northrop Grumman

5   continuing requiring compliance performance by DynCorp, and

6   the parties continuously disagreeing about how to rectify

7   the property-management issues and who would pay for the

8   remedial actions.

9        The complaint is further deficient under Federal

10  Rule of Civil Procedure Rule 9(b), whether you look at it

11  under the standard typically applied to fraud allegations or

12  under the relaxed-scheme standard that the relator asks to

13  be applied here.

14       It simply fails to identify any particular claims

15  for payment, the amount that is allegedly falsified, whom

16  they were submitted, when they were submitted, what

17  Northrop's involvement was in any particular fraudulent

18  scheme.  Instead, in this case, Your Honor, the complaint

19  continuously describes DynCorp conduct and alleges the

20  falsity to Northrop Grumman as well; it doesn't make any

21  particularized allegations about what was lost.

22       Now, while one might lose the accountability of

23  property at some point in time, that doesn't necessarily

24  mean that the property is lost.

25       With respect to the retaliation claim, Your Honor,

1    under Count 3, we claim it warrants dismissal, because the

2    relator does not allege he was an employee, contractor or

3    agent of Northrop Grumman, or had any employment-like

4    relationship with Northrop Grumman to be entitled to

5    Whistleblower protection.

6            He attempts to create new law in this jurisdiction

7    and expand the scope of the False Claims Act liability to

8    joint employers.

9            And, Your Honor, you need not reach that issue

10   here, because he hasn't even pled sufficient facts, alleging

11   that Northrop Grumman had sufficient control over the terms

12   and conditions of his employment to qualify as a joint

13   employer.

14           Finally, under Count 5, where he alleges tortious

15   interference with contract under Virginia law, the relator

16   fails to allege the requisite elements of that tort against

17   Northrop Grumman as well, because it doesn't allege he had a

18   contract; in fact, it expired by its own terms.  It was

19   simply not renewed.

20           And he doesn't allege sufficient facts to show

21   that he had an objectively reasonable expectation of future

22   employment, because all that's alleged is that he was

23   invited to apply to a series of positions, never a

24   guarantee.

25           And even if he could show that he had some kind of

1  an objective expectation, in those circumstances, Virginia

2  requires that you show that there's some kind of improper

3  method of interference by the company.  In here, all it

4  alleges is that Northrop Grumman remove DynCorp, who relator

5  alleges was not performing well, replace them with the third

6  party, and then DynCorp didn't renew relator's position,

7  presumably because it fell within the work that was being

8  done that they no longer had.

9          Now, Your Honor, we respectfully request --

10         THE COURT:  You have about a minute left.

11         MS. PERRY:  -- that the dismissal be with

12  prejudice, because the relator can't cure the complaint by

13  the mere addition of facts.

14         We understand that under Federal Rule of Civil

15  Procedure 15(a), the Court should freely give leave when the

16  justice so requires.

17         But justice requires the opposite here.  The only

18  cure to the fact is a wholesale repudiation of a litany of

19  allegations that actually negate the liability for Northrop

20  Grumman.

21         While it might be appropriate to allow the relator

22  to amend a complaint to add additional facts, it is

23  inappropriate to allow the relator to tell an entirely new

24  story simply because the facts he's alleged already

25  affirmatively negate his case.  That kind of wholesale

1    revisionism would affect nothing more than a waste of this

2    Court's and Northrop Grumman's resources.

3            Thank you very much.

4            THE COURT:  Thank you.

5            MR. ROMAN:  Good afternoon, Your Honor.

6            THE COURT:  Good afternoon.

7            MR. ROMAN:  Before I begin, I should mention that

8    I do represent three DynCorp entities.  The relators has

9    agreed that two of them should be dismissed; that is,

10   DynCorp International, Inc., and Delta Tucker Holdings.  So

11   I would ask the Court to incorporate that into whatever

12   ruling it resolves the motions to dismiss with.

13           In this case, the Court has before it a very hefty

14   complaint, a complaint which the United States declined to

15   join, which takes five separate FCA violations and shoe

16   horns them into a single count.  It then uses 100 pages of

17   allegations and says that these allegations, in total,

18   support these separate claims for relief.

19           The complaint makes it all the more difficult to

20   find out which allegations support which claims for relief,

21   because it cites to provisions, regulations of the Federal

22   Acquisition Regulation and the Defense Federal Acquisition

23   Regulation Supplement, as well as ITAR Regulations.  But it

24   doesn't tie those into specific factual allegations or

25   claims for relief.

1    When the Courts have had this kind of situation,

2    they haven't hesitated to say that the complaint is a

3    shotgun plea.  It may be well-worded, but it's still a

4    shotgun pleading.

5         And the reason those pleadings aren't favored and

6    the reason relators aren't required to replead, is it puts

7    an onerous burden, not only on the defendants, but on the

8    Court, to say which allegations are sufficient to which

9    particular FCA claim for relief, because, quite

10   respectfully, Your Honor, that is your job, to measure the

11   complaint.  And you need to take the allegations, you need

12   to compare them against the specific claim for relief.  And

13   if you don't know which allegations go with which, it makes

14   it extremely difficult.

15        That's what the Court faced in *Lumberman's*, which

16   we cited.  That's what the Court faced a few months ago in

17   *Jiggetts*, where the Court had what it referred to as a

18   complaint which made it nearly impossible to know which

19   allegations go with which claims for relief.  That's the

20   burden on a plaintiff, that's the burden on a relator, and,

21   quite frankly, they haven't met that burden here.

22        Let me give you some examples of what I'm talking

23   about.  The relator devotes about 30 paragraphs in the

24   complaint, 30 paragraphs, to a gentleman named Randy Munger,

25   who's a Senior Northrop Grumman Official, and the inventory

1   that he tried to put together of property.  He led the

2   effort.

3           The relator refers to it as the Munger inventory.

4   And he says, the Munger inventory was a whitewash that was

5   designed to hide problems in property management, was

6   designed to hide things from the government.

7           While he has 30 paragraphs on the Munger

8   inventory, the whitewash, nowhere does he say what those

9   allegations mean in terms of a claim for relief under the

10  False Claims Act.

11          So, for example, we don't know, but, perhaps, he's

12  saying the Munger inventory represent a false claim for

13  presentment, a presented claim to the government.

14          Well, if that's his theory, that fails, because

15  there was no claim for payment presented in connection with

16  the Munger inventory, and the relator doesn't even say there

17  was.

18          So was the Munger inventory a violation of the

19  false records and statements prong of the FCA?  We don't

20  know if that's a theory, but we know that can't work,

21  because the Munger inventory resulted in no records or

22  statement going to the government.  It wasn't even finished.

23  The government couldn't have relied on it, because there's

24  no allegation that they ever saw any part of it.

25          Well, is the Munger inventory and the allegations

1  related to it, is that part of the FCA conversion claim or

2  the FCA Reverse False Claims case?  We don't know.  But if

3  so, the relator has certainly failed to allege that the

4  Munger inventory, which, again, wasn't completed, was used

5  to convert property or was used to reduce an obligation to

6  the government.

7        This is the situation we're in, trying to take all

8  of these allegations, marry them up, and seeing if they're

9  sufficient.

10       Let me give you one more example.  Push pack, the

11  complaint is long, it says millions and millions, I think

12  hundreds of millions are even alleged as missing.  But very

13  few specific examples are given of actual property that was

14  missing.

15       Now, one of those examples are these push packs,

16  four big containers of property used to set up an air base.

17  These are the relators's big-ticket items.  He says they

18  were worth 4- to $5 million each.  So how do the push packs

19  fit into these five combined FCA claims for relief?  The

20  complaint doesn't say, so we have to measure them against

21  all of them.

22       Is there a presentment claim on the push packs?

23  No.  DynCorp didn't buy the push packs; it didn't submit a

24  bill for them.  DynCorp received them from Northrop Grumman.

25  Northrop Grumman received them from another contractor.

1    There was no presentment claim.  The defendant alleges no

2    false records or statements related to the push pack.

3            And there's no argument, no real issue about

4    either a conversion or a Reverse False Claim.  The most the

5    complaint alleges is that items were taken out of the push

6    packs and used for the benefit of the government on the

7    CNTPO program.  That's not conversion and that's not

8    reduction of a liability to the government, which would

9    support a Reverse False Claim.

10           I give these two examples, the Munger and the

11   Toray, the push packs, together, they're almost 60

12   paragraphs of the complaint, and yet we don't know why the

13   defendant is using them -- excuse me, the relator is using

14   them for which particular claim for relief.

15           And if there isn't a valid reason to use them, if

16   they don't support a claim for relief, they should be thrown

17   out of the case so we don't proceed on expensive discovery

18   as to issues which can't state a valid claim.

19           Now, the defendants -- excuse me, the relators's

20   shotgun complaint and the pleading deficiencies in it is

21   compounded by the fact that the relator never takes the step

22   of connecting what he alleges is fraudulent activity with

23   claims for payment.  That is the essence of a False Claims

24   Act case.

25           And I think it was Judge Lamberth who said you

1    can't simply allege that there's foul or fraudulent conduct

2    afoot, you have to tie that conduct into a specific claim

3    for payment or a specific obligation.  And if you don't, it

4    doesn't matter how much fraud was out there.

5          And that's where the complaint falls down.  It

6    alleges lots of property in this matter and some very

7    limited and some specific items of deliberative falsehoods.

8    But it never ties those claims to a payment.  That's what it

9    needs to do if it's going to survive the motions to dismiss.

10          I want to turn to one of the issues that the

11   relator uses to try to get out from all of this, and that is

12   to argue that they're pleading by schemes; that because

13   they're pleading by schemes, there is a reduced obligation

14   to state the who, what, where, when, and why of the False

15   Claims Act, and we submit to you there is no such scheme

16   exception.

17          In fact, in the case that they cite for that

18   exception, the *Bernad* case in this Court, I believe it was

19   Judge Urbina, noted that there were schemes that were

20   alleged, but he noted, in particular, that those schemes

21   were linked to payments; and, indeed, in that case, there

22   were a dozen representative, specific payments that show

23   that the services that were billed for was not what was

24   being provided for.

25          The relator cannot get around what it needs to

1  plea so that we can prepare a defense, if necessary, simply

2  by going and arguing that schemes excuse as the problems in

3  the complaint.

4         I'd like to turn quickly, if I could, to some of

5  the more specific pleading deficiencies that we've noted in

6  the complaint.  I've talked about the general ones, the

7  shotgun pleading, the failure of particulars required under

8  9(b), which is an excuse by the pleading by schemes.

9         There are a couple of specific things I want to

10  draw your attention to.  One of them is that the entire

11  complaint, the FCA part, seems to be based on DynCorp's

12  violation of certain FAR and DFARS provisions and its

13  implied certification that it was in compliance with those

14  provisions.

15         And we've explained, in our papers, why those

16  provisions aren't even part of the contract.  They don't

17  appear in the contract, which is attached to our motion in

18  which the relator does not object to your consideration now.

19  There simply isn't a contractual basis for the contractual

20  claims they make.

21         And if those foreign provisions aren't in the

22  contract, and they're not, they don't even have a

23  breach-of-contract case against us, much less a False Claims

24  base on an implied certification of compliance with the

25  contract.

1          I also want to note, as we do in our papers, that

2     any presentment claim must be based on an objective

3     falsehood.  And that's a critical requirement, because,

4     without an objective falsehood, the fundamental distinction

5     between actions for fraud and breach of contract are

6     rendered meaningless.  And the issue of whether DynCorp did

7     enough, did the right things on its property management

8     function and did enough to try to correct issues is a very

9     subjective thing.

10          Now, the relator, obviously, believes DynCorp

11     didn't do enough.  But there is no clear line between what

12     is enough and what isn't enough in a property management

13     function to characterize it as an objective falsehood.

14          And as Judge Wilkinson said in a Fourth Circuit

15     case, it's not exactly clear what would have been enough for

16     a defendant to do; and in that case, there can't be an

17     objective falsehood.

18          With respect to the false records or statement

19     claims that are made, which is the second part of the

20     five-part Count 1, the relator makes very few efforts to

21     actually allege a statement or the creation of a record that

22     went to the government that could serve as a basis for False

23     Claims.  We've pointed out those examples in our papers.

24     And without that link, without the "to the government" part

25     of it, there can be no false records or statements case.

1           With respect to FCA conversion, we've noted that

2    all of the -- as best we can tell, whatever property he

3    thinks was converted, and since the complaint doesn't say,

4    we've tried to guess as to which property he's talking

5    about, none of that property was converted by DynCorp.  In

6    fact, most of it wasn't even to be delivered to the

7    government, it was to be delivered to the program itself, to

8    be used by DynCorp or Northrop Grumman rather than the

9    government, and that's an important distinction in a

10   conversion claim.

11          And then finally under the Reverse False Claims,

12   their primary argument is that DynCorp was immediately

13   obligated to pay the government back for any lost, stolen,

14   or destroyed property.  And because DynCorp didn't pay that

15   obligation, there is a Reverse False Claim.

16          That's not how government contracting works.  If a

17   government contractor loses property or it's destroyed or

18   it's stolen, the contractor isn't automatically responsible

19   for that property.  The contractor needs to fill out a form,

20   which DynCorp did.

21          And it's only when the contracting officer says,

22   I am not excusing you from the loss because of willful

23   misconduct or bad faith and you're going to have to pay it,

24   unless and until the government contracting officer says,

25   you have to pay for the property, there's no liability, and

1   thus, there can be no False Claims.

2           Let me turn briefly to the relator's --

3           THE COURT:  You have one minute left.

4           MR. ROMAN:  -- retaliation counts.

5           The relator's job ended.  It ended through no

6   fault of DynCorp.  The property management function was

7   transferred from DynCorp to another company by Northrop

8   Grumman, relators's position was eliminated, as were many

9   other DynCorp positions related to property management, the

10  relator did not continue in his position because his

11  position no longer existed.

12          Finally, with respect to the Virginia wrongful

13  discharge case, I recommend to the Court to read the *Twigg*

14  *v. Triple Canopy* case we cite from the Eastern District,

15  remarkably similar facts.  The only difference is this

16  conduct of the relator took place in Afghanistan.  In *Triple*

17  *Canopy*, it took place in Iraq.

18          But the Court there said, Virginia doesn't have

19  any jurisdiction over acts in Iraq, much like it doesn't in

20  Afghanistan, and so the relator couldn't be charged with

21  larceny.  And if that's the case, he has no basis to

22  overcome the Virginia at-will employment doctrine.

23  Thank you.

24          THE COURT:  Thank you, Mr. Roman.

25          All right.

1          MR. COLATRIANO:  Good afternoon, Your Honor, may

2     it please the Court.

3          My name is Vince Colatriano for relator.

4          Mr. Kumin and I are going to split up our time,

5     25 minutes for me and five minutes for him to handle the

6     retaliation allegations.

7          THE COURT:  Okay.

8          MR. COLATRIANO:  First of all, let me, at the

9     outset, thank you, Your Honor, for moving the date of this

10    hearing, it was my vacation that you saved --

11         THE COURT:  It's all right.

12         MR. COLATRIANO:  -- when you accommodated that.

13    So we appreciate that very much.

14         THE COURT:  That's fine.

15         MR. COLATRIANO:  We also have a binder that has

16    some slides, if we may approach.  It's really just the

17    statutory language.

18         THE COURT:  It's all right.

19         MR. COLATRIANO:  You don't want it?

20         THE COURT:  I'm old school.

21         MR. COLATRIANO:  Okay.  That's fine.

22         It really just summarizes what's in our brief

23    anyway.

24         The defendants here are seeking to stop, at the

25    outset, a case that raises very serious issues regarding

1   their actions in connection with a critical counterterrorism

2   program, a program under which they were paid hundreds of

3   millions of dollars of taxpayer dollars and were entrusted

4   with hundreds of millions of dollars of government property.

5            And the complaint here presents an incredibly

6   detailed chronological account of the defendants' sustained

7   and often coordinated efforts, over a multiyear period, to

8   obtain money under false pretenses, to avoid paying money

9   owed to the government, and to return government property,

10  to provide misleading information relating to those False

11  Claims, and to conceal information that could have led the

12  government to discover the defendants' wrongdoing.  In those

13  respects, we submit that the complaint outlines and details

14  a number of classic schemes to violate the False Claims Act.

15           Now, defendants do not dispute, for purposes of

16  this motion at least, that their stewardship and management

17  of government property were critical components of their

18  responsibilities under both the prime contract and the

19  subcontract.

20           They do not dispute, at least for purposes of this

21  motion, that they failed miserably in fulfilling those

22  responsibilities.

23           They, indeed, acknowledge very serious problems in

24  their tracking and management of the government property

25  with which they were entrusted.

1          And they do not dispute that they made claims for

2     payment under their contracts, and that those claims for

3     payment were premised upon their provision of property

4     management and inventory management services and their

5     stewardship of government property.

6          Defendants insist that, notwithstanding all of

7     those facts that they don't dispute, that this case cannot

8     proceed and, in fact, must be dismissed with prejudice

9     before it can even get started.  They're wrong about that

10    with respect.

11         And I do think this case has to be assessed in

12    light of the relevant pleading standard, which is Rule 8(a),

13    obviously, Rule 9(b) for certain elements of certain of the

14    claims.

15         And under that pleading standard, as long as there

16    are well-pled factual allegations, this Court must take them

17    to be true.

18         THE COURT:  What about Ms. Perry's contention that

19    there's no linkage between allegations being made and

20    specific claims under the False Claims Act?

21         In essence -- I don't want to put words in her

22    mouth, but the essence of what she was arguing was, look,

23    you're bringing, under five separate theories of the False

24    Claims Act, but you're not -- you're not linking the

25    allegations to the specific theories, so we have no way

1   really to -- she didn't say no way to defend ourselves, but

2   no way to really deal with this complaint in a way that

3   makes it defensible for us.

4           MR. COLATRIANO:  Your Honor, I think those

5   concerns are overblown, at best.

6           This complaint does state claims for False Claims

7   for payment, a number of those, at least four different

8   categories of those.

9           For example, it does allege a scheme by which

10  DynCorp billed Northrop and Northrop billed the government

11  for property-management services that were never provided.

12          Now, defendants say that this is just a

13  contractual issue, where we're fighting about the level of

14  property-management services and that somehow that those

15  were subjective -- that's a subjective issue that can never

16  be the basis of a False Claim.  We respectfully disagree.

17          THE COURT:  So you're alleging never provided at

18  all?

19          MR. COLATRIANO:  Well, in effect, that's right,

20  Your Honor.

21          And there are numerous allegations in the

22  complaint in which Northrop officials and DynCorp officials

23  that there -- had never admitted or acknowledged to relator

24  and to others that there had never been effective property

25  management under this contract; that they had never turned

1   over, for example, this property-management system that they

2   had been developing and had billed the government for years.

3           THE COURT:  So it wasn't like it was a no-show

4   situation, but it was just being very poorly done, you're

5   alleging?

6           MR. COLATRIANO:  Well, it was being --

7           THE COURT:  Inadequately done.

8           MR. COLATRIANO:  I think the complaint has

9   numerous allegations where Northrop and DynCorp officials

10   admit that property manage -- I think one of the quotes is,

11   a DynCorp official admitted there had never been property

12   management under this contract, from the beginning.

13           So they, yes, they had employees who were being

14   billed for property-management services, but the property

15   management was, effectively, non-existent.

16           Now, with respect to one item --

17           THE COURT:  Sounds like GSA.

18           MR. COLATRIANO:  I'm sorry?

19           THE COURT:  Sounds like a GSA operation.

20           MR. COLATRIANO:  I will not comment on that.

21           THE COURT:  I've had to deal with them for 15

22   years.  I can comment.

23           Go ahead.

24           MR. COLATRIANO:  That's your prerogative, and I'll

25   just leave it at that.

1          With respect to one of the items that they were

2    required to provide, this MIS system, property-management

3    system that was designed to track certain

4    government-furnished equipment, millions of dollars of

5    government-furnished equipment.  The Northrop and DynCorp

6    billed the government $500 million, roughly, for that.  It

7    was never turned on.  The complaint alleges, and with facts,

8    that it was essentially scrapped, this system.

9          THE COURT:  Do you allege that the government was

10   never told of this?

11         MR. COLATRIANO:  That's right.

12         THE COURT:  So they billed it, never used it.

13         MR. COLATRIANO:  They billed it, they developed

14   it, some people in DynCorp thought it was being used, but

15   others knew that it was not being used.  And eventually,

16   when -- the complaint alleges, that the system was scrapped,

17   is the word that is used in the complaint.

18         There's -- let me speak for a minute about the

19   implied false certification theory, because that is one of

20   our claims for a False Claim.

21         The first amended complaint alleges that both

22   Northrop and DynCorp were contractually obligated to

23   establish and maintain systems to control, protect, preserve

24   and maintain government property.

25         It alleges that the contract to provide -- that

1    among the services that were critical to the performance of

2    this contract, was logistics.  That logistics included

3    inventory management and property management, and this was a

4    critical contractual term.

5         The complaint also alleges that there are federal

6    regulations that govern property-management issues that

7    applied, but it's not disputed that those regulations apply

8    to the Northrop prime contract.  There is an issue about

9    whether they apply to the DynCorp contract.

10        But even laying that issue aside, the Northrop --

11   the DynCorp subcontract had statements of work that

12   themselves were issued under the contract and that

13   themselves imposed property-management obligations on

14   DynCorp.

15        The complaint alleges that, for the reasons I just

16   discussed, these services were never effectively provided,

17   they were just not provided.  And that every time DynCorp

18   billed Northrop for these services and every time Northrop

19   billed the government for these services, they were asking

20   for payment for contract performance without disclosing that

21   a critical feature of that contract performance wasn't

22   being --

23        THE COURT:  Are you alleging that when DynCorp did

24   that, that Northrop Grumman not only billed it but knew that

25   those services weren't being provided?

1          MR. COLATRIANO:  Yes.

2          It's clear that, as we allege in the complaint,

3    that at least by, in late 2012, Mr. Cloninger heard from

4    DynCorp employees that both Northrop and DynCorp employees

5    knew that these services weren't being effectively

6    proceeded.

7          THE COURT:  They kept billing them.

8          MR. COLATRIANO:  That's right.  That's the

9    allegation, and there's lots of facts to support that

10   allegation.

11         We think that this supports a classic False Claim

12   under both -- especially under the D.C. Circuit's decision

13   in the SAIC case and the Supreme Court's decision in the

14   *Escobar* case from last year.

15         In the SAIC case, the D.C. Circuit held that a

16   complaint for implied false certification is actionable if

17   the plaintiff can show that the contractor withheld

18   information about its non-compliance with material

19   contractual requirements.

20         In *Escobar*, the Supreme Court held that at least

21   in some situation, where contractor omits from its request

22   for payment for services its violations of statutory,

23   contractual, or regulatory requirements, those omissions can

24   be a basis for liability.

25         Now, Northrop contends that, under *Escobar*, there

1   needs to be a specific representation.  That's not -- that's

2   actually not true.

3           And in *Escobar*, the Supreme Court explicitly left

4   that question open.  It noted that it did not need to

5   resolve whether all claims for payment implicitly represent

6   that the billing party is legally entitled to payment.  So

7   *Escobar* left that question open.

8           But SAIC, the D.C. Circuit precedent, which is

9   still good law in this Circuit, did answer that question and

10  said that if you submit a request for payment without

11  disclosing that you haven't complied with the material term,

12  then that's a basis for liability.

13          There's a recent decision by Judge Huvelle in this

14  Court involving DynCorp, and DynCorp performance of a

15  contract in Iraq, not Afghanistan, in which --

16          THE COURT:  Unrelated facts.  So nothing to do

17  with this.

18          MR. COLATRIANO:  Unrelated facts, but the legal

19  analysis is very pertinent.

20          And in that case, the Court noted that, under

21  SEIC, all that you need to show is that the contractor

22  withheld information regarding its non-compliance with

23  contractual or other requirements, and that those

24  requirements were material.

25          THE COURT:  Was that case a case where the Court

1   granted summary judgment or a motion to dismiss?

2           MR. COLATRIANO:  I think it was a case where the

3   Court denied a motion to dismiss.

4           THE COURT:  I see.

5           MR. COLATRIANO:  So a very similar procedural

6   posture to where we are now.

7           THE COURT:  I see.

8           MR. COLATRIANO:  There's another element of that

9   decision that I think is very pertinent, and that has to do

10  with DynCorp's argument that there's no objective falsehood

11  here, this is all about subjective standards about whether

12  they were complying with the contract.

13          I don't think you can read our complaint and come

14  away thinking that we were just quibbling over whether

15  certain performance met certain standards.  The allegations

16  are there was effectively no performance.

17          But leaving that aside, in the other DynCorp case

18  that I mentioned, the contractual perform -- the alleged

19  False Claim was that DynCorp was charging unreasonable rates

20  for hotels, and DynCorp made the same argument, while

21  reasonableness is an inherently subjective term, it's too

22  subjective, you can't make a False Claim out of that, it can

23  only be a breach of contract, and that argument was

24  rejected.

25          By the way, in the SAIC case itself from the

1    D.C. Circuit, the alleged False Claim was that the

2    contractor had provided consulting services without

3    disclosing that it had a conflict of interest.  And, again,

4    the argument was made, well, these conflict-of-interest

5    requirements are too amorphous, they're too subjective to

6    make out a claim for a False Claim.

7          The D.C. Circuit had no problem concluding that

8    even though the governing standard for whether there was a

9    conflict had some elements of imprecision, there was still a

10   False Claim in that case.

11         THE COURT:  Remind me, if you will -- this is a

12   130-page complaint with 488 paragraphs, so I can't just

13   pluck it out of the air, but were there any allegations in

14   there that either DynCorp or Northrop Grumman gave false

15   information in response to government inquiries as to

16   whether or not they had provided the services they had been

17   contracted to provide?

18         MR. COLATRIANO:  There are definitely numerous

19   allegations that, when the government made information

20   requests, including a request for a so-called property book,

21   that what that did was that it kickstarted an effort by both

22   Northrop and DynCorp to falsify information; to come up with

23   a property book that looked compliant so that it wouldn't

24   raise questions.  But that really wasn't compliant because

25   there was no effort to really get to the bottom of the

1   property-management issues and all the lost property.

2           And so that is an example of a false statement

3   that was made that is material to a False Claim.  It's an

4   impeachment to cover up, essentially, the fact that these

5   False Claims were made to prevent the government from

6   discovering them, which, I think, goes to another issue that

7   the defendants raise as well, which is --

8           THE COURT:  Oh, they raised the inventory issue,

9   did they not?

10          MR. COLATRIANO:  They did raise the inventory

11  issue.

12          And if you read the complaint, I don't think you

13  can come away with anything other than a firm view that both

14  Northrop and DynCorp were instructing DynCorp employees to

15  do this inventory in a way in which they were just counting

16  what they could find, and they were making no effort to

17  compare that against a reliable property list, because they

18  hadn't been keeping a reliable property list, essentially.

19          And so that was an inventory that was designed --

20          THE COURT:  Well, that's not even really disputed,

21  is it, that they weren't keeping a contemporaneous property

22  list?

23          MR. COLATRIANO:  Well, I don't want to put words

24  in their mouth.

25          THE COURT:  All right.

1          MR. COLATRIANO:  I'm sure they would dispute that.

2          THE COURT:  I'm sure Ms. Perry will have an

3    opinion on that subject.  Mr. Roman will too.

4          MR. COLATRIANO:  But one thing that I think -- to

5    get back to Your Honor's question about requests from the

6    government for information, Northrop attempts to, and

7    DynCorp to a certain extent, Northrop attempts to use that

8    to show there's no material violation here, because the

9    government had actual knowledge of that there were problems,

10   and they cherry-pick a few allegations in which the

11   contracting agency was raising questions about property

12   issues.

13         But the complaint alleges, time and again, that

14   the government didn't have actual knowledge of the full

15   extent and scope of what was going on here, of all the lost

16   property, of all the property-management deficiencies.

17         There was no actual knowledge of violations here.

18   And so, therefore, they attempt to use that actual knowledge

19   to defeat any type of materiality claim.

20         THE COURT:  You've got about ten minutes.  You

21   were going to leave five for --

22         MR. COLATRIANO:  I'm leaving five.

23         THE COURT:  So you've got five, I think, and he's

24   got five.

25         MR. COLATRIANO:  Thank you.

1          THE COURT:  Yeah.

2          MR. COLATRIANO:  Mr. Roman mentioned that there's

3  an issue about whether these FAR provisions apply to the

4  subcontract, and, as I mentioned, there's no dispute that

5  they apply to the prime contract.

6          THE COURT:  Right.

7          MR. COLATRIANO:  And he argues that, as a result

8  of that issue, the complaint must be dismissed in its

9  entirety, because it's entirely premised on the

10 applicability of certain FAR provisions to the subcontract.

11         There's a reason to doubt, by the way, that there

12 were no FAR provisions applicable to the subcontract.  But

13 for purposes of this motion, we're willing to assume that

14 there was no express incorporation of a FAR property

15 management provision to the subcontract.

16         But it doesn't matter, because for at least four

17 separate reasons, Mr. Roman's claim that our claims are

18 premised upon this incorporation of the FAR provision is

19 incorrect.

20         First, the subcontract, wholly apart from the

21 FAR -- from whether the FAR provision applied, imposed other

22 obligations on DynCorp with respect to property management.

23         There's detailed allegations in the complaint

24 about how the statements of work issued under the task

25 orders under the subcontract imposed obligations on DynCorp

1   with respect to property management that they failed to live

2   up to.

3           Second, DynCorp is liable under the statute, even

4   if the FAR provisions didn't apply to it, for causing

5   Northrop to make False Claims about its compliance with

6   those provisions.

7           Northrop was, to a certain extent, relying on

8   DynCorp to provide these property management services.  And

9   DynCorp and Northrop, everyone concedes, was subject to

10  these FAR provisions.  So under the statute, one can be

11  liable for causing another company to submit a false claim.

12          THE COURT:  What if you had a situation where

13  Northrop Grumman didn't know that it was false, what the

14  subcontractor was claiming would be the appropriate claim to

15  be made?

16          MR. COLATRIANO:  Well, first of all, that's not

17  what we have here.  We've alleged that Northrop did know.

18          THE COURT:  Did know, right.

19          MR. COLATRIANO:  But if they didn't know they were

20  false but DynCorp caused them to make a false claim and

21  DynCorp knowingly did that, then DynCorp is liable under the

22  statute, even if Northrop might not be.

23          THE COURT:  But not Northrop, under that

24  hypothetical.

25          MR. COLATRIANO:  Under that hypothetical.

1          They would -- even wholly apart from these FAR

2     provisions, DynCorp is liable for making false statements

3     that are material to Northrop's false claim.  There were all

4     these false statements, as I mentioned, about an attempt to

5     cover up what was going on.  Those are actionable False

6     Claims.

7          And, by the way, they are linked -- those are

8     actionable false statements, and they are linked to False

9     Claims, because they're an attempt to conceal what had

10    happened, the presentment of these False Claims.

11         Very briefly, I do want to talk about Rule 9(b).

12         THE COURT:  You still have about three minutes.

13         MR. COLATRIANO:  Okay.  Good.

14         We do cite case law in our complaint for the

15    proposition that where there is an extensive-and-complex

16    scheme to commit fraud, you don't need to allege every

17    particular detail of every particular instance of that

18    scheme.

19         With respect, I think we've satisfied that

20    standard here.

21         THE COURT:  Especially pre-discovery.

22         MR. COLATRIANO:  Especially pre-discovery,

23    although there are -- 9(b) is a pre-discovery type of rule,

24    but that's one of the concerns here.

25         And there's also case law, which we cite in the

1    complaint, for the proposition that -- where you allege that

2    you don't have access to all the information that would

3    allow you to provide all the details, that that's a relevant

4    consideration, and we do specifically allege that in the

5    complaint.

6            But this case law does say you need to at least

7    allege the details of the scheme, and our complaint, we

8    submit, does that.  It talks about the time frame where

9    these claims were submitted, essentially, throughout the

10   entirety of the contract.  It talks about the -- as we've

11   discussed, it talks about the nature of these False Claims

12   and the nature of the false statements.

13           There's a legend at the beginning of the complaint

14   identifying 40 different people who are discussed in the

15   complaint, at least 40, and the complaint provides numerous

16   details about what these individuals did, what their role

17   was in the cover-up, in the concealment, and things like

18   that.

19           And so there is -- I'm sure that there is no set

20   of facts that we could plead, no matter how detailed, that

21   will ever satisfy the defendants, but we think that these

22   schemes that we've pled are more than sufficient under

23   Rule 9(b).

24           And, finally, as with respect to the issue of

25   shotgun pleading, we've presented a lengthy chronological

 1    recitation of historical facts.  It shouldn't be too

 2    difficult for the defendants to look at each one of those

 3    and determine, is it true, is it not true, do I not have

 4    enough information to admit or deny it.  It's a historical

 5    description of what happened here.

 6            And these facts are relevant to more than one

 7    theory.  They're relevant to presentment and to False

 8    Claims.  They're relevant to scienter, which is an element

 9    of the False Claims.

10            And, by the way, the Munger inventory, which

11    counsel mentioned, is directly relevant to the scienter

12    issue; it shows the attempt, the knowing attempt to conceal

13    what was happening here.

14            Could the complaint have been organized in a

15    different way?  Yes, I'm sure it could have been organized

16    in a different way.  But the test is whether there's enough

17    substance to these complaints to allow defendants to

18    respond.  We submit that there is.

19            Thank you.

20            THE COURT:  Thank you.

21            MR. KUMIN:  Thank you, Your Honor.  I'll be

22    speaking about the employment law claims.

23            As you know, the complaint -- or, as we allege,

24    the complaint plausibly suggests an entitlement to relief.

25    And as Your Honor has pointed out, especially prediscovery,

1    that's enough on each one of those claims for us to go

2    forward.

3            With respect to the first claim against DynCorp,

4    which is the False Claims Act retaliation claim, we allege

5    that despite Honeywell coming in for certain functions, that

6    multiple other functions remained with DynCorp, and that

7    many DynCorp employees continued their employment on the

8    same base and on the same contract.

9            Now, our allegation is that DynCorp told him that

10   he was an extremely valuable employee, that he was going to

11   move him into another position and extend his employment,

12   and that the fact Honeywell was coming in to take over

13   certain functions would not affect that at all.

14           We then allege that he was told that his

15   employment would then not be continued because he had rocked

16   the boat too much with his allegations about

17   property-management misconduct.

18           Now, they raise an alternative set of facts and

19   they say that Honeywell would have affected this and would

20   have invalidated his ability to continue, but that's an

21   alternate allegation, and that outcome suggests that

22   discovery is necessary to determine his right on that.

23           We also allege two other adverse actions, the

24   failure to hire him for certain positions, he was told he

25   was a perfect candidate, and then couldn't even get an

1    interview for any of the positions.

2            Also, they failed to reimburse him for travel

3    expenses they previously told him would be reimbursed, and

4    that caused him direct monetary loss.

5            Now, with respect to the wrongful termination and

6    violation of public-policy claim, again, against DynCorp,

7    counsel for DynCorp directed you to the *Twigg* case, and the

8    *Twigg* case could not be more at odds with this complaint

9    here.

10           In the *Twigg* case, the complaint did not contain a

11   single allegation, literally not a single sentence about any

12   alleged conduct of any type that occurred in Virginia.

13           In this complaint, we expressly allege that -- and

14   this is paragraph 479, Your Honor -- many of the larcenist

15   acts were approved by Virginia-based officials of the

16   defendants at in-person meetings with the defendants, with

17   government officials and through communications originating

18   in Virginia, also that the larceny was furthered by

19   fraudulent documents that were prepared, reviewed, and

20   finalized in Virginia.  So we have specifically alleged

21   misconduct in Virginia, not just misconduct but larceny in

22   Virginia, and that is very different from *Twigg* and the

23   other cases that they cite.

24           With respect to Northrop Grumman's motion to

25   dismiss -- the fourth claim against Northrop Grumman is a

1    False Claims Act retaliation claim.

2            And we don't disagree that we need to allege that

3    he was an employee, contractor, or agent of Northrop.

4    That's what the statute requires.  But we plausibly allege

5    that he was an employee of Northrop through the Joint

6    Employment Theory.  We cited multiple D.C. cases, including

7    cases from the D.C. Circuit Court of Appeals, as well as

8    other cases, all of which have had denied motions to dismiss

9    based on allegations of joint employment.

10           And Northrop has not cited a single case for the

11   principle that such joint employer analysis would not apply

12   in the False Claims Act retaliation context.  We, however,

13   have cited two cases in footnote 37, the *Carnithan* and

14   *United States ex rel. Worthy* cases, which have applied joint

15   employment analysis to False Claims Act, not only applied

16   it, but refused to grant motions to dismiss based on

17   allegations of a joint employer relationship.

18           Now, we do allege a joint employment relation

19   through Northrop.  First, we allege control over the terms

20   and conditions of employment; that he was threatened with

21   termination, and that ultimately he was told that Northrop

22   directed his termination because of his protected

23   opposition, and there's no better way to control the terms

24   and conditions of employment than through termination.

25           And in the *Carnithan*, *Al-Saffy*, and *Clayton* cases,

1   those were the exact facts that the Court used to deny a

2   motion to dismiss.

3            We also allege that Northrop controlled or

4   directed the work of the employee.  We allege that the

5   plaintiff reported directly to Northrop officials for his

6   work, not only for the generalized assignments but the

7   details about how to do it, and we cite a number of examples

8   of that.

9            Now, that's very different from the cases that

10  they cite in which there essentially was little to no

11  connection between the joint employer.

12           And we've also cited, Your Honor, multiple

13  D.C. District Court cases, emphasizing that joint employer

14  allegations are quintessentially allegations of fact,

15  particularly ill-suited for determination on a motion to

16  dismiss.

17           Finally, Your Honor, there's tortious interference

18  with business expectancy.  And the word that counsel for

19  Northrop used that he had no guarantee of future employment.

20  But that's not the legal test, Your Honor.  The legal test

21  is just whether he could show a probability of future

22  employment.

23           And the allegation here is that before the end of

24  his employment contract, he was specifically told by DynCorp

25  that he is slated to be hired, and that despite Honeywell

1    coming in, he would simply be moved to another position and

2    his employment would be continued.

3           That's more than a probability.  That was a

4    concrete plan that was -- made it all the way down to him

5    being told about it, to continue his employment that we

6    allege was then thwarted by Northrop's interference.

7           And finally, improper methods.  Again, they

8    presented a counterfactual.  Their version of the events is

9    that Honeywell came in and so, therefore, his job

10   disappeared.

11          But that's not our version of the allegations.

12   Our version of the allegations is that he would have

13   continued in working on the same base and the same project,

14   and that he was then retaliated against, and that

15   retaliation was tortious, it was illegal, it was unethical,

16   and all those things are improper methods.

17          So there certainly has been an allegation of

18   improper methods here.  Thank you.

19          THE COURT:  Thank you very much.

20          Ms. Perry, five minutes, if you wish to use it,

21   it's rebuttal, or as much of it as you wish to use.

22          MS. PERRY:  Your Honor, I'd like to start with a

23   general statement that relator's counsel has said, we don't

24   dispute the facts.  Well, Your Honor, it's a motion to

25   dismiss.  So no matter how much we may dispute the facts, we

1   have to assume them as correct.  So it's not that we don't

2   dispute them.

3           THE COURT:  But there are some facts that probably

4   aren't disputed, right?

5           MS. PERRY:  But we had a contract.  DynCorp was

6   our subcontractor.

7           THE COURT:  Yeah.

8           MS. PERRY:  He alleges that they, in fact, did

9   connect the fraud to a false claim.

10          Your Honor, I want to bring you right back to the

11  actual allegations in the complaint, which they claim that

12  there was a knowing violation of false invoices, and they

13  identify three schemes.

14          The first was invoices for property-management

15  services, and they claim in the opposition, that were never

16  provided.  But as you correctly identified, the allegation

17  in the complaint is not that they were never provided, they

18  simply weren't sufficient.  And while that may constitute a

19  breach of contract, that's not a false claim.

20          He doesn't allege that Northrop Grumman billed for

21  any labor hours that weren't performed and that there wasn't

22  at least someone doing some property management, no matter

23  how ineffective he alleges it may have been.

24          With regard to the submission -- he then alleges

25  that certain unspecified invoices for certain unspecified

1   property weren't delivered, and that's the second thing.

2          Now, with regard to that one, that's an allegation

3   that DynCorp, within its own DynMRO system, falsified

4   records to show things have been delivered.  There's no

5   allegation Northrop Grumman had any knowledge of that, none

6   whatsoever.  So it can't possibly constitute a false claim

7   for Northrop.

8          The last is the inventory control system, and this

9   they made some claims here that are simply not in the

10  complaint.

11         In the complaint, Your Honor, in paragraph 84,

12  they allege that the MIS system was never -- the

13  property-management part was not turned on.  It doesn't

14  allege that Northrop Grumman, in fact, billed the government

15  for the development that never occurred, and it doesn't

16  allege that it was never turned over to the government.  It

17  simply alleges that they had a system that they designed and

18  developed, and it didn't -- one particular element wasn't

19  turned on.  So when they said here today that, oh, they

20  allege that it was never turned on, it was scrapped.  First,

21  they don't allege it, and how would the government not know

22  that a system was being developed that wasn't turned over?

23         Next, Your Honor, they claim that they never did

24  an inventory against any kind of a real set of data, and

25  they also talked about this manual property book.  So the

1   actual allegation in the complaint about this manual

2   property book is that relators said he was tasked with

3   providing a manual property book, which was just to create a

4   property book in an Excel file rather than using DynMRO.

5   It's alleged that's not how they to it, therefore, it's

6   fraud.

7          But what the actual allegation in the complaint is

8   that they use this Excel spreadsheet because it allowed

9   errors to be updated more quickly, right, corrected and

10  updated.  And that Northrop Grumman only allowed them to do

11  a manual property book under the express condition that they

12  would clean up the data in DynMRO and provide a completely

13  compliant property book by September of 2013.  That's in

14  paragraph 358 of the complaint.  Therefore, there is no

15  falsity there.

16         And with respect to never comparing it to a real

17  list, what it alleges with respect to the push packs is

18  that, in fact, Northrop Grumman came to DynCorp with a list,

19  hundred of pages long, of property, a manifest from the

20  government of what had been delivered, and told them to do

21  an inventory based on that.

22         So, again, there was a real list, and a physical

23  property, a physical inventory would have identified exactly

24  what was missing.  Same is true if they compared a physical

25  inventory, whether they used DynMRO in the first instance or

1    not, once they complete their physical inventory, you

2    compare it to what DynMRO said is there, and when there's a

3    disconnect, that would be the missing property.

4              THE COURT:  All right.

5              MS. PERRY:  Thank you.

6              THE COURT:  Thank you.

7              Mr. Roman, if you wish.

8              MR. ROMAN:  Thank you, Your Honor.

9              I actually have the benefit of being involved in

10   that other DynCorp case --

11             THE COURT:  Oh.

12             MR. ROMAN:  -- and it was incorrectly described.

13             Judge Huvelle did not deny the motion to dismiss,

14   she granted it in part and denied it in part.

15             THE COURT:  Oh.

16             MR. ROMAN:  And what she did was follow the links.

17             She looked at the alleged problem, the alleged

18   fraud, she followed it through the payments, and she decided

19   the link wasn't there for certain parts of the plaintiff's

20   case, and she dismissed that part.

21             That's the job this Court has to do, and that's

22   why I brought forward the fact that in the shotgun

23   complaint, the relator has taken what he should have done

24   and put it on us, and it will soon be put on you.

25             I should also mention that Judge Huvelle didn't

1    say that unreasonable costs are violations of the False

2    Claims Act.  Her ruling was different than that, but I'll

3    leave it, because it's not relevant here.

4          I am glad, though, that the relator's counsel and

5    you discussed MIS, as did Northrop Grumman's counsel,

6    because it's a great example of how the relator is trying to

7    take what might be a contract violation and turn it into a

8    False Claims Act case.

9          What the relator alleges is not what was just

10   represented.  There is no allegation in the 118-page

11   complaint that MIS was scrapped.

12         And just for background, MIS is a separate

13   property-management system that could handle the Russian

14   Cyrillic alphabet, because, after all, they're flying

15   Russian helicopters, the parts have Russian part numbers and

16   so forth.  So they needed MIS, a separate system.  And the

17   allegation in the complaint, which is right, is that DynCorp

18   was charged with developing and implementing the MIS system.

19         And during the one year that the relator spent on

20   the seven-year CNTPO program, MIS was still in development.

21   He alleges it had not been turned on.  Well, that's actually

22   not true, but assuming it's true, that wouldn't be a

23   violation of the contract even, because the contract is to

24   develop and implement.

25         And nowhere does the relator allege, as is his

1    burden, that the government was unaware of what was going on

2    with MIS, what was happening with the development.

3              But even if DynCorp improperly developed MIS,

4    didn't do it quick enough, didn't do it the right way,

5    that's a contract violation.  You can't have an objective

6    falsehood about that.  That's a contract violation.  It's

7    not a false claim.

8              And it should be noted, the government hasn't sued

9    DynCorp over MIS under a contract claim.  It can't be a

10   false claim.

11             MIS is another good example.  What part of the MIS

12   problem is the relator using to try to bolster one of his

13   five FCA claims, is it a presentment claim?  It doesn't

14   allege any falsity in what was presented about the

15   development of MIS.  Is it a false record?  No allegation

16   there?

17             They didn't convert the MIS property and they

18   didn't reduce an obligation, which would be part of a

19   Reverse False Claim.  Again, we're left to guess as to where

20   it fits into the puzzle.  But that shouldn't be our job, it

21   shouldn't be your job, it's the relator's job when a

22   complaint is drafted.

23             And I know that they had many explanations about

24   what the complaint says and doesn't say and what the links

25   are and so forth.  But I think it was in *Barco* decided just

1    a few month ago, when the Court was very clear, you have to

2    put it in the complaint.  You can't save a complaint by

3    arguing the way the links work and what it really says.  You

4    have to look at the four corners of the complaint and any

5    attachments to it.

6          The manual property book was listed as a record

7    that was purportedly false.  The prime mover, the author of

8    the manual property book, is Mr. Cloninger, and he knows.

9    And he even, in his complaint, alleges that manual property

10   book is part of a bigger system.  It was never represented,

11   and he never claimed it was represented to the government,

12   as the be-all and end-all of what was going to be presented

13   in terms of an inventory.

14         A quick point on retaliation.  The $3,500 that

15   wasn't paid to him, as we -- his foreign services one-year

16   employment agreement includes what he's entitled to in terms

17   of back-and-forth payment.  No allegation he wasn't paid.

18   In fact, he was paid exactly what he was owed under that

19   agreement.

20         But, finally, going back to the DFARs and FARs

21   issue and whether or not the absence of those clauses is

22   important -- because they now recognize they're not in the

23   contract that DI signed in 2007, even though they based

24   their entire complaint on them, and they recognize that if

25   those FAR provisions and DFAR provisions aren't in, they

1   aren't even contract violations, much less False Claims.

2          They cite to DynCorp internal policies and say, if

3   DynCorp violated those, that's a breach, DynCorp impliedly

4   represented it didn't violate its own policies, therefore,

5   it's a false claim.

6          DynCorp internal policies are just that:  Internal

7   policies.  They are not part of the contract.  They create

8   no contractual rights.  Relator doesn't allege to the

9   contrary, and the law doesn't say that.

10         In addition, DynCorp, if it's not in its contract,

11  it can't violate the contract and have that as a predicate

12  for a False Claims Act, because Northrop Grumman violated

13  its prime contract.  There's no allegation that DynCorp even

14  knew what was in the prime contract and, indeed, it didn't.

15         But the False Claims Act isn't the strict

16  liability.  You have to knowingly violate it.  And if it's

17  not in DynCorp's contract, it couldn't knowingly violate it.

18         But I leave you, again, with the linkage, because

19  I think that's the real crux of the problem here in terms of

20  moving forward and determining, as Judge Huvelle did, what

21  belongs in the case and is subject to discovery, and what

22  doesn't belong in the case and is out and the parties don't

23  have to worry about it anymore.

24         They say that they have adequately alleged the

25  claims for payment.  But what they have really done is that

1    there are an unspecified number of claims with unspecified

2    content that must have been submitted, and that they all

3    somehow were or contained fraudulent information.

4             If you'll bear with me, I want to read exactly the

5    four or five lines.

6             THE COURT:  Your time has come and gone.

7             MR. ROMAN:  Okay.  In their claims, all their --

8             THE COURT:  Your time has come.

9             MR. ROMAN:  Thank you, Your Honor.

10            MR. COOPER:  Your Honor, may I have 20 seconds?

11            THE COURT:  No.  I'll give you something better

12   than that.

13            In cases like this, I normally give the parties a

14   chance to review the transcript, which I've known from years

15   of experience, can be an illuminating experience, because

16   they see things that they wish they responded to that they

17   didn't, or they said some things that they wish to clarify

18   further or whatever.

19            So I give each side ten days, from when the

20   transcript is produced, not from today, because it's going

21   to take my very able court reporter a few days to get this

22   transcript together.  But whenever he gets it to you, you'll

23   have ten days then to supplement your argument.

24            But there's a page limit of 15 pages, not to

25   exceed it.  Don't send me a motion to extend it or anything,

1  no, I'm not going to grant it.

2         So you'll get 15 pages, up to 15 pages.  You don't

3  have to use it all.  I'm not asking you to use it all.  I've

4  got plenty of paper already on this motion.

5         But I know from experience, firsthand experience,

6  and as a Judge, invariably, you'll be having a beer 20

7  minutes from now and you'll be saying, I wish I'd said this,

8  I wish I'd said that.  That's the way it works in real life.

9         So you can have up to 15 pages to supplement your

10  argument, but it has to be limited to things that were said

11  here.  You can't be bringing in new arguments.  So if you

12  start bringing in new things that weren't argued about here,

13  I'm just going to reject it; I'm not going to look at it.

14         Now, as far as getting a decision, well,

15  I don't know how long that'll take.

16         But I can tell you this from experience.  And

17  Judge Huvelle's -- I haven't seen her decision that you

18  referenced, but it might be insightful in that regard.

19         We write so much around here, somewhere between 65

20  and 80 published opinions a year per judge, sometimes more,

21  that I will not write an opinion if I deny the motion.  If I

22  grant it in part and deny it in part, then I'll make some

23  reference to the denial portions.  But if I grant, I have to

24  write.  The Court of Appeals absolutely wants it in ribbons

25  and bows.  They like it all put together and wrapped up in a

1    neat package.

2            So obviously, writing opinions is time-consuming,

3    it takes time.  And I've got a two-month trial on the

4    horizon and a bunch of other things.

5            So I'll get you an opinion as fast as I can, if

6    there's going to be an opinion.  But I'll get you a ruling,

7    if there's not going to be an opinion, as fast as I can too.

8    So that's about all I can say right now.

9            MR. ROMAN:  Your Honor, if I might?

10           THE COURT:  We'll stand in recess.

11           MR. ROMAN:  If I might, and I apologize, but given

12   vacation schedules, which literally start tomorrow, I wonder

13   if we could get some --

14           THE COURT:  Ten days.

15           MR. ROMAN:  Ten days.  Thank you.

16           THE COURT:  Big law firm.

17           DEPUTY CLERK:  All rise.

18           This Honorable Court will stand in recess until

19   the return of court.

20           (Proceedings concluded at 4:27 p.m.)

21

22

23

24

25

# C E R T I F I C A T E

I, William P. Zaremba, RMR, CRR, certify that the foregoing is a correct transcript from the record of proceedings in the above-titled matter.


Date: August 30, 2017_____    /S/__William P. Zaremba_____

William P. Zaremba, RMR, CRR