**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* FRED MAXEY CLONINGER,<br><br>               **Plaintiffs,**<br><br>     vs.<br><br>DYNCORP INTERNATIONAL INC.;<br>DYNCORP INTERNATIONAL LLC;;<br>NORTHROP GRUMMAN<br>CORPORATION;<br>NORTHROP GRUMMAN SYSTEMS<br>CORPORATION; AND<br>NORTHROP GRUMMAN TECHNICAL<br>SERVICES, INC.<br><br>               **Defendants.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No:  1:14-cv-00581 (RJL)<br><br>**SECOND AMENDED COMPLAINT FOR VIOLATION OF THE FALSE CLAIMS ACT [31 U.S.C. §3729 et seq., WRONGFUL DISCHARGE AND TORTIOUS INTERFERENCE**<br><br>**JURY TRIAL DEMANDED** |

Charles J. Cooper (DC Bar No. 248070)
David H. Thompson (DC Bar No. 450503)
Vincent J. Colatriano (DC Bar. No. 429562)
Harold S. Reeves (DC Bar No. 459022)
Davis Cooper (DC Bar No. 1034231)
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, NW
Washington, DC 20036
Tel: (202) 220-9600
Fax: (202) 220-9601
Email: ccooper@cooperkirk.com

Colette G. Matzzie (DC Bar No. 451230)
PHILLIPS & COHEN LLP
2000 Massachusetts Ave., NW
Washington, DC. 20036
Telephone:  (202) 833-4567
Email:
cmatzzie@phillipsandcohen.com

Larry P. Zoglin (DC Bar No. 298620)
PHILLIPS & COHEN LLP
100 The Embarcadero, Suite 300
San Francisco, CA 94105
Telephone:  (415) 836-9000
Email:  lpz@pcsf.com

Avi Kumin (DC Bar No. 475761)
Adam D. Herzog (DC Bar No. 1022990)
KATZ, MARSHALL & BANKS, LLP
1718 Connecticut Ave., N.W., 6th Floor
Washington, D.C. 20009
Telephone:  (202) 299-1140
Email: kumin@kmblegal.com,
herzog@kmblegal.com

*Attorneys for Plaintiff-Relator Fred Maxey Cloninger*

**TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................................. 1

II.     PARTIES ............................................................................................................ 6

III.    JURISDICTION AND VENUE............................................................................ 9

IV.     CNTPO BACKGROUND ................................................................................... 10

        A.      The Counter Narcoterrorism and Technology Program Office................................ 10

        B.      The Counter Narcoterrorism Global Support Contract............................................. 10

V.      CNGS CONTRACT LANGUAGE AND LEGAL FRAMEWORK................................... 13

VI.     THE ROLE OF LOGISTICS AND PROPERTY MANAGEMENT UNDER THE
        CNGS CONTRACT .......................................................................................... 19

        A.      The Logistics Function........................................................................................ 19

        B.      DynMRO and MIS.............................................................................................. 23

VII.    DEFENDANTS' FRAUDULENT CONDUCT AND RECKLESS DISREGARD
        FOR CONTRACTUAL AND LEGAL OBLIGATIONS ON THE CNTPO
        PROGRAM VIOLATED THE FCA AND CAUSED MILLIONS OF DOLLARS
        OF DAMAGE TO THE UNITED STATES ........................................................ 24

        A.      Shortly After He Began Working for DynCorp, Relator Learned of Massive
                Problems With Defendants' Management of Property on the CNTPO
                Program ............................................................................................................ 24

        B.      Shortly After His Arrival in Afghanistan, Relator Discovered That DynCorp
                Had Lost Track of Millions of Dollars of Government Property ............................. 28

                1.      Relator Discovered That DynCorp Blatantly Disregarded Standard
                        Procedures, Required by Law and Contract, for Handling the Receipt
                        and Tracking of Government Property...................................................... 28

                2.      Northrop and DynCorp Were Not Willing to Devote Sufficient
                        Resources to Meet Their Property Management Responsibilities
                        Under the Contract and FAR .................................................................. 31

TABLE OF CONTENTS

C.	Dyncorp Devised a Fraudulent Scheme to Bill the Government for Property That Dyncorp Falsely Claimed Had Been Delivered to Afghanistan When the Property Was Still Sitting in a Warehouse in Texas, Which Ultimately Led to the Loss and Wastage of Millions of Dollars of Government Property ................... 34

D.	DynCorp Failed to Maintain a Reliable Property Management System to Track Inventory, as Required by Law and Contract, Which Resulted in Loss and Wastage of Millions of Dollars of Government Property ................................ 41

	1.	Most Dyncorp Employees Assumed That MIS Was Tracking GFE, but in Fact MIS Was Not Tracking Anything, Much Less GFE .................. 41

	2.	DynCorp Was Supposed to Track Contractor Acquired Property in DynMRO but It Was Dysfunctional and Unreliable ................................... 46

		a.	DynMRO Was Riddled With Errors and Wholly Unreliable ........... 46

		b.	DynMRO Had a Fundamental Design Flaw -- It Could Not Recognize Variations of Cyrillic Characters -- That Rendered It Unable To Track Millions of Dollars of Russian-Manufactured Property Utilized in the CNTPO Program ................ 49

E.	DynCorp Consistently Lied to the Government About the Status of Deliveries In Order to Cover Up Deficiencies in DynCorp's Property Management System ............................................................................................................ 50

F.	Representative Examples of Valuable Government Property That Defendants Lost or Wasted on the CNTPO Program Due To Defendants' Reckless Disregard for Contractual and Legal Requirements ................................................ 53

	1.	Defendants Lost or Wasted at Least Four "Push Packs" Valued at Several Million Dollars Each ..................................................... 53

	2.	Dyncorp Lost Track of or Rendered Unserviceable Aircraft Parts Valued at Several Million Dollars .............................................. 56

TABLE OF CONTENTS

3. Dyncorp Lost Track of Fuel Valued at Several Million Dollars ................... 58

4. DynCorp Failed to Account for Surplus Property ........................................ 59

VIII. DEFENDANTS DELIBERATELY CONCEALED FROM THE GOVERNMENT
THEIR LOSS AND WASTAGE OF MILLIONS OF DOLLARS OF
GOVERNMENT PROPERTY ........................................................................... 60

A. DynCorp and Northrop Thwarted Relator's Efforts to Correct Deficiencies in
Defendants' Property Management System and to Honestly Account to the
Government for Missing Property ........................................................... 60

1. Relator Prepared a Proposed Corrective Action Plan Designed to
Address Property Management Deficiencies and Identify Losses to
the Government ............................................................................ 62

2. Northrop and DynCorp Corporate Leadership Refused to Pay the
Nominal, Additional Costs Necessary to Implement the Corrective
Action Plan .................................................................................. 65

3. Northrop Gutted the Necessary Remedial Steps Called for by the
Corrective Action Plan and Substituted a Whitewash "Inventory" in
Place of the Plan .......................................................................... 66

4. The Whitewash Inventory Predictably Concealed the Government's
Actual Losses ............................................................................... 71

B. Defendants Knowingly Provided the Government With an Incomplete and
Misleading Property Book to Conceal Defendants' Loss of Millions of
Dollars of Government Property ............................................................. 72

1. After the Government Announced That It Was Going to Recompete
the CNGS Contract, Defendants Were Required to Produce a Property
Book ............................................................................................ 73

TABLE OF CONTENTS

2.     DynCorp Devised a Plan to Produce a Property Book That Would Conceal Lost Government Property ........................................................... 76

     a.     DynCorp Intended to Produce a Property Book That Would Conceal Lost GFE........................................................................ 77

     b.     DynCorp Intended to Produce a Property Book That Would Conceal Lost CAP ........................................................................ 78

3.     DynCorp Began to Doubt It Could Produce Even a Flawed Property Book by the Deadline and Directed Relator to Put Together a Manual Property Book ............................................................................................ 82

4.     While Relator Worked on the Manual Property Book, DynCorp Officials Falsified Data in DynMRO and Took a Number of Other Desperate and Non-Compliant Actions in Their Attempt to Produce a Property Book That Minimized Losses ....................................................... 85

5.     DynCorp Decided to Submit a Non-Compliant Manual Property Book and Northrop Approved the Decision.......................................................... 89

6.     DynCorp Delivered the Non-Compliant Manual Property Book to the Government in a Format Designed to Look Like a Compliant Property Book ............................................................................................ 92

IX.     DEFENDANTS ARE LIABLE TO THE GOVERNMENT UNDER THE FCA IN THE AMOUNT OF SEVERAL HUNDRED MILLION DOLLARS FOR MISMANAGING THE GOVERNMENT'S PROPERTY IN THE CNTPO PROGRAM .................................................................................................... 93

X.     DEFENDANTS RETALIATED AGAINST RELATOR FOR HIS EFFORTS TO BRING DEFENDANTS' PROPERTY MANAGEMENT INTO COMPLIANCE WITH THE LAW ............................................................................................. 95

A.  Relator Consistently Opposed, Protested, and Attempted to Stop Defendants' Violations of the FAR/DFARS and the FCA ........................................................... 95

B.  Defendants Repeatedly Retaliated Against Relator for His Attempts to Stop Defendants' Violations of the FAR/DFARS and the FCA ................................... 100

C.  Events Preceding DynCorp's Termination of Relator ........................................... 101

D.  When Northrop and DynCorp Learned That the Government Was Going to Audit CNGS Property Management, DynCorp Abruptly Changed Its Strategy, Stopped Its Corrective Efforts, and Terminated Relator ........................ 104

E.  Defendants Further Retaliated Against Relator by Refusing to Hire Him as the Senior Logistics Manager for DynCorp Aviation, and Failed to Address His Allegations of Retaliation .............................................................................. 108

TABLE OF CONTENTS

## GLOSSARY OF ACRONYMS

AGSE – Aircraft Ground Support Equipment
ALSE – Aircraft Life Support Equipment
ASD – Aircraft Supply Depot, the warehouse that housed CNTPO aircraft parts
CAP – Contractor Acquired Property
CNTPO – Counter Narcoterrorism Program Office
CNGS – Counter Narcoterrorism Global Support (name of CNTPO prime contract)
COR – Contracting Officer Representative
DCAA – Defense Contract Audit Agency
DCMA – Defense Contract Management Agency
DoD – U.S. Department of Defense
DoS – U.S. Department of State
DFARS – Defense Federal Acquisition Regulation Supplement
DRMO – Defense Reutilization and Marketing Office
EBSR – Equipment Backorder Status Report
FAR – Federal Acquisition Regulation
GFE – Government Furnished Equipment
GFP – Government Furnished Property
GPA – Government Property Administrator
ID/IQ – Infinite Delivery/Infinite Quantity Contract
ITAR – International Traffic in Arms Regulations
LTDD – Lost, Theft, Damage, Destruction (of Government property)
MMAS – Material Management Accounting System
MoD – Afghan Ministry of Defense
MoI – Afghan Ministry of Interior
MPB – Manual Property Book
NSRWA – Non-Standard Rotary Wing Aircraft Office (within DoD)
NVG – Night vision goggles
PBO – Property Book Officers
PM – Project Manager
PMO – Project Management Office
PMP – Property Management Plan
PoP – Period of Performance
PPM – Program Property Manager
PMR – Performance Management Review
QCC - Quality Consolidation Center (warehouse)
ROR – Relief of Responsibility
SOW – Statement of Work
TDY – Temporary Duty work assignment
USASMDC – U.S. Army Space & Missile Defense Command/Army Forces Strategic Command

## ALPHABETICAL LIST OF INDIVIDUALS IDENTIFIED IN THE SECOND AMENDED COMPLAINT

- Albaugh, Joan: DynCorp Logistics Manager on the G-222 Contract, then on CNTPO
- Alexander, Andre: DynCorp Warehouse Lead for Afghan Ministry of Interior (MoI) Aircraft Supply Depot ("ASD")
- Allman Darrell: Northrop Grumman Director of Aviation Operations, former Program Director for DynCorp Aviation
- Baber, Steve: DynCorp CNTPO IT Lead
- Benton, Brian: DynCorp QCC Supervisor in Ft. Worth, Texas, then on-site in Kabul
- Burpee, Doug: Northrop Grumman Project Manager in Kabul
- Carr, Randy: DynCorp CNTPO Logistics Manager (January 2012 to July 2012), then MIS Lead
- DiLorenzo, Ron: DynCorp QA Compliance Manager
- Dodson, Rhonda: DynCorp Director of Property Management
- Duque, Luis: DynCorp Supply Officer and Property Book Officer in Kabul
- Fagan, Tracey:  DynCorp Aviation Contracts Manager in Ft.Worth, Texas
- Fatum, Ross: DynCorp Vice President of HR
- Fisher, Mark: DynCorp CNTPO Project Manager in Kabul
- Fix, Blane: DynCorp Senior Logistics Manager in Ft. Worth, Texas
- Frazier, Guy: DynCorp IT Project Manager
- Harlin, Billy: DynCorp Director of Procurement and Supply Chain Management
- Hays, Rick: DynCorp CNTPO IT Manager in Afghanistan
- Hicks, Afton: Senior Recruiter from World-Wide Recruiting Services, a division of DynCorp
- Lawson, Chris: Northrop Grumman Contracts Manager
- Lickliter, Mike: Northrop Grumman Logistics Property Manager in Kabul
- McBride, Jimmy: DynCorp Logistics Manager from 2008-12, then Deputy Project Manager
- McClendon, Becky: DynCorp Aviation PMO Senior Logistics Manager
- Miller, Chris: DynCorp Finance Manager for CNTPO
- Morales, Carlos: MoD Team Lead for Aircraft Supply Depot; then DynCorp ASD Warehouse manager
- Morales, Joshua: Non-Standard Rotary Wing Contracting Officer Representative
- Munger, Randy: Northrop Grumman Deputy Project Manager in Kabul, now Northrop Grumman Project Manager for CNTPO
- Myles, James: Senior VP of DynCorp Aviation
- Nelson, Ray: DynCorp Aviation Program Director
- Peters, Ralph: DynCorp Aviation Senior Program Director
- Rauer, Scott: VP of DynCorp Military Aviation
- Rodriguez, Jose: Northrop Grumman Logistics Manager in Kabul
- Rutledge, Charles: Quality Consolidation Center (QCC) Personnel
- Schorer, Steven: DynCorp Aviation President
- Schreiner, Michael: DynCorp Logistics Supervisor for CNTPO

- Smith, Melissa: DynCorp Aviation Property Management Manager for DynCorp Aviation, Ft. Worth
- Snodgrass, Amber: DynCorp Lead for Aircraft Life Support Equipment
- Solis, Ben: DynCorp PMO Logistics Analyst
- Sorenson, Julie: Northrop Grumman Logistics Manager in Kabul
- Tanner, John: DynCorp Logistics Lead
- Trudeau, Richard: Non-Standard Rotary Wing Contracting Officer
- Wagner, Scott: Northrop Grumman Program Manager for CNTPO
- Werner, Richard: DynCorp Maintenance Lead for Afghan Ministry of Defense
- Wood, Allen: DynCorp CNTPO Deputy Project Manager in Kabul, then became Project Manager for a different DynCorp contract

Plaintiff Fred Maxey Cloninger, through his attorneys, on behalf of the United States of America, for his Second Amended Complaint against defendants DynCorp International Inc., DynCorp International LLC, (the preceding two entities are collectively referred to herein as "DynCorp"), Northrop Grumman Corporation, Northrop Technical Services, Inc., Northrop Grumman Systems Corporation (the preceding three entities are collectively referred to herein as "Northrop Grumman" or "Northrop") (all collectively, "Defendants"), alleges based upon personal knowledge and relevant documents as follows:

## I.     INTRODUCTION

1.      This is an action to recover damages and civil penalties on behalf of the United States of America arising from false and/or fraudulent records, statements and claims made, used, presented, and caused to be made, used or presented by Defendants and/or their agents, employees and co-conspirators, in violation of the Federal Civil False Claims Act, 31 U.S.C. § 3729 et seq. ("the FCA").  This is also an action by Plaintiff-Relator Fred Maxey Cloninger to recover damages for Defendants' retaliation against him in violation of the anti-retaliation provision of the FCA, 31 U.S.C. § 3730(h), which prohibits retaliation against employees, contractors, and agents who attempt to stop violations of the FCA.  Relator also seeks to recover damages under state tort law for DynCorp's Wrongful Termination of his employment in violation of public policy, as well as Northrop's Tortious Interference with his DynCorp employment contract.

2.      As described in more detail below, defendants Northrop Grumman ("Northrop") entered into a prime contract with the United States Government (the "Government") to provide logistical and operational support for the United States Counter Narcoterrorism Technology Program Office ("CNTPO") in Afghanistan (the "Contract").  Northrop in turn subcontracted the majority of the activities under the Contract to DynCorp (the "Subcontract").



- 1 -
SECOND AMENDED
COMPLAINT

3.      Pursuant to the Subcontract, DynCorp agreed to provide multiple services required of Northrop under the Contract in furtherance of the Government's counter narcoterrorism efforts in Afghanistan, including providing support services, supply operations, field operations, training, and logistics.  To provide these services, DynCorp was responsible for management of the entire life cycle of property utilized on the Contract, including procurement, supply chain management, and inventory management.

4.      Effective and reliable management of the Government's property in the CNTPO program is critically important to the mission of the program, as well as to avoid repetition of prior losses of Government property that have been well-publicized, including the loss of billions in property by other contractors in Iraq and Afghanistan.

5.      As set forth in this Second Amended Complaint, Defendants defrauded the Government by grossly mismanaging the Government's property in the CNTPO program, resulting in the loss and wastage of hundreds of millions of dollars of Government property for which Defendants are responsible under the Contract and federal law.  Defendants' mismanagement extended throughout the entire life cycle of the property, from initial receipt of the property, through tracking of the property, to supply chain and inventory management.

6.      In addition, Defendants devised several fraudulent schemes to obtain contractual payments from the Government under false pretenses, and to conceal from the Government Defendants' loss of control over the Government's property in the CNTPO program.  These fraudulent schemes included:

- Systematically billing the Government for a management information system that was completely broken and dysfunctional;

- Systematically billing the Government for millions of dollars of property that DynCorp



- 2 -
SECOND AMENDED
COMPLAINT

falsely claimed had been delivered to Afghanistan when the property was still sitting in a

warehouse in Texas;

- Submitting, or causing to be submitted, false reports to the Government claiming that

    none of DynCorp's shipments to Afghanistan were behind schedule when this was

    blatantly untrue;

- Submitting a purposefully deceptive and misleading Property Book to the Government

    that concealed the huge amount of Government property that Defendants could not

    account for;

- Conspiring over an extended period of time to withhold from the Government any

    information that would reveal the existence and scope of the massive property

    management failures on CNTPO;

- Intentionally and falsely manipulating data within a vast electronic database to conceal

    the extent and actual value of lost items of Government property; and

- Repeatedly threatening to terminate any employees who disclosed information to the

    Government about the massive property management failures on CNTPO.

7.      As a result of Defendants' fraudulent conduct and reckless disregard of their legal

obligations under the Contract and federal law, the CNTPO mission has been harmed and hundreds

of millions of dollars of Government-owned property is missing, unaccounted for, or rendered

unserviceable in Afghanistan.  In addition, Defendants' fraudulent conduct and reckless disregard of

their legal obligations has resulted in gross over-ordering of property and widespread failure to put

needed property into use, at great expense to the Government and to the CNTPO mission.

8.      Defendants deliberately concealed their mismanagement of the Government's

property in the CNTPO program in reports Defendants submitted or caused to be submitted to the



Government.  Defendants' acts of concealment knowingly misled the Government and deprived the Government of the opportunity to direct Defendants to correct the profound flaws in their management of the Government's property in a timely manner.

9.      Every invoice that Defendants submitted or caused to be submitted to the Government for non-compliant and substandard property management services, and every invoice that Defendants submitted or caused to be submitted to the Government based upon Defendants' false and fraudulent statements and conduct, constitutes a separate violation of the FCA.

10.     Under the FCA, federal regulations, and the Contract, Defendants are also liable to the Government for all of the Government's property that Defendants lost or wasted as a consequence of their violations of the FCA, federal regulations, and the Contract.

11.     The FCA was originally enacted during the Civil War to redress fraud against the Government, including fraud in the sale of defective products to the military.  Congress amended the Act in 1986, and again in 2009 and 2010, to enhance the Government's ability to recover losses sustained as a result of fraud against the United States.

12.     The FCA prohibits knowingly presenting (or causing to be presented) to the federal Government a false or fraudulent claim for payment or approval.  31 U.S.C. § 3729(a)(1)(A). Additionally, the FCA prohibits knowingly making, using, or causing to be made or used, a false or fraudulent record or statement material to a false claim.  31 U.S.C. §§ 3729(a)(1)(B).

13.     The FCA further prohibits anyone that has possession, custody, or control of property used or to be used by the Government from knowingly delivering, or causing to be delivered, less than all of that money or property.  31 U.S.C. §§ 3729(a)(1)(D).  The FCA also prohibits knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property to the Government.  31 U.S.C. §§ 3729(a)(1)(G).  The FCA also prohibits conspiring to

commit a violation of one of the above provisions of the FCA.  31 U.S.C. §§ 3729(a)(1)(C).

14.     Any person who violates the FCA is liable for a civil penalty of up to $11,000 for each violation, plus three times the amount of the damages sustained by the United States.  31 U.S.C. § 3729(a)(1).

15.     The FCA allows any person having information about a violation of 31 U.S.C. U.S.C. § 3729(a)(1) to bring an action on behalf of the United States ("*qui tam*") and to share in any recovery of the Government.  The complaint must be filed under seal for a minimum of 60 days (without service on the defendant during that time) to allow the Government time to conduct its own investigation and to determine whether to join the suit.

16.     In addition, the FCA makes it unlawful to discharge, demote, threaten, harass, or otherwise discriminate against an employee, contractor, or agent in the terms and conditions of employment "because of lawful acts done by the employee, contractor, or agent" in furtherance of a *qui tam* suit or "other efforts to stop 1 or more violations of" the False Claims Act.  31 U.S.C. § 3730(h)(1).

17.     Virginia law provides for an exception to the at-will employment doctrine through the Wrongful Termination in violation of public policy cause of action, when an employer terminates an employee in retaliation for the employee's opposition to or refusal to participate in violations of the law.  Virginia also makes it unlawful for a third party to engage in Tortious Interference with an employee's contractual relationship with his employer.

18.     Based on these provisions and state law causes of action, *qui tam* plaintiff and relator Fred Maxey Cloninger seeks to recover all available damages, civil penalties, and other relief for the violations alleged herein.

## II.    PARTIES

### A.    Plaintiffs

19.    The United States is the real party in interest herein.  It entered into the Counter Narcoterrorism Program Office prime contract No. W9113M-07-D-0007 (the Contract) and various task orders thereunder with defendants Northrop Grumman.

20.    Fred Maxey Cloninger, the *qui tam* Plaintiff/Relator in this action (hereafter, "Relator"), is a resident of Fort Smith, Arkansas.  Relator was hired by defendant DynCorp as Logistics Manager in October 2012.  In that position, he was responsible for overseeing procurement and supply of aviation support components for the Department of Defense ("DoD") CNTPO Program operating in Afghanistan.  He was based in Afghanistan and reported to managers in Afghanistan and in Huntsville, Alabama, and Fort Worth, Texas.  Approximately twenty-five logistics employees were designated to report to him.  Relator was in charge of property management for DynCorp and Northrop's work on the CNTPO program during this time period.

21.    DynCorp agreed that Relator's starting salary would be $110,000 per year, and that his salary would increase to $125,000 after 90 days.  Additionally, because he would be working in Afghanistan, Department of State ("DoS") regulations mandated an "uplift" of 70% of his salary, bringing his total salary to $187,000.  DynCorp also agreed to pay him a contract completion bonus of 10% of his base pay, a period of 30 consecutive days of R&R pay after working for 90 consecutive days, and a travel stipend of $14,000 per year.  Relator was also eligible for stock options, a 6% 401(k) matching program, insurance benefits, and health and other benefits.

22.    Relator held this position until his retaliatory termination on September 8, 2013.

23.    Prior to joining DynCorp, Relator had extensive experience in all areas of federal (including DoD) subcontract management and development, especially in the areas of Aviation



Logistics, Maintenance and Operations management for DoD and DoS government contracts in the Middle-East.  He has twenty years of aviation maintenance, flight operations, flight scheduling, logistics and management experience.  From July 2004 to November 2007, Relator worked as a Project Lead/Senior Operations Manager (Air Operations) for Halliburton – Kellogg, Brown & Root in Baghdad, Iraq, where he directed the implementation and management of extensive air operations.  From December 2007 to May 2009, he worked as a Senior Vice President for Air Operations, and was later promoted to Chief Financial Officer, for Gryphon Airlines, where he managed the restructuring, administration and flight operations of an American airline company operating in the Middle East under DoD and DoS contracts (LOGCAP) to move American government and military personnel into and out of Kuwait and Iraq/Afghanistan.  From May 2009 to August 2012, Relator worked as the President of Alliance Contractor Logistics, a division of Two Brothers Group.  In that position, he led a joint-venture to provide aviation logistics and commercial flights to American government, military, and DoD/DoS personnel on LOGCAP in Iraq, Afghanistan, and Northern Africa.

24.     During his career, Relator received extensive training regarding DoD requirements, procedures, and processes for procurement, supply chain management, and property accountability for government property.  Relator possesses a DoD Security Clearance (Secret Level), and is a former active and reserve member of the United States Marine Corps (Marine Air Group, Marine Air Traffic Control Squadron).

B.     Defendants

25.     Defendant Northrop Grumman Corporation is a Delaware corporation with headquarters in Falls Church, Virginia.  Northrop is a global aerospace and defense technology company.



SECOND AMENDED
COMPLAINT

26.    Defendant Northrop Grumman Systems Corporation is a Delaware corporation with its principal place of business in Falls Church, Virginia.  Northrop Grumman Systems Corporation is the successor-in-interest to Northrop Grumman Space & Mission Systems Corporation and Northrop Grumman Information Technology, Inc.  Upon information and belief, the CNGS contract was awarded to a subsidiary of Northrop Grumman Information Technology, Inc. and was subsequently novated to Northrop Grumman Space & Mission Systems Corporation.  Northrop Grumman Systems Corporation is a wholly-owned subsidiary of Northrop Grumman Corporation.

27.    Defendant Northrop Grumman Technical Services, Inc. is an Oklahoma corporation with its principal place of business in Herndon, Virginia.  Northrop Grumman Technical Services, Inc. is a wholly-owned subsidiary of Northrop Grumman Systems Corporation.

28.    Northrop Grumman Corporation, Northrop Grumman Systems Corporation and Northrop Grumman Technical Services, Inc. are referred to collectively in this Second Amended Complaint as "Northrop Grumman" or "Northrop."

29.    Defendant DynCorp International Inc. is a Delaware corporation with headquarters in McLean, Virginia.  It provides professional and support services outsourced by the U.S. military, non-military U.S. governmental agencies, and foreign governments.  It provides law enforcement training, as well as support, base, and logistics operations for the services it offers.

30.    Defendant DynCorp International LLC is a Delaware corporation with headquarters in McLean, Virginia.  It functions as the operating company for DynCorp International Inc., and is the entity that entered into an employment contract with Relator.

31.    DynCorp International Inc. and DynCorp International LLC are referred to collectively in this Second Amended Complaint as "DynCorp."  The business segment within DynCorp that performs work on the CNPTO program is the Aviation Group (hereafter, "DynCorp

Aviation").

## III.   JURISDICTION AND VENUE

32.     This Court has jurisdiction over the subject matter of this action pursuant to 28

U.S.C. § 1331, 31 U.S.C. § 3730(h)(2), and 31 U.S.C. § 3732, the latter of which specifically

confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. § 3729 and 3730.  This

court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

33.     To Relator's knowledge there has been no statutorily relevant public disclosure of

the "allegations or transactions" in this Second Amended Complaint, as those concepts are used in

31 U.S.C. § 3730(e), as amended by Pub. L. No. 111-148, § 10104(j)(2), 124 Stat. 119.  Moreover,

whether or not such a disclosure has occurred, Relator would qualify as an "original source" of the

information on which the allegations in this Second Amended Complaint are based.  Before filing

this action, Relator voluntarily disclosed to the Government the information on which the

allegations or transactions in this Second Amended Complaint are based.  Additionally, Relator has

direct and independent knowledge of the misconduct alleged herein and that knowledge is

independent of and materially adds to any publicly disclosed allegations or transactions relevant to

his claims.

34.     This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a)

because that section authorizes nationwide service of process and because Defendants have

minimum contacts with the United States.  Moreover, Defendants can be found, transact, or have

transacted business in this judicial district.  Venue is proper in this judicial district pursuant to 28

U.S.C. §§ 1391(b), 1395(a), 31 U.S.C. § 3732(a), and 31 U.S.C. § 3730(h)(2) because one or more

Defendants can be found in and transact or have transacted business in this judicial district.

## IV.    CNTPO BACKGROUND

### A.    The Counter Narcoterrorism and Technology Program Office

35.    In 1996, Congress established the Counter Narcoterrorism and Technology Program Office (CNTPO) within the Department of Defense.  The mission of CNTPO is to disrupt and deter terrorism by creating technology networks, infrastructure, and capabilities to detect, identify, and disrupt narcotics trafficking activities that fund terrorism worldwide.  CNTPO works with other agencies within the federal government alongside host nations and allied partners to support their counter-narcotic and counter-terrorism activities.

36.    CNTPO originally had operations in Colombia and Haiti.  In 2008, CNTPO began operations in Afghanistan, with the mission of hindering the opiate trade which provides a source of financing for the Afghan insurgency.  CNTPO's purpose is to assist the United States Military's effort to transition Afghanistan to an independent government with a functioning police force and military.  In order to perform this work, CNTPO contracts with private defense contractors, including Defendants Northrop.

37.    CNTPO's headquarters in Afghanistan are located in Kabul, at the Kabul International Airport.  Other offices are located in Jalalabad, Kandahar, Shindad, Herat, and Mazar-E-Sharif.

38.    CNTPO utilizes approximately 1,000 people in its operations in Afghanistan. Approximately 450 of these are employees of private contractors paid by the United States, another 450 are Afghan military and police, and the remaining are United States military personnel, mostly members of the Air Force.

### B.    The Counter Narcoterrorism Global Support Contract

39.    In 2007 the United States Government requested bids for a contract to provide



- 10 -
SECOND AMENDED
COMPLAINT

support services to CNTPO.  On behalf of CNTPO, the United States Army Space & Missile

Defense Command/Army Forces Strategic Command ("USASMDC") awarded five indefinite

delivery/indefinite quantity ("ID/IQ") contracts to prime contractors.

40.     One of the five contracts, Contract No. W9113M-07-D-0007, was awarded to

Northrop on or about August 24, 2007 for program and operations support for CNTPO in

Afghanistan.  This contract is referred to as the Counter Narcoterrorism Global Support ("CNGS")

Contract.  The original award was for two years, with three one-year options for extensions.  The

Government extended the Contract each of the option years.

41.     The Contracting Office that oversees administration of the CNGS Contract is the

Non-Standard Rotary Wing Aircraft Office ("NSRWA") within the Department of Defense.

42.     Pursuant to the CNGS Contract, Northrop agreed to provide multiple services in

furtherance of the Government's counter narcoterrorism efforts in Afghanistan.  These services

included providing support services, critical equipment, and materials to CNTPO operations in

Afghanistan, as well as assisting in counter-narcotics operations in Afghanistan.  The support

services required by the Contract include: Technology Development and Application; Training,

Operations, and Logistics Support; and Professional and Executive Support.

43.     The CNGS Contract permits Northrop to subcontract with other entities.  Northrop

subcontracted with DynCorp to perform the majority of the services required by the Contract.

Northrop, however, continues to provide overall management of the project, and is responsible for

fulfilling the requirements of the Contract.

44.     Relator estimates that DynCorp performs approximately 90% of the actual Contract

operations and support related services.  Most significantly, in terms of manpower and equipment,

DynCorp handles all activities that are flight and training related, and all of the support elements for



- 11 -
SECOND AMENDED
COMPLAINT

flight and training related activities.  For example, DynCorp supplies aircraft parts, weapons and night vision goggles for the military; repairs and tests aircraft; performs all aircraft quality control functions; conducts flight training and aviation safety training; manages pilots; and plans and executes counter-narcotics missions alongside United States and Afghan military personnel.

45.    Because it is impossible to specify the Government's precise counter narcoterrorism needs at the outset of each prime contract, as needs arise the Government and the prime contractor execute "Task Orders" detailing particular operations or services that the contractor agrees to furnish.

46.    Under the CNGS Contract, there are three payment options for task orders:  (1) firm-fixed-price, level-of-effort for labor tasks; (2) cost-plus-fixed-fee for material and other direct costs; and (3) cost-reimbursable for travel and insurance.[1]  The Government utilized all three payment options on task orders under the Contract, with the selection of payment option dependent upon the type of work performed.

47.    For the majority of the CNGS Contract activities that are the subject of this Second Amended Complaint, the Contract and task orders thereunder provided for payment on a cost-plus basis.  That is, Northrop provided the Government with records showing the cost of allowable expenditures, and the Government reimbursed the cost, plus a fixed margin on top of those

---

[1] (1) Firm-fixed-price contracts are task orders with an established price that is not subject to any adjustments based on the contractor's performance.  Firm-fixed-price, level-of-effort contracts require the contractor to provide a specified level of effort over a stated time period on work that can only be stated in general terms.  48 C.F.R. § 16.207-1.  (2)  Cost-plus-fixed-fee contracts are defined as a type of cost-reimbursement contract allowing a fee paid to the contractor to remain fixed in relation to the actual cost.  However, the fee can be varied according to changes in the work performed.  48 C.F.R. § 16.306. (3) Cost-reimbursable contacts provide for payment of allowable costs incurred to the extent permitted by the contract.  The contract contains an estimated total cost and establishes a ceiling that the contractor cannot exceed.  48 C.F.R. § 16.301-1.

expenditures.  The margin varied between different expense categories and within single categories.

The Government paid Northrop, and Northrop in turn paid DynCorp with Government funds for

work that DynCorp performed under the Contract.

## V.    CNGS CONTRACT LANGUAGE AND LEGAL FRAMEWORK

48.    Like all Government contracts for goods and services, the CNGS Contract and the

Subcontract and task orders thereunder are governed by the Federal Acquisition Regulation

("FAR"), codified in Chapter 48 of the Code of Federal Regulations.  FAR sets forth the

requirements binding the executive agencies of the United States and all contractors that provide

goods and services to those agencies.  48 C.F.R. § 1.101 et seq.

49.    Because the CNGS Contract specifically involves defense contracting, it is also

subject to the Defense Federal Acquisition Regulation Supplement ("DFARS"), promulgated by the

Department of Defense.  41 U.S.C. § 421(c)(2).

50.    In addition, many items utilized on the CNTPO program are subject to the

International Traffic in Arms Regulations ("ITAR").  ITAR restricts access to certain defense-

related information, articles, and technologies.[2]

51.    Under the FAR, DFARS, and ITAR provisions governing the CNGS Contract and

Subcontract, Northrop and DynCorp were required to establish and maintain a system to control,

protect, preserve, and maintain all Government property in their possession, and to provide a

complete and auditable record of any shortage, loss, damage, or destruction of that property.

52.    FAR 52.245-1, entitled "Government Property" requires in pertinent part:

---

[2] In April 2013, DynCorp appointed Relator as DynCorp's ITAR Compliance Officer for the
CNTPO program. Relator's official title in this position was "Export Control Administrator."  In
this position Relator was responsible for ensuring DynCorp's compliance with ITAR and export
trade laws and regulations.

(b) Property management. . . . The Contractor shall have a system to manage (control, use, preserve, protect, repair and maintain) Government property in its possession. The system shall be adequate to satisfy the requirements of this clause.  In doing so, the Contractor shall initiate and maintain the processes, systems, procedures, records, and methodologies necessary for effective control of Government property, consistent with voluntary consensus standards and/or industry-leading practices and standards for Government property management . . . .

*        *        *        *

(f)(iii) Records of Government property.  The Contractor shall create and maintain records of all Government property accountable to the contract . . . .  (A) Property records shall enable a complete, current, auditable record of all transactions . . . .

(f)(iv) Physical Inventory.  The Contractor shall periodically perform, record, and disclose physical inventory results. . . .

(f)(vi) Reports.  The Contractor shall have a process to create and provide reports of discrepancies; loss, damage, destruction, or theft; physical inventory results; audits and self-assessments; corrective actions; and other property-related reports as directed by the Contracting Officer.

(A)  Loss, damage, destruction, or theft.  Unless otherwise directed by the Property Administrator, the Contractor shall investigate and promptly furnish a written narrative of all incidents of loss, damage, destruction, or theft to the property administrator as soon as the facts become known . . . .

48 C.F.R. § 52.245-1.

53.     Under DFARS 252.242-7004, the contractor must maintain a Material Management and Accounting System ("MMAS").  That section of DFARS requires the following:

(d) System Criteria.  The MMAS shall have adequate internal controls to ensure system and data integrity, and shall—

 (1) Have an adequate system description including policies, procedures, and operating instructions that comply with the FAR and Defense FAR Supplement;
 . . . .
(3) Provide a mechanism to identify, report, and resolve system control weaknesses . . . .;

(4) Provide audit trails and maintain records (manual and those in machine readable form) necessary to evaluate system logic and to verify through transaction testing that the system is operating as desired;

(5) Establish and maintain adequate levels of record accuracy, and include reconciliation of recorded inventory quantities to physical inventory by part number on a periodic basis. A 95 percent accuracy level is desirable.

48 C.F.R. § 252.242-7004(d).

54.     FAR and DFARS require government contractors that manage government property to conduct regular inventories of that property.  When an inventory reveals a shortage that cannot be accounted for due to a technical or administrative error (such as miscoding items or placement of items in the wrong bin, etc.), the shortage is considered a "Loss, Theft, Destruction or Damage" (LTDD) event.  When there is an LTDD event, the regulations require that an LTDD report be created and provided to the Government Property Administrator.  *See* FAR 52.245-1.

55.     In relevant part, FAR 52.245-1, entitled "Government Property," provides:

> Loss, damage, destruction, or theft.  Unless otherwise directed by the Property Administrator, the Contractor shall investigate and promptly furnish a written narrative of all incidents of loss, damage, destruction, or theft to the property administrator as soon as the facts become known . . . .

48 C.F.R. § 52.245-1.[3]

56.     The LTDD report must provide a variety of information, including a description of the loss, the cost of the loss, the reason for the loss, and the Corrective Actions that will be taken to mitigate future losses.  48 C.F.R. § 52.245-1(f)(vi).

57.     The LTDD report serves multiple purposes.  First, it apprises the Government of the missing items and the reason therefor.  Second, it permits the Government to oversee corrective action so that similar losses do not continue to occur.  Third, it provides a procedure for either assessing the cost of the loss to the contractor or, alternatively, relieving the contractor of responsibility for the missing items.

---

[3] ITAR and related regulations require even stricter reporting requirements when there is a loss of sensitive property.  *See, e.g.,* DOD Manual, No. 5100.76, issued April 17, 2012, http://www.dtic.mil/whs/directives/corres/pdf/510076m.pdf, at page 77 (loss of sensitive military property must be reported as soon as possible but no later than 72 hours after discovery to the Office of the Under Secretary of Defense for Intelligence, Director of Security).

58.     Upon review of the LTDD, if the Government Property Administrator determines that the contractor should not be held financially liable for the missing items, the Property Administrator issues a "Relief of Responsibility" (ROR) report, which, as its name implies, relieves the contractor of any further responsibility for the missing items.  The pertinent federal regulation provides:

> (vii) Relief of stewardship responsibility. Unless the contract provides otherwise, the Contractor shall be relieved of stewardship responsibility for Government property when such property is
>
>     (A) Consumed or expended, reasonably and properly, or otherwise accounted for, in the performance of the contract, including reasonable inventory adjustments of material as determined by the Property Administrator; or a Property Administrator granted relief of responsibility for loss, damage, destruction or theft of Government property . . . .

48 C.F.R. § 52.245-1(f)(vii).

59.     Pursuant to FAR 52.245-1(h)1(ii), government contractors are responsible for the "[l]oss of Government property that is the result of willful misconduct or lack of good faith on the part of the Contractor's managerial personnel."

60.     Under the CNGS Contract, each Task Order contains a Statement of Work describing the types of services to be provided by Northrop.  Northrop in turn provided a Statement of Work to DynCorp describing the types of services to be provided by the subcontractor.

61.     Each Statement of Work ("SOW") issued by Northrop to DynCorp states clearly that DynCorp is required to maintain strict accountability for all Government-owned property in its possession.  For example, the provision governing "Accountability" for Government Furnished Equipment states:

**15.0    Government Furnished Equipment Or Material**
**15.1 Accountability.**
The Subcontractor shall maintain strict accountability of parts/ equipment in its possession. At a minimum, items will be tagged/labeled/identified while in possession of the Subcontractor.  Subcontractor responsibility extends to maintaining accurate chain of

custody documentation to track turnover / possession between the U.S. Government, the Subcontractor, the MoD AAF [Ministry of Defense, Afghan Air Force] and the MoI-CN [Afghan Ministry of Interior-Counter Narcoterrorism] Air Squadron.  In the case of theft or loss, the reported incident will be examined by a USG representative in theater and the T/OM [Task Order Monitor].  Examination of all aspects of the incident, to include documentation will be reviewed with final determination by the responsible Contracting Officer.

Northrop to DynCorp SOW, July 2, 2012.

62.     Other standard provisions of the SOW governing property management

responsibilities of the subcontractor include:

**3.1 Maintenance/Sustainment.** Subcontractor shall implement a supply chain management and aviation maintenance program in accordance with (IAW) authorized processes and procedures . . . .

**4.1.1 Inventory and Warehouse Management.** The Subcontractor shall maintain the existing standardized material management processes and procedures . . . .

**5.2.1 Warehouse**.  The Subcontractor shall establish accountability and security procedures to minimize pilferage, loss and damage of material and shall provide the USG a discrepancy report annually.  The Subcontractor shall establish warehouse procedures so that parts will be tracked to their location . . . .

**19.1 Reports.**
Subcontractor shall be capable of generating the following technical reports (CDRL A00E) on a near-real time basis (less than 24 hrs) upon request.
a) Backorder Report: Show all items that are currently on backorder.
b) Document Report: Shows all transactions that processed for the given calendar month by day (issues, receipts, turn-in and others as required).
c) Demand Data Information: Shows all demands made against supply by part number for the current month and all previous months during the period of T/O performance.
d) Inventory Report: Show on-hand quantity of all parts . . . . *Id.*

63.     In order to comply with the property management requirements of FAR/DFARS,

DynCorp developed its own internal procedures, called a "Property Management Plan," DynCorp

Document No. 3.5.17.1 (hereafter, "PMP").  Section I.A. of the PMP describes its purpose:

SECOND AMENDED
COMPLAINT

The purpose of this Property Management Plan (PMP) is to establish DynCorp International LLC's (DI) formal property procedure with a focus on the management of all categories of property including (DI) corporate, government, and customer, assets.

The property function is responsible for establishing an infrastructure that will facilitate property management through the entire life cycle of an asset.  This includes developing and implementing detailed policies, procedures, operating guidelines and recordkeeping system(s).

. . . . Program/Project Managers and Subcontractors are required to use this Plan except where inconsistent with law, regulation or contract provisions.  [PMP, p.2.]

With regard to maintaining property records, the PMP provides:

Property Records – Records of Government Property must ensure the accountability and maintenance for the Government property in DI's possession, to include DI primary and alternate mission locations as well as subcontractor locations. DI Program Property Managers (PPM) shall ensure that the property management system, established for each DI Government contract, maintains custodial and property control records as required by the Contract/Customer requirements, FAR 52.245-1(f) and DI 3.5.17 and all applicable property clauses. . . . [*Id.*, p. 27.]

Official and custodial property records will provide complete identification of all property (government, customer and company) including quantities on hand by location, and complete current accounting audit trails including supporting voucher and transaction files. . . . [*Id.*, p. 28.]

The DI system of record is used as a basis for posting information to the records of property to provide a complete, current and auditable record of all transactions: evidencing acquisition, receipt, consumption, utilization,  movement, maintenance, physical inventory reconciliation and reporting, and disposition; . . . Official, accountable records will be maintained to show the status and control of all government property furnished by the government or acquired by DI.  [*Id.*]

With regard to conducting inventories, DynCorp's PPM provides:

When applicable, standard inventory frequency of 10% monthly will be maintained in applicable system of record for all materials and non-sensitive items. For some controlled property, e.g., night vision devices, technical data, etc., more frequent inventories might be required in accordance with license conditions and contract requirements.  [*Id.*, p. 32]

With regard to making adjustments to inventory, the PMP provides:

SECOND AMENDED
COMPLAINT

**Reconciliation:** . . . . All potential adjustments must be thoroughly reviewed and verified to determine the validity of the adjustment and the contributing factors that created the need for the adjustment. . . .  [*Id.*, p. 34.]

With regard to reporting instances of loss, theft, damage or destroyed property, the PPM provides:

**Reports of Lost Theft Damaged Destroyed (LTDD) Property -** All PPM shall implement a reporting process for all instances of loss, theft, damage or destroyed government, customer or DI property. . . .The appropriate agencies and authorities shall be notified as soon as possible but no later than 7 days depending upon the location and type of property.  [*Id.*, p. 38.]

64.     As alleged below, DynCorp, with knowledge of Northrop, recklessly disregarded its contractual and regulatory obligations and internal procedures requiring it to maintain strict accountability over the Government's property and to report missing items to the Government. Moreover, DynCorp, with knowledge of Northrop, also devised several fraudulent schemes to deceive and mislead the Government about DynCorp's accountability for the Government's property and to conceal property management deficiencies from the Government.

65.     As a consequence of Defendants' conduct, hundreds of millions of dollars of Government property and services were lost or wasted in the CNTPO program.

## VI.     THE ROLE OF LOGISTICS AND PROPERTY MANAGEMENT UNDER THE CNGS CONTRACT

### A.     The Logistics Function

66.     The CNGS Contract required Northrop (through Dyncorp) to provide a variety of services for CNTPO including Operations (actual flight operations); Training and Management of pilots; Certified Technicians Services; Maintenance of equipment; Aviation Safety (training, paramedics, etc.); Special Mission Wing (SMW) Maintenance; Information Technology / Management Information Systems; and Logistics.

67.     Logistics is integral to all of the other activities.  Logistics involves managing the



- 19 -

flow of persons and property on the Contract.  Of particular relevance to this Second Amended

Complaint, the logistics function encompasses all aspects of property management, including (1)

procurement, (2) supply chain management, and (3) inventory management.

68.     "Procurement" refers to the process of purchasing items for the Government's

benefit.  On the CNGS contract, DynCorp handled procurement duties.

69.     "Supply chain management" refers to the process of receiving, moving, and tracking

an item from the vendor to the point of use.  Items ordered by DynCorp typically travel from the

vendor to a DynCorp Quality Consolidation Center ("QCC") located in Coppell, Texas.  There, the

item is "Verified," i.e., determined that the items delivered match the purchase order.

70.     From the QCC, the item is shipped by private carrier (typically via DAMCO, the

DynCorp contracted overseas carrier) to another DynCorp QCC, located in Dubai, UAE.  At the

QCC in Dubai, multiple shipments are consolidated for forward transport to CNTPO in Afghanistan

for delivery to the end-user.  For goods procured "locally," meaning throughout the Middle-East

region, the vendor may ship directly to the DynCorp QCC located in Dubai.  The item is then

moved by private carrier (usually by truck) to Kabul.  Kabul is supposed to receive all property,

regardless of whether the ultimate destination is a satellite base.

71.     "Inventory management" refers to stewardship of government property that is in the

possession of a contractor.  Inventory management formally begins with "Receiving," the process

by which property is recorded as having been delivered to the site where it will be put into service.

72.     There are different categories of property that are "received."  One type of property

is Government Furnished Equipment ("GFE"), which refers to equipment that the Government

furnishes to a contractor for use in providing services under the contract.  Unlike property procured

on the Government's behalf, which moves within a contractor's supply chain, a contractor is not

responsible for GFE until it is formally received.  On CNGS, the Government furnished the

property directly to Northrop (as the prime contractor), and Northrop was required to sign for it and

then formally turn over custody to DynCorp.

73.     Once a contractor formally receives an item of GFE, it is accountable for it.  Within

CNGS, such property generally consists of heavy equipment, such as helicopters, military vehicles,

forklifts, aircraft tugs, auxiliary power units, nitrogen carts, and cranes; as well as aircraft parts and

components.

74.     The other type of property is Contractor-Acquired Property ("CAP"), which refers to

property that a contractor procures for use in providing services to the Government.  Within CNGS,

CAP consists primarily of aircraft ground support equipment, maintenance tools, weapons, scopes,

Kevlar vests and helmets, and IT and office equipment.  Once CAP is formally received (i.e.,

delivered), a contractor can bill the Government for it, and title to the property changes to the

Government, at which point CAP is also referred to as Government Furnished Property ("GFP").

Henceforth in this Second Amended Complaint, the acronym "CAP" will refer to Contractor

Acquired Property that was billed to the Government.[4]

75.     The process of "receiving" consists of someone in-country signing for the items,

securing them in the receiving supply yard until each item can be verified against a shipping

manifest, and then recording the fact of delivery into the electronic repository.  The process of

receiving is completed by supply technicians and Property Book Officers ("PBO").  Supply

technicians (also commonly referred to as "supply officers") physically receive the pallets or boxes

and provide the relevant paperwork to the PBO.  The PBO verifies each item against the order, and

---

[4] For purposes of this Second Amended Complaint, CAP also includes Contractor Acquired
Services that the contractor bills to the Government, including internet, satellite data, mobile
communications, local labor services, garbage and hazardous material removal, and shipping costs.

records the fact of delivery into the system.  Once the system is updated, the status of the item

changes from "in transit" to "in stock" (until it is issued or hand receipted out).

76.     After receiving, a contractor is responsible for accounting for (i.e., tracking) the

government property (GFE and CAP) that it uses or consumes on the contract.  The system of

tracking depends on the type of property involved.  There are two types of property:  Material and

Equipment.

77.     Material refers to items of property that are expected to be consumed during the life

of the contract (e.g., gas, food, clothing, toner, calling cards) and items that will lose their separate

identity by being incorporated into another item (e.g., aircraft parts).  By dollar value, aircraft parts

constitute the highest percentage of material on CNGS.  Once material is received, it is either

assigned to a storage warehouse facility or "issued" to an end user (in a transaction that is recorded

in a log).

78.     Equipment consists of durable items of property that are expected to survive the life

of the program (and thus be returned to the Government, or delivered to a third party at the

Government's direction, at the end of the contract).  Once a piece of equipment is received, supply

officers either move it to a storage warehouse facility or issue it to an end user through a system of

"hand receipts."

79.     When a supply officer issues an item of equipment, he retains a hand receipt with

relevant information about the item of property and the signature of the person to whom the

property is issued.  The custodian of the property is then legally responsible for the item of

equipment.  If the equipment is returned, the supply officer returns the hand receipt to the custodian

and the custodian is no longer legally responsible for the item.

80.     If these rules are followed, then until equipment is returned, a supply officer or PBO

can determine the location of a particular item of equipment at a particular time merely by referencing the hand receipt.

**B.    DynMRO and MIS**

81.    Federal regulations require a government contractor to create a system of records that tracks the accountability of Government property "from cradle to grave," i.e., at all stages of the property's life cycle.  FAR and DFARS require that an approved property management system be capable of audit by the United States Government and be certified by the Government.  Under these regulations, a system is auditable if data entered into the system is non-changeable (i.e., an entry cannot be changed without creating a record of the change), and limits system user rights to align with a user's job duties.

82.    DynCorp's certified property management system is known as DynMRO. DynCorp's exclusive rights to DynMRO gave it an advantage over competitors that do not have a government certified management information system.

83.    DynMRO was designed to be DynCorp's system of record, i.e., the central repository of all underlying procurement, supply chain, and property management transactions occurring on a government program, as required by FAR.  DynMRO was supposed to be updated when property was procured, when it was received in the QCC in Texas, when it was shipped from the QCC to Dubai and then to Kabul, when it was received in Kabul, and when it was either issued (material) or hand receipted out (equipment) to end users in Kabul (or other bases).  If the system works properly, the location and all information regarding an item of property is available to anyone with access to the system.

84.    Because DynCorp considered DynMRO to be proprietary software, it would not allow other contractors (including Northrop) access to the system or even to use data in the system.


SECOND AMENDED
COMPLAINT

That posed a problem on CNTPO, which involved several different military personnel and different contracting companies.  Additionally, the mission of CNTPO in Afghanistan is to turn over the program, including all of the equipment and operational support elements (both GFE and CAP), to the Afghan government at the completion of the program so that the Afghan government can continue these essential operations.

85.    Because DynMRO is proprietary software – and because DynCorp had not designed DynMRO to be conversant with the Dari and Pashtun languages prevalent in Afghanistan – DynCorp could not simply turn it over to the Afghanistan government in the future.  As part of the CNGS Contract and Subcontract, DynCorp agreed to develop and implement a new management information system, called MIS, that it would turn over to the Afghan government at the end of the program.  The purpose of MIS was to import the data from DynMRO and other contributing software platforms into a stand-alone database that would then be passed on to the Afghan government when turnover was complete.

86.    As alleged below, both DynMRO and MIS were flawed tools.  MIS never became operational; and DynMRO, though operational, never adequately tracked government property.

## ALLEGATIONS

### VII.    DEFENDANTS' FRAUDULENT CONDUCT AND RECKLESS DISREGARD FOR CONTRACTUAL AND LEGAL OBLIGATIONS ON THE CNTPO PROGRAM VIOLATED THE FCA AND CAUSED MILLIONS OF DOLLARS OF DAMAGE TO THE UNITED STATES

#### A.    Shortly After He Began Working for DynCorp, Relator Learned of Massive Problems With Defendants' Management of Property on the CNTPO Program

87.    Relator began working for DynCorp on September 27, 2012, as the Logistics Manager on the CNTPO program, the highest-ranking logistics officer for DynCorp on the CNTPO



program in Afghanistan.  He was responsible for logistics not only for the Kabul base, but for all the CNTPO bases in Afghanistan.  Approximately twenty-five logistics employees were designated to report to him.

88.     According to the organization chart that DynCorp provided him, and what he was told by his superiors, Relator's job was to oversee all aspects of logistics in the program, including procurement, supply chain management, transportation management (moving personnel or equipment), and property/inventory management.  In his new position he quickly learned that DynCorp's system for managing property for the CNTPO program was completely broken and non-compliant with the CNGS Contract and federal law.

89.     For the first month after being hired, Relator trained in Fort Worth, Texas, under the guidance of Rebecca ("Becky") McClendon, DynCorp Senior Logistics Manager.  Although Ms. McClendon had responsibility for CNGS, she also worked on a number of other government contracts within DynCorp's Aviation Group.  She worked from DynCorp's Fort Worth office.  Ms. McClendon was Relator's direct logistics supervisor on the corporate side (i.e., his supervisor in the United States); in country, his direct supervisor was Mark Fisher, DynCorp's Project Manager (in Kabul) on CNGS.

90.     While Relator was in Fort Worth, Ms. McClendon "cross trained" him regarding DynCorp's operations in the United States for the CNTPO program.  She wanted Relator to understand the roles that DynCorp logistics staff operating in the United States performed as they related to the CNTPO program.  She showed him how to read and interpret data in DynMRO and how to order through the procurement process.

91.     During his training, Ms. McClendon emphasized that the "day to day" task of "keeping the squadron flying" (i.e., initiating procurement orders in response to government



requests) was critical.  She downplayed the importance of property management in-country.  She

conceded that property management in CNGS over the past several years had been chaotic or non-

existent.  She said, "Well, as you're going to find out, there's never really been property

management there."  Ms. McClendon noted that the property management function in Kabul was

short-handed, but they were "doing the best they can" with the inadequate resources they were

given.

92.    Ms. McClendon also told Relator that he was probably going to notice that certain

items of property were not in DynMRO (even though the Contract and federal regulations require

the system of record to track all property), but she told him not to worry because John Tanner, the

Logistics Lead, and Randy Carr, the MIS Lead, had told her that property was being tracked in MIS.

(Relator later learned that property was *not* being tracked in MIS, since MIS was non-functional.

*See* ¶¶ 152-169 below.)

93.    Ms. McClendon said that she had asked for reports regarding property management

from Mr. Tanner and Mr. Carr but they failed to provide them.  Moreover, neither Ms. McClendon,

nor anyone in the United States, had access to MIS, which was still being managed by DynCorp's

IT organization.  That lack of access made it impossible for her to verify that in-country personnel

were following property accountability procedures and entering information into MIS.

94.    In the course of his training, Relator noticed an entry for a pair of night vision

goggles ("NVG") in DynMRO.  Under the field for "location," the NVG were listed as "**Lost**."

95.     In a system compliant with FAR/DFARS, such an entry would be impossible.  In a

compliant system, when the custodian of an item reports it as lost, the Property Book Officer must

fill out a Loss, Theft, Damaged or Destroyed ("LTTD") form and forward it to the NSRWA

contracting officer.  An investigation is then conducted to determine whether there has been fault on

the part of the contractor.  If so, the contractor is responsible for paying for the item; if not, the Government absorbs the loss.  While that determination is pending, the system should display that the property is still in the custody of the person to whom it was last hand-receipted (i.e., the hand receipt for the item should not be returned to the custodian).

96.     In this instance, the Property Book Officer had returned the hand receipt, absolving the custodian of responsibility, and simply marked the location as lost.  There was no indication that DynCorp had disclosed the loss to the Government or that an investigation to apportion responsibility had ever been done.  These failings were serious not only because they represented a disregard for the requirements of the Contract and federal regulations, but also because NVG's are a sensitive item subject to ITAR.

97.     When Relator asked Ms. McClendon about the issue, she told Relator "not to worry about that," saying that she "knew the history."  She said, "We know there are issues in DynMRO.  You're not telling us something we don't know."  She summarily concluded, "You're up to speed on DynMRO" and told him not to "dig around" the system any further.  She encouraged Relator to take off the rest of that afternoon.  Relator believed that Ms. McClendon was defensive about the subject of property management since she had been the Senior Logistics Manager, responsible for property management since the beginning of the CNTPO program.

98.     When he went to Afghanistan, Relator soon learned that his early exposure to the failings of DynCorp during training was only a small window onto a much bigger problem: DynCorp's entire property management system for CNTPO was completely broken and dysfunctional.

**B.      Shortly After His Arrival in Afghanistan, Relator Discovered That DynCorp Had Lost Track of Millions of Dollars of Government Property**

**1.      Relator Discovered That DynCorp Blatantly Disregarded Standard Procedures, Required by Law and Contract, for Handling the Receipt and Tracking of Government Property**

99.      On October 25, 2012, Relator arrived in Afghanistan.  In the weeks following his arrival, he learned that the property management situation was even worse than the very bleak picture that his superior, Ms. McClendon, had described.

100.      After Relator arrived, as often as fifteen or twenty times a day, DynCorp personnel would approach him to ask where particular materials or items of equipment were.  This was often the result of Air Force personnel asking a Northrop manager why a particular piece of equipment necessary to the mission was unavailable.  The Northrop manager would then ask a DynCorp mechanic or technician, who would say that he had requested the item, often some time ago.  The DynCorp personnel would then ask Relator where the item was or to provide information regarding its procurement and estimated delivery date.

101.      These questions related to "mission essential" items, such as generators, aircraft repair tools, safety wire, safety gloves, avionic testing equipment, and equipment calibrations to name only a few.  The DynCorp personnel would explain to Relator that the item had been ordered months or even years ago but apparently still had not arrived.  In researching these items, Relator began to discover the extent of problems within DynCorp's system of property accountability.

102.      When trying to find an item that DynCorp had ordered, Relator typically began by referencing whatever information was available in DynMRO.  He discovered that many of the items that were being requested were listed in DynMRO as being "in transit."  An "in transit" item indicated that the item was en route from the QCC (Texas) to Kabul, or between CNTPO sites.  But many of the "in transit" items that Relator saw had been "in transit" for years.

103.     Relator investigated the problem by contacting the vendor to obtain tracking

information from which he could determine whether the item had, in fact, been delivered.  He

discovered that often delivery had occurred months or years before, but that no DynCorp employee

had properly handled receipt of the item in Kabul, nor updated the system to reflect the delivery.

104.     To try to locate the item, Relator then tracked down the person who had signed for

the item (which would be provided by the carrier's tracking information).  Invariably, this led to a

dead end.  Often, the person who had signed for the item did not remember doing so or had never

even seen the property to begin with but had simply signed at the direction of someone else.  Other

times, the person was no longer with the program and could not be located or contacted.  Other

times, the person who had signed for the property had given the property to someone else (without

creating a hand receipt or other record indicating that change of possession).  Invariably, the next

person in this "chain of custody" had done (or, rather, failed to do) the very same thing.

105.     In the few instances where someone had made a note of receiving the item, each

department appeared to have its own ad hoc private recording system.  Some departments kept

spreadsheets on which they recorded items of property.  Others attempted to use a manual hand

receipt system, including on the hand receipt whatever information they saw fit.  All of these

various systems were ad hoc and not compliant with FAR.  They often became useless when the

person who devised the system left the program or, as in the case for the base Operations

Department, they were under the misunderstanding that they were required to burn all paperwork

once per year.

106.     Within weeks of his arrival, Relator realized that poor receiving practices in Kabul

were leading to serious problems for the CNPTO mission.  Many items were simply being put into

use – or disappearing – without ever being received and assigned to the end user for whom they had

been designated.  In the absence of any accountability for the property, Relator was rarely able to locate the item that was the subject of the original inquiry, and this had a continual negative impact on daily mission operations.

107.     Additionally, Relator discovered that even when property was properly received and entered into the system for tracking, numerous problems plagued the system of hand receipts.  Even when hand receipts were received, they generally had not been scanned or updated into the DynMRO system since the program's inception.  Additionally, satellite bases typically did not issue hand receipts at all and thus there was no way to track property after it was sent to a base other than Kabul.

108.     At all bases, respect for the system of hand receipts was appallingly lax.  When personnel went on R&R, they were supposed to return the property to a supply officer who would then return the relevant hand receipt, but this requirement was not enforced.  Typically, personnel simply left the property in the care of someone else, who neither signed for it nor verified what it was.  No data reflecting the transfer of the item was entered into DynMRO.  As a result, sensitive ITAR controlled equipment was allowed to sit unattended in the barracks during a custodian's absence.  It often disappeared.

109.     Some hand receipts were summarily destroyed.  Amber Snodgrass, a DynCorp employee, was the Lead for Aircraft Life Support Equipment ("ALSE"), the equipment that supports flight operations -- e.g., night-vision goggles, flame retardant flight suits, survival radios, encrypted radios, navigation equipment and other important equipment.  All of these items were very sensitive and subject to ITAR.  She was responsible for tracking this important ALSE equipment, both checking it out and ensuring its return every day.  (In the case of ITAR controlled items, she was also required to verify the recipient's authorization to possess the sensitive

equipment.)  Rather than scanning hand receipts and/or updating the data into DynMRO, as required by FAR and DynCorp's internal policies, she purged all of this data by burning the hand receipts once per year, even if some of the hand receipts were only a few days old.

110.     In mid to late November 2013, Relator witnessed a stark example of just how poor receiving practices were in Kabul.  DynCorp had chartered a 747 cargo plane to facilitate transportation from the QCC (Texas) to Kabul of a thirty-pallet load of Aircraft Ground Support Equipment ("AGSE"), including cranes, forklifts, pressure washers, and other expensive items.  The plane contained approximately eight to ten million dollars' worth of AGSE.  Within weeks of the plane's arrival, Northrop managers and DynCorp personnel began asking Relator about particular items that the Air Force had expected to be on the shipment.

111.     When Relator followed up on these inquiries, he found that items were still listed as "in transit" even in cases where Relator knew from the Shipping Manifest that the item had been delivered.  When Relator tried to locate the items, he learned either that numerous items already were being used, even though they had not formally been hand receipted to particular personnel, or that the items could not be located at all, even within days of the shipment's arrival.  In one case, an $80,000 generator could not be located.

112.     Relator had been involved in logistics on over a dozen other government programs/contracts.  On every one, property accountability was scrutinized carefully by the contractor itself.  Internal audits would be performed on a regular basis.  The prime contractor would also audit the subcontractor on property management issues and compliance.  In general, Relator was shocked by the lack of property accountability in the CNTPO program in Afghanistan.

     **2.     Northrop and DynCorp Were Not Willing to Devote Sufficient Resources to Meet Their Property Management Responsibilities Under the Contract and FAR**



113.     During his first few weeks in-country, Relator spoke to many DynCorp personnel on the ground in Kabul that corroborated the scope of the deficiencies in DynCorp's property management system that Relator had observed.

114.     For example, Allen Wood, the previous Deputy Project Manager for DynCorp (in Kabul), had taken a position as Project Manager on G222, a contract that DynCorp was performing for the DoD.  When Relator approached Mr. Wood about the state of property management within CNPTO, Mr. Wood told him that property management was a "[expletive deleted] turd mess."  He added, "We've been trying to get our arms wrapped around it for years.  Good luck with that."

115.     Jimmy McBride, who had been the Logistics Manager from the beginning of the CNGS contract (in 2008) until early 2012 when he became the Deputy Project Manager for CNTPO, told Relator that everyone had known that property management was a mess from day one, but no one had tackled it.  Mr. McBride said that he had raised the problematic state of property management with DynCorp's Project Management Office ("PMO") in Fort Worth but had never received any response or direction.  He added that "no one cares about property management until they care about property management" (i.e., until it caused them a specific problem).

116.     Both during Relator's training and after he arrived in Kabul, Michael Schreiner, a Logistics Supervisor who reported to Ms. McClendon in the United States, said: "Nobody's paid any attention to property management since the beginning of the program."

117.     After working in Afghanistan for a few weeks, Relator observed that three of the basic problems with DynCorp's receiving and tracking functions of property management were that (1) too few DynCorp employees were actually performing these functions on a dedicated basis; (2) those that were performing these functions knew little about proper procedures; and (3) the majority of DynCorp employees designated by the CNTPO program to perform these functions were directed

by DynCorp to perform completely unrelated functions, to the exclusion of their assigned duties.

118.    According to DynCorp's organizational chart, twenty-five DynCorp logistics employees reported to Relator.  Of these, the organizational chart listed only two personnel as being dedicated property management employees.  Of the remaining 23 employees, very few were performing any property management functions at all, and even the two "dedicated" employees were not performing property management functions exclusively; in fact, those two employees were performing many functions that were in direct conflict with their property management duties.

119.    Moreover, Luis Duque was serving as *both* the Supply Officer and the Property Book Officer in Kabul.  Standard property management procedures consistent with FAR/DFARS require that these two different functions be performed by separate personnel.  Under FAR/DFARS, a supply officer should physically receive the property and issue a hand receipt to the custodian of the property.  The PBO then validates the hand receipt and enters this data into the system so that it can be tracked in the future.  Separating the supply officer and property manager roles is one method to safeguard property and to maintain the accountability of the supply system.

120.    Additionally, Mr. Duque was not only serving as both the Supply Officer and PBO for Kabul but for *every* CNTPO base in Afghanistan (although he was never physically present at any site other than Kabul), even though a FAR-compliant property management system requires a PBO representative at every site.  In situations where an item destined for another base was properly routed to Mr. Duque for receiving, Mr. Duque was marking the property as received at the other base, even though he was not at the other base to verify receipt.  Mr. Duque informed Relator that there were "major problems" with property management and that Mr. Duque and others were "doing the best we can."

121.    Mr. Duque lacked the personnel to complete the receiving process properly.  In a

compliant property management system, the Warehouse Manager, Carlos Morales, was not supposed to touch items until Mr. Duque had formally received them.  But Mr. Morales had the personnel (that Mr. Duque lacked) to move items, so his unit unloaded items first.  Some of those items would go through the receiving process later; others never did – people just began to use them without any record (hand receipt) of their having done so (and no corresponding entry in DynMRO).

122.     Relator observed that the basic dynamic was that DynCorp and Northrop personnel knew that there were rampant problems, but nobody wanted to "own" the problems and take responsibility for addressing them.  Moreover, DynCorp and Northrop had a financial disincentive to address the problems since the lack of property management resulted in additional ordering (to replace the property that could not be located), and additional orders meant more profit for Defendants under the cost-plus CNGS Contract.

123.     Within the overall state of disarray in Defendants' management of the Government's property in the CNTPO program, Relator discovered several particularly egregious practices that defrauded and caused financial loss to the Government.  These are detailed below.

C.     **Dyncorp Devised a Fraudulent Scheme to Bill the Government for Property That Dyncorp Falsely Claimed Had Been Delivered to Afghanistan When the Property Was Still Sitting in a Warehouse in Texas, Which Ultimately Led to the Loss and Wastage of Millions of Dollars of Government Property**

124.     Under the law governing the CNGS Contract, the prime contractor cannot bill the Government for Contractor-Acquired Property until the items are delivered into service (i.e., received at the relevant location where they will be used).  In order to circumvent this requirement and expedite payment, DynCorp devised a scheme to systematically falsify records in DynMRO to make it appear that procured items had been delivered in Afghanistan when they had in fact only been received at the DynMRO QCC warehouse in Texas.  As explained more fully below, this

SECOND AMENDED
COMPLAINT

fraudulent scheme caused tremendous confusion within the DynCorp supply chain, resulted in the wastage and loss of millions of dollars of government property, and negatively impacted the CNTPO mission in Afghanistan.

125.    Relator first discovered this scheme in February or March 2013, when the Air Force began threatening to issue a Corrective Action Plan regarding Northrop and DynCorp's failure to provide multiple fully-functioning Avionics test labs.

126.    Aviation industry standards require that every 200 flight hours, operators must test the communications, navigation, display, and operational components of a helicopter, which are known as "Avionics."  Avionic instruments include all gauges in the cockpit, including such critical instruments as the altimeter, temperature gauges for the engine, air speed indicators, and hydraulic gauges.  An Avionics test lab is intended to be housed in a forty-foot container in which several mechanics can conduct a series of tests of avionic components.  The CNGS Contract and task orders required Northrop (and thus DynCorp) to provide a test lab at each base in Afghanistan, a total of five.

127.    In the five years that the Contract had been in place, DynCorp had been unable to supply even one functioning lab, which meant that none of the Avionics on the aircraft for the remaining sites had been tested in-house by Northrop or DynCorp in five years.  (There was a single functioning lab in the Kabul facility of the Afghan Ministry of Defense, but this was put together with solely GFE equipment using components intended for other locations.)  Thus Avionics testing had to be outsourced in a haphazard manner without any reliable testing facility or testing process in place.  The United States Air Force was irate about this problem, which jeopardized the safety of

the soldiers and private contractors flying in the Government's helicopters.[5]

128.     Relator learned of the Air Force's extreme dismay over the lack of Avionics test labs from an email forwarded by Ray Nelson, the Program Director for DynCorp Aviation, as well as from on-the-ground management discussions with DynCorp and Northrop.  Relator immediately tried to determine what components of the test labs were missing, which had been ordered, and which had been delivered.

129.     In May or June 2013, in the course of researching why DynCorp had failed to supply even one functioning Avionics test lab, Relator made several discoveries that led him to uncover DynCorp's fraudulent billing scheme described above.

130.     First, Relator discovered that DynCorp's property records showed that there had been "delivery" to Kabul or another base in Afghanistan of many of the missing components of the Avionics test labs, yet no one in-country had seen the component parts.

131.     Second, Relator noticed that a number of the records stating that the items had been "delivered" were made by one person, Charles Rutledge.  When Relator asked other people in Afghanistan who Mr. Rutledge was, nobody knew.

132.     Thirdly, Relator discovered that several entries were suspicious.  For example, one entry showed that Mr. Rutledge had "received" the property in Fort Worth, Texas on August 21, 2011, and he had also received it as "delivered" in Afghanistan on August 22, 2011.  Since it took anywhere from six to twelve weeks to ship even high-priority items from the QCC (Texas) to

---

[5] During the life of the program, excluding combat-related incidents, there had been five helicopter crashes.  Relator is informed and believes that these aircraft had been maintained using equipment that was out of calibration (i.e. they had not been timely calibrated and/or the calibration had expired).  To Relator's knowledge, no investigation was ever performed to determine if equipment being out of calibration was a contributing factor to the helicopter crashes.

SECOND AMENDED
COMPLAINT

Kabul, that was an impossibility. It was also suspect that Mr. Rutledge himself had both sent the item from QCC Fort Worth and received it the next day in Kabul, Afghanistan.

133. In late June or early July 2013, Relator requested that his colleague Richard Werner be assigned the task of going to Fort Worth and determining whether any Avionics components were sitting in the warehouse. (DynCorp billed this trip to the Government at an expense of approximately $20,000.) On his trip, Mr. Werner discovered that many components of the Avionics test labs that had supposedly been "delivered" in Afghanistan were in fact still sitting in the QCC in Fort Worth. Mr. Werner also learned that Mr. Rutledge was a DynCorp employee in the QCC in Fort Worth and had never worked in Afghanistan.

134. Shortly after learning these facts, Relator obtained an explanation for what was happening from Brian Benton, a QCC Supervisor in Fort Worth who had been temporarily assigned to Kabul to assist with the CNTPO inventory efforts.

135. When Relator learned about all of the Avionics test components sitting at the QCC in Texas, he said to Mr. Benton, "I can't believe all this equipment is just sitting there." Mr. Benton replied, "How'd you know about it?" Relator received the impression that Mr. Benton was worried that Relator had stumbled upon a very sensitive matter. Relator explained that he was not trying to get anyone in trouble; his main concern was getting the components to Kabul as quickly as possible and trying to understand what had caused the problem.

136. Mr. Benton explained that DynCorp's Business Management office had ordered the QCC personnel to falsify property records to indicate that the property had been delivered in Afghanistan before it was even shipped, for the purpose of expediting payment from the Government before payment was due to the vendor. Mr. Benton explained that personnel (like Mr. Rutledge) had achieved this by logging into DynMRO as a "PBO" in Afghanistan, and "verifying"

that an item had been received in-country, even though QCC personnel do not have user rights to log in as in-country personnel.  Mr. Rutledge is a low-level employee who would not have done this without direction from his superiors.

137.     Relator learned that this fraudulent practice was part of a company-wide initiative to expedite invoicing of the Government (through Northrop), particularly for expensive items (such as Avionics test lab components), in order to reduce the amount of money that the company had to pay vendors prior to receiving payment from the Government.

138.     In addition to Mr. Benton, other DynCorp employees, including Michael Schreiner, who had been the Logistics Supervisor for CNTPO before the closure of the Fort Worth PMO office, confirmed to Relator the existence of this billing scheme.

139.     Not only did this practice represent a billing fraud on the Government, but it caused a cascading series of problems in the CNTPO program.  In DynMRO, once an item is delivered into service (i.e., marked as received or delivered to the end-user site), DynMRO can no longer generate a shipping order billable to the Government to transport the item to the end-user site -- since the item is already marked as "delivered," the system will not allow a user to generate a shipping cost for that item.  Thus, by falsely reporting that these items had been delivered to Afghanistan, the QCC personnel were rendering it all but impossible to actually ship the items to Afghanistan using standard shipping procedures.  As a result, many of the items affected by this billing scheme remained stateside in the QCC warehouse in Texas.

140.     Based on his experience on the CNGS Contract, Relator estimates that there were several thousand items that Mr. Rutledge and others entered as "delivered" in Afghanistan while the items were in fact sitting in the warehouse in Texas.

141.     Because these items were laying around the warehouse in Texas, on many occasions

warehouse personnel would try to include these items on an ad hoc basis in later shipments destined

for Afghanistan.  For small items, the QCC would include these items in larger shipments without

listing them on the shipping manifest.  For example, Luis Duque often received shipments in Kabul

in which the billing manifest might list ten items but the shipment would contain 100 items.

142.     When items were shipped but not recorded on the shipping manifest, this caused

tremendous confusion on the receiving end, and more often than not meant that the items were not

logged into the system and were used on a first-come first-served, completely haphazard basis, and

rarely reached the intended user under the billing charge code budgeted and represented to the

Government   .

143.     For larger items, like airplane jacks that Relator found sitting in the QCC in Fort

Worth in March or April 2013, the QCC basically just held the items because they could not be

consolidated with other shipments.  The items that remained in the warehouse in Texas (despite

being shown as "delivered" in DynCorp's records) were essentially lost in the system and never

utilized, or at best, not timely utilized.

144.     The consequences of this fraudulent scheme were serious for the Government.  For

example, the Avionics test lab components that had been sitting in the warehouse for long periods

of time had become worthless.  Avionics test equipment itself has to be tested for calibration every

six to twelve months, depending upon the item.  Because the components had sat on shelves for so

long, they had to be sent out for recalibration before they could be used.  Additionally, it was later

determined that many of these avionic components were counterfeit, which rendered them

worthless, with no recourse taken by DynCorp to notify the Government (which had paid for them)

or to secure proper replacements or credit from the original vendor.

145.     Furthermore, after Relator understood the problem, he could see that the Avionics

SECOND AMENDED
COMPLAINT

orders themselves were both incomplete and excessive.  A complete test lab requires sixty-five components.  After three years, the CNGS team had only 49% of the components required to make the five labs and thus lacked any complete sets, yet it had ordered many duplicate items for particular components.  Northrop and DynCorp had billed the Government $2.1 million and still lacked the parts necessary for even one test lab.  Additionally, the failure to track the orders properly had cost another $300,000, resulting in an expenditure of approximately $2.4 million.

146.    Moreover, each Avionics test lab was powered by a generator that provided a conditioned electrical current set to Russian standards since the avionics components being tested were Russian components of Russian aircraft.  DynCorp had procured five such generators, costing approximately $400,000 each, to power the labs.  These generators, which had never been used to power the labs (because there were no labs), could not be used for any other purpose because of their non-standard current.  Accordingly, they were also useless.

147.    Relator informed Billy Harlin, the DynCorp Director of Procurement and Supply Chain Management (in DynCorp's Corporate office), about the Avionics problems, including the fact that QCC personnel had falsely listed items as "delivered" in Kabul.  Mr. Harlin indicated that he would look into the issues, but he never responded to Relator or addressed the issues.  Relator also reported these problems to several other DynCorp officials, including Mr. Fisher, Mr. Nelson, Ms. Albaugh, and Ms. Smith, but no corrective action was taken.

148.    DynCorp never disclosed to the Government the billing scheme.  DynCorp also did not disclose that it had ordered many duplicate items to replace items that were recorded as "delivered" but that could not be located.

149.    The Air Force decided not to wait any longer on DynCorp for a functioning Avionics test lab.  In July 2013, the Air Force approved an order to Lockheed Martin to supply digital



components for the Avionics labs.  The three new test labs cost approximately $12 million each.

> **D.     DyncCorp Failed to Maintain a Reliable Property Management System to Track Inventory, as Required by Law and Contract, Which Resulted in Loss and Wastage of Millions of Dollars of Government Property**

150.     Under FAR and DFARS, DynCorp was required to establish and maintain a system to control, protect, preserve, and maintain all Government property in inventory, and to provide a complete and auditable record of any shortage, overage, surplus, loss, damage, or destruction of that inventory.  *See, e.g.*, FAR 52.245-1.

151.     DynCorp's certified management information system is known as DynMRO.   As part of the CNGS contract, DynCorp agreed to develop and implement a new management information system, called MIS.  MIS would be turned over to the Afghan government at the end of the CNTPO program.  *See* ¶¶ 80-84 above.

152.     As explained more fully below, neither DynMRO nor MIS were adequate to the task of tracking the Government's property.  MIS was an emperor with no clothes:  everyone *believed* that it was tracking GFE, but the property management module of the software was never turned on and never was operational for a single day.  DynMRO was not much better.  Although it was operational, it was so riddled with problems that it was wholly unreliable.  This left DynCorp with no reliable tool to track property on the CNGS Contract.

> **1.     Most Dyncorp Employees Assumed That MIS Was Tracking GFE, but in Fact MIS Was Not Tracking Anything, Much Less GFE**

153.     During his initial training in Fort Worth (in September and October 2012), Ms. McClendon had informed Relator that DynCorp tracked Government Furnished Equipment (GFE) in MIS, not in DynMRO.  *See* ¶ 91 above.  She explained that DynCorp used DynMRO to track Contractor-Acquired Property (CAP) but not to track GFE.

154.     Within weeks of arriving in Afghanistan, however, Relator began to suspect that

DynCorp was not tracking GFE in MIS.  Since Relator did not have direct access to MIS, he began

speaking with other DynCorp officials with access to MIS to determine whether the system was in

fact tracking GFE, as it was supposed to do.

155.     Several people stated that it was their "belief" or "understanding" that GFE was

being tracked in MIS, but no one could confirm that GFE was in fact being tracked in MIS.  For

example, Luis Duque, the Supply Officer and the Property Book Officer in Kabul, said that it was

his "understanding" that DynCorp was tracking property in MIS.  Relator found it bizarre that Mr.

Duque, the only Property Book Officer in CNTPO, would have no direct visibility into MIS.

156.     When Relator followed up with IT personnel involved in developing MIS, including

Guy Frazier (the IT Project Manager), Relator received a series of conflicting answers regarding

whether MIS was tracking property.  Some personnel informed him that the property was being

tracked.  Others informed him that property was being tracked but MIS was incapable of generating

any reports.  Still others informed him that the MIS property management module was not even

operational, nor funded to become operational.

157.     Relator also followed up with Randy Carr.  Mr. Carr had been the Logistics Manager

from approximately January 2012 through July 2012, when DynCorp had removed him from the

position and placed him in charge of the MIS software development.  Relator had numerous

conversations with Mr. Carr in which he tried to ascertain whether DynCorp was tracking property

in MIS, but he could not get a clear answer.

158.     The fact that no one could confirm that MIS contained records of GFE began to

worry Relator.  He was particularly concerned over whether MIS was tracking aircraft parts, one of

the most sensitive, mission essential, and expensive categories of property that the Government

entrusted to Northrop and DynCorp.


SECOND AMENDED
COMPLAINT

159.     On CNTPO, aircraft parts were GFE to DynCorp, since Lockheed Martin procured the parts and, at NSRWA's direction, furnished them to Northrop (and DynCorp).  Relator repeatedly asked DynCorp employees Guy Frazier (IT Project Manager), Carlos Morales (Warehouse Manager), Randy Carr (CNTPO Logistics Manager), Rick Hays (CNTPO IT Manager), Mark Fisher (CNTPO Project Manager), Rebecca McClendon (Senior Logistics Manager) and Steve Baber (CNTPO IT Lead), whether DynCorp was tracking and accounting for these parts.  He could not obtain a straight answer.

160.     In mid-November 2012, Relator asked Mr. Morales, who was a manager for the Class 9 warehouse, whether DynCorp was tracking aircraft parts in MIS.  Mr. Morales said that he was tracking the aircraft parts himself, on Excel spreadsheets.  The spreadsheets listed neither part numbers nor specific quantities, thus making it impossible for DynCorp to provide accurate inventory levels to NSRWA.  Not only was this a non-compliant way of tracking this critically important set of property, but it raised a serious red flag in Relator's mind that MIS was not tracking these parts – otherwise, Mr. Morales' spreadsheet would not have been necessary.

161.     Relator brought his concerns to the attention of Mr. Fisher and Ms. McClendon, but they both told him that this was "not [his] concern."  Although Mr. Morales's department was supposed to report to Relator, and Relator was the manager responsible for ensuring that Mr. Morales's department complied with the Contract and federal law, Northrop claimed that Mr. Morales reported to Northrop managers only.  It was apparent that Northrop did not want Relator looking further into this subject.

162.     In late November and early December 2012, Relator reported his suspicions that DynCorp was not tracking property in MIS not only to Mr. Fisher and Ms. McClendon, but also to Melissa Smith (DynCorp Aviation Property Management Manager), Ray Nelson (DynCorp



Aviation Program Director), Rhonda Dodson (DynCorp Director of Property Management) and Guy Frasier (DynCorp IT Project Manager), and others at DynCorp's Corporate office, but they refused to take him seriously.  Ms. McClendon claimed that Relator did not understand what he was talking about or was getting incorrect information because she was convinced that all CNTPO property was being tracked within MIS.  The others restated their belief that the property was being tracked, even if they did not know how it was being tracked.

163.    In early December 2012, Mr. Carr finally admitted what Relator had suspected: DynCorp was not tracking GFE, or any other property, in MIS.  The implications of this revelation were huge.  It meant that in the five years since NSRWA had awarded Northrop the CNGS contract, and Northrop had subcontracted with DynCorp for logistical services, Northrop and DynCorp had failed to track (and thus could not account for) the tremendous amount of Government-furnished equipment in their possession, which was a fundamental requirement of the CNGS Contract and FAR/DFARS.  It also followed from this that DynCorp had never conducted even a single proper inventory of GFE, as required by law and the Contract.

164.    In mid-December 2012, Relator traveled to Fort Worth to discuss the severity of the situation with Melissa Smith (the Property Management Manager for DynCorp Aviation).  During a meeting with Ms. Smith (the Property Management Manager for DynCorp Aviation) and Ms. McClendon (DynCorp Senior Logistics Manager), Relator reported the extent of the problems.  It was clear that Ms. McClendon had, for some time, been informing Ms. Smith that the property management issues were not as grave as they actually were.  Ms. McClendon informed Ms. Smith that Government property was, in fact, being tracked in MIS, as Ms. McClendon had purportedly believed all along.  Relator said that it was not.

165.    Ms. Smith suggested that they call Guy Frazier, the IT Project Manager (who had

very recently returned to Fort Worth from temporary duty in Kabul).  Mr. Frazier indicated that he

did not know whether property was being tracked in MIS.  He suggested that they speak with Mr.

Carr back in Afghanistan.  With all participants in the meeting still present in the conference room,

Relator then placed a call to the CNTPO Kabul office.  When Mr. Carr got on the line, he said that

there had been property management training on MIS but the program was not operational yet.  It

literally had not been "turned on," much less served as the database repository for tracking all

Government property during the life of the CNTPO program.

166.     Ms. Smith was stunned.  When she heard this news, she said, "Holy [expletive

deleted].  This is bad.  This is really bad.  I've seen bad and this is [the] worst I've seen in my time

at DynCorp."

167.     In a separate meeting that day, Relator, Ms. McClendon, and Ms. Smith met with

Rhonda Dodson, who was the Director of Property Management for DynCorp (not just DynCorp

Aviation).  Relator and Ms. Smith briefed Ms. Dodson on the dire situation.  Ms. Dodson agreed

that the magnitude of the problem was huge.  Ms. Dodson said that if the United States Government

learned of this epic failure, it could result in the decertification of DynCorp's management

information system and jeopardize every contract that DynCorp had with the Government.  Ms.

Dodson told those present that she would report the issue to her supervisors at DynCorp and that, if

necessary, she would go to Afghanistan to address these problems.

168.     In late January 2013, Relator learned from Mark Fisher (DynCorp CNTPO Project

Manager), Doug Burpee (Northrop's CNTPO Project Manager in Afghanistan), and Randy Munger

(Northrop's CNTPO Deputy Project Manager in Afghanistan) that there was "no funding from the

Government to turn the property management 'module' within MIS on."  At that point, DynCorp

basically scrapped MIS altogether as a tool for property management.  Although the cost of the

development originally was approximately $3,000,000, DynCorp spent (and billed the Government

through Northrop) for approximately $5,000,000 on the project, for which the Government never

received a usable system.

169.    Northrop and DynCorp had failed to fulfill the most basic requirements of the

property management function of the Contract while knowingly billing the Government for

property management services.  Roughly 5-7% of the approximately $300 million per year that was

budgeted for personnel resources for CNGS Contract services was related to property management

and logistics.  Thus, on an annual basis, Northrop and DynCorp were receiving approximately $15

to $21 million for property management services that they were not providing to the United States.

Relator estimates that the loss in the first five years of the program, when property management

essentially was not being performed at all, is therefore approximately $100 million.

170.    Moreover, the inability to provide accurate inventory levels led to over-ordering of

parts.  As one representative example, in January 2013, Relator learned that there were 126 Pitot

Static testers in the warehouse (at a unit cost of $24,900 each), when only approximately 15 were

necessary.   A Pitot Static tester is an instrument designed to test aircraft avionics systems for leaks

and to simulate pressures of altitude and speed for calibrating aircraft equipment.  Because of

DynCorp's failure to track, maintain, secure, and preserve the testers properly, the Government

spent approximately $2,763,900 on excess testers.

### 2.    DynCorp Was Supposed to Track Contractor Acquired Property in DynMRO but It Was Dysfunctional and Unreliable

#### a.    DynMRO Was Riddled With Errors and Wholly Unreliable

171.    Unlike GFE, which DynCorp was supposed to be tracking through MIS (but not

actually doing so), DynCorp continued to utilize DynMRO as its certified system for tracking

Contractor Acquired Property.  Contractor Acquired Property becomes Government Furnished

SECOND AMENDED
COMPLAINT

Property once invoicing is submitted to the Government.

172.     Although DynMRO, unlike MIS, was at least operational, DynMRO was wholly

unreliable.  Relator learned of the deficiencies in DynMRO in the following circumstances.

173.     On February 12, 2013, Chris Lawson, the Northrop Contracting Officer, sent an

email to DynCorp informing the company that during the Performance Management Review

("PMR"), NSRWA had requested a list of all Aircraft Ground Support Equipment ("AGSE") that

DynCorp had procured during the Contract.  Within the CNTPO program, DynCorp often referred

to equipment (other than aircraft parts) as AGSE.  Since NSRWA was requesting the list of all

AGSE items procured, DynCorp employees understood that NSRWA wanted a comprehensive list

of all items – equipment or material, CAP or GFE – that DynCorp had acquired since the beginning

of the Contract.  Mr. Lawson indicated that NSRWA wanted the list by February 15, 2013.

174.     The request from NSRWS caused concern within DynCorp that NSRWA may have

been on the verge of initiating an audit.  To minimize the amount of information it had to report –

and thus to cover up the fact that it had no information regarding GFE – DynCorp interpreted

NSRWA's request in the narrowest possible manner.  Although technically NSRWA had requested

a list of all AGSE "procured," DynCorp understood that NSRWA had really wanted a list of all

AGSE for which DynCorp was accountable (i.e., GFE and CAP).  However, DynCorp decided to

generate a list *only* of CAP.  Since two-thirds of AGSE was GFE, DynCorp set out to provide a list

of only one third of the AGSE that the Government had requested.

175.     Blane Fix, who had replaced Ms. McClendon as DynCorp's Senior Logistics

Manager, generated the list of CAP from DynMRO with the assistance of Joan Albaugh, the

Logistics Manager for DynCorp's separate G-222 military support program.  The list contained over

86,000 lines, each with 30-40 columns of data.  Mr. Fix asked Relator to review the list, which he

did. This was the first time that Relator had seen a list of all of the data in DynMRO. He was stunned by how incomplete and inaccurate the data was. Errors included:

- Items whose location was listed as "lost" or "unknown;"

- Items with negative quantities;

- Approximately 4,000 items with a blank or "zero" in the column for "acquisition cost" (including items for which Government charge codes were listed and thus the Government had been billed);

- An enormous number of multi-item lines. Every "line" in DynMRO should correspond to an item. Thus, every item has 30-40 columns of data, including manufacturer, model number, serial number, location (and other data point), about that particular item. In total, the 86,000 lines corresponded to 335,865 items, meaning that at least three-fourths of the items in the system did not contain individualized data, which would make it impossible to verify the existence of these items during an inventory.

- Nine different "ownership" categories (despite the fact that property was supposed to be either "GFE" or "CAP").

- Conflicting data coming from different sources (e.g., finance, procurement, QCC etc.).

176. The extent of the errors went well beyond the "in transit" issues that had first led Relator to discover the problems in DynCorp's receiving and tracking functions of property management. *See* ¶¶ 99-102 *supra.* The errors in this list revealed the fundamental unreliability of the data in DynMRO.

177. Relator spent fourteen hours reviewing the data. Relator believed that Northrop and DynCorp also needed to disclose to the Government the full range of problems in DynMRO or it

needed to fix the issues and clean up the data in DynMRO before furnishing this list to the

Government.  But Ray Nelson, Program Director for DynCorp Aviation, instructed Mr. Fix to send

NSRWA the list as is, and Mr. Fix did so.

178.     Further efforts to conceal the unreliability of DynMRO from the Government are

discussed in section VIII *infra*.

> **b.      DynMRO Had a Fundamental Design Flaw -- It Could Not Recognize Variations of Cyrillic Characters -- That Rendered It Unable To Track Millions of Dollars of Russian-Manufactured Property Utilized in the CNTPO Program**

179.     CNTPO is unique in that it is the only United States Government program that

exclusively uses Russian aircraft.  Because the goal of the program is ultimately to turn over the

operations and equipment in Afghanistan to the Afghan Government, the United States Government

wanted to avoid using sensitive, American technology that would be left behind with the Afghan

government.   Additionally, it was believed that Afghan pilots have more experience flying Russian

aircraft than American aircraft.  Thus, the CNTPO program decided to purchase most of the aircraft

utilized in the program from Russia and former Russian controlled countries.

180.      To service these aircraft, DynCorp had to order the components, parts, testing

equipment, and repair equipment from Russia or the Ukraine.  Approximately half of the

procurement dollars that Northrop and DynCorp billed to the Government were for Russian aircraft

components and their related supply chain and procurement costs.

181.     DynCorp ordered all avionics components from Simplex, a Russian vendor with a

subsidiary vendor located in Coppell, TX.  Most of these products arrived at the DynCorp

warehouse in Texas with the shipping manifest written entirely in Russian.

182.     The arrival of products with Russian labels created a massive problem for property

management, because DynMRO does not directly recognize the Cyrillic alphabet of the Russian

SECOND AMENDED
COMPLAINT

language.  Although procurement officers could cut and paste Cyrillic characters into DynMRO, or

use English type characters that resembled Cyrillic characters, the system did not recognize the

characters, which made it nearly impossible to use the system to track the aircraft components.

183.    Additionally, the language on the boxes in which components arrived contained

Cyrillic characters.  Thus, when Relator called the QCC warehouse to determine whether any of the

components were sitting in the warehouse, no one could understand what was in the boxes.  There

was no one at the QCC who could speak or read Russian, despite the fact that approximately half of

the procurement dollars that Northrop and DynCorp billed to the Government were for Russian

components.

184.    The above design flaw in DynMRO, combined with the lack of Russian-language

speaking employees at DynCorp, rendered DynMRO virtually useless in tracking the property

acquired from Russian vendors.  As a result of not being able to track this property within DynMRO

with any degree of certainty, verification that shipments were complete was often not performed;

expensive orders were often duplicated; and items were frequently misidentified and not sent on to

the intended recipient, all of which led to massive losses and wastage of this property.

E.    **DynCorp Consistently Lied to the Government About the Status of Deliveries In Order to Cover Up Deficiencies in DynCorp's Property Management System**

185.    Problems in DynCorp's receiving and tracking abilities created problems for an

important performance report that DynCorp provided to the Air Force.  The U.S. Air Force and

NSRWA COR (Contracting Officer Representative) required that on a weekly basis DynCorp

provide the Air Force and NSRWA with an Equipment Backorder Status Report ("EBSR").

186.    The EBSR provided a summary of how quickly and completely items procured

through the CNTPO program had been delivered.  It was a key indicator of how well DynCorp's

supply chain was functioning, as well as a key indicator to the Government of performance

deficiencies.  The report was provided to the Air Force, in addition to NSRWA, because these metrics were considered "mission-related" and not just "contract-related."  The information included in the report was also part of the "Dashboard" report provided to DynCorp corporate management.

187.     Prior to Relator's arrival, DynCorp failed to report past due items in the EBSR. There was not even a "delivery past due" category on the report.  Rather, if an item was past due, DynCorp would include that item in a category of items expected to be delivered in "0 to 15 days" (regardless of whether the expected delivery date fell in that range or was past due for over a year).

188.     After he arrived in Kabul, Relator added "past due" categories that mirrored the "delivery expected" categories, and thus began including in the report how many items were past due (and by how many days).  For items that had not yet been delivered, Relator began to complete the reports using an "estimated delivery date" reporting metric already within DynMRO.  If the estimated delivery date had passed, then a negative date was listed.  The report provided different columns for items that were past due 0-30 days, 31-60, 61-90, and 90+ days.

189.     After the change, the Air Force began asking Northrop why the delivery of so many items was past due.  Relator set out to improve the delivery rates.  When he arrived, DynCorp had an overall delivery rate of only 40% (i.e., in the history of the CNTPO program to that date, only 40% of items ordered had been delivered).  By late January 2013, he had the rate up to 70%.  Much of this increase was the natural result of Relator's research into items listed as "in transit" during November and December 2013.  That is, many items that had been delivered were not showing up as delivered because they had not been properly received.  By updating the system, these items became "delivered" for purposes of the EBSR.

190.     Despite Relator's success in raising the overall delivery rate, in early February 2013,

Ray Nelson (DynCorp Aviation Program Director) told Senior Logistics Manager Blane Fix and Relator that the backorder numbers were making the Dashboard reports to DynCorp management look bad.  He wanted Mr. Fix to make the numbers look better.  Relator said that he wanted the numbers to look better, too, but only because the delivery problems were being solved, not by manipulating the data.

191.     That was not good enough for Mr. Nelson, who instructed Mr. Fix to alter the numbers in DynMRO (which generates the reports).  On February 14, 2013, Mr. Nelson instructed Mr. Fix to "move" the estimated delivery date "to the right 90 days" (i.e., to arbitrarily change the estimated delivery date to 90 days from the current date for any items that had not yet been delivered, with the changes having no basis in any actual updated supporting information).

192.     Mr. Fix subsequently directed Relator to effect the necessary changes to the estimated delivery dates within DynMRO; however, Relator did not have the authority to change these dates within DynMRO.  Only a DynCorp buyer who has contacted a vendor and received more current information, such as that an item is on backorder, is authorized to change the estimated delivery date in DynMRO.  Relator told Mr. Nelson and Mr. Fix that this was improper, since it meant that DynCorp would be lying about the delivery status of shipments in the EBSR reports submitted to the Government.  Relator refused to do this, and instructed his staff not to do it, either.  But Mr. Fix asked Joan Albaugh, the G-222 Logistics Manager at DynCorp, to make the changes.  Although she was not part of the CNTPO program at that time, she worked in the same office (Huntsville) as Mr. Fix, and she made the changes in DynMRO.  The IT department provided her with user rights that she was not authorized to have so that she could make the changes.

193.     Mr. Nelson told Mr. Fix that going forward, once per month, he should make a list of all items that were beyond their delivery dates, and then change the estimated delivery date to 90

days beyond the current date.  Thus, as of mid-February 2013, DynCorp began regularly falsifying the delivery numbers that it reported to the Air Force and NSRWA.  From that point forward, DynCorp falsely reported that it had a 100% on-time delivery rate, which was blatantly untrue.

194.     DynCorp's false reporting had the effect of hiding from the Air Force and NSRWA key data that would have caused them to discover rampant problems in DynCorp's property management.

**F.      Representative Examples of Valuable Government Property That Defendants Lost or Wasted on the CNTPO Program Due To Defendants' Reckless Disregard for Contractual and Legal Requirements**

**1.      Defendants Lost or Wasted at Least Four "Push Packs" Valued at Several Million Dollars Each**

195.     "Push packs" consist of approximately two large (eight foot by forty foot) sealed containers, plus heavy equipment (tractors, forklifts, generators, etc.) that contain all of the basic property necessary to establish a new base to support aircraft.  The sealed containers contain approximately $4-5 million of property each.  With the heavy equipment, the value of the push packs is approximately $6-7 million each.

196.     The United States Air Force delivered four push packs to Northrop in early 2011. Because the push packs were items of GFE, the Government furnished them directly to NG, who was supposed to formally turn over custody of the property to DynCorp for the required receiving process.  Northrop physically delivered the push packs to DynCorp but did not prepare any of the required paperwork to formally transfer custody to DynCorp, and DynCorp in turn did not formally receive nor inventory the property in its record keeping system.  Since DynCorp had not properly received the items, they were not listed in DynMRO.

197.     In early April 2013, Julie Sorenson, Northrop Logistics Manager, produced a spreadsheet that was approximately 100 pages long and contained approximately 3,500 to 4,000

items.  Ms. Sorenson explained to Relator that this spreadsheet was the delivery manifest for

Delivery Order Number Seven, pursuant to which the United States Air Force had delivered four

push packs.  Ms. Sorenson wanted the push packs, after all this time, to be properly received into

DynMRO and to have the existence of the items inventoried and verified.

198.    This project had special urgency for Ms. Sorenson, who had signed for the push

packs two years before and then failed to properly receive, document, and transfer the property to

DynCorp to ensure formal accountability.  (Ms. Sorenson was scheduled to leave CNTPO in August

2013, and wanted the inventory of the push packs done before that time.)  Additionally, in the

spring of 2013, Northrop and DynCorp heard rumors that the Air Force was getting ready to call for

the establishment of several Afghan Ministry of Interior bases using the push packs.

199.    As Relator began to research items on the spreadsheets, he discovered a huge

problem.  Since base personnel could not obtain supplies and equipment in a timely manner through

DynCorp's procurement and supply chain system, they had raided the push packs for individual

items.  In the two years that the push packs had been sitting at the base warehouse in Kabul, base

personnel had broken the seals and begun removing individual items from the push packs.  The seal

on all four push packs had been broken and approximately 50% of the items had been removed, all

of which occurred without any record of where the equipment went.  The heavy equipment

accompanying the sealed containers was also no longer there; it had either been put to other

purposes (without anyone accounting for it) or simply disappeared.

200.    The ransacking of the push packs rendered them useless: the moment an item is

removed from a push pack, the push pack ceases to be a push pack (i.e., a dedicated, sealed

container that possesses everything necessary to establish a new base).  Additionally, each push

pack is individually designed.  The push pack intended to stand up the base envisioned in Jalalabad

SECOND AMENDED
COMPLAINT

is not the same as the one needed to stand up the base envisioned for another location.  The

ransacking of the push packs wasted all of the time and expense the Government expended in

designing the push packs, gathering the items within them, and delivering them to Northrop.  The

CNTPO program's ability to establish new bases in Afghanistan was completely compromised by

these actions.

201.    When Relator informed Ms. Sorenson that the items in the push packs had been

raided, she replied, "Then you better find them."  Relator and his staff did the best they could to

find items that had been removed from the push packs.  But working from the Delivery Manifest,

which only listed an item, such as "tractor" (but without listing a serial number), made identifying

particular items that had originated in the push packs very difficult.  Because many of the items

were the same make and model as items that were being used elsewhere in the program, it was all

but impossible to determine what items had originated from the push packs.

202.    Relator and his team tried to update DynMRO with information about the items in

the push packs, ultimately generating 20,000 lines that needed to be updated in DynMRO.  Doug

Burpee (Northrop's CNTPO Project Manager in Afghanistan), Randy Munger (Northrop's CNTPO

Deputy Project Manager in Afghanistan), and Mark Fisher (DynCorp CNTPO Project Manager in

Afghanistan) all instructed, however, that they did not want to list items in DynMRO that could not

be found, because then Defendants would be responsible to the Government for the lost items (that

the Government had paid for).

203.    A number of the items that Relator and his team tried to update pertained to material

(and not equipment), and included items of material that were not found in the inventories.  Rather

than disclose the items of loss to the Government, Ms. Albaugh falsified DynMRO by manipulating

the data to indicate that these items had been "issued out" to various base personnel.  Since these

were items of material and not equipment, tracking after that was unnecessary.  Ms. Albaugh's false

entries misrepresented that the items of material had been accounted for, properly consumed on the

program, and used for the Government's benefit, when she had no way of knowing whether that

was true or not.  She did this over Relator's protests.

204.    Relator wanted Ms. Albaugh to enter the updates regarding push packs into

DynMRO, but Ms. Albaugh refused to enter items into DynMRO unless she knew the property

could be found (and thus would not have to be shown as a loss).

205.     Relator is informed and believes that to this day, Defendants have not disclosed to

the Government that the four push packs, valued at a total of tens of millions of dollars, were

rendered without value due to the failure of Defendants to properly manage the Government's

property.

### 2.    Dyncorp Lost Track of or Rendered Unserviceable Aircraft Parts Valued at Several Million Dollars

206.    On CNTPO, most aircraft parts were purchased by the Government from Lockheed

Martin, and were delivered as "GFE" to Northrop and DynCorp.

207.    Aircraft parts are considered "material" since they lose their separate identity when

they are incorporated into an aircraft.  Aircraft parts were the largest category of material by dollar

value.

208.    Because aircraft parts are important to life safety of aircraft personnel, and because

of their high dollar value and sensitive technology, DoD has designated them as "Class 9" materials,

which are subject to special inventory and accountability rules.  The rules require that the parts be

stored in a tightly secured facility to which there is controlled, limited access to only authorized

personnel.  Although DynCorp maintained a "Class 9" warehouse, the warehouse was *not* tightly

secured with limited access.



SECOND AMENDED
COMPLAINT

209.     In December 2012 or January 2013, Relator alerted Northrop personnel that the Aircraft Supply Depot ("ASD"), the Class 9 warehouse that housed the program's aircraft parts, was not secure as required by FAR.  In response, Northrop changed the access codes on the office door to the ASD to limit access to the facility.  Since a forty-foot hangar door to the ASD was open all day, however, changing access codes was only a cosmetic change.  The facility was still not secured.

210.     Additionally, since the warehouse manager, Carlos Morales, was not an American citizen (he was Colombian), he was not authorized under DFARS to serve as the manager of the ASD.  At the time, Mr. Morales served as the Afghan Ministry of Defense ("MoD") Team Lead, and Andre Alexander served as the Afghan Ministry of Interior ("MoI") Team Lead, for the ASD. The MoI side of the ASD was secure, but that was only 10% of the size of the MoD.

211.     Relator repeatedly asked DynCorp employees Guy Frazier, Carlos Morales, Randy Carr, Rick Hays, Mark Fisher, Rebecca McClendon and Steve Baber whether DynCorp was tracking and accounting for these parts.  He could not obtain a straight answer.  As noted above, in mid-November, Relator asked Mr. Morales, whether DynCorp was tracking aircraft parts in MIS, and Mr. Morales said that he was tracking the aircraft parts, himself, on Excel spreadsheets.  The ad hoc spreadsheets listed neither part numbers nor specific quantities, thus making it impossible for DynCorp to provide accurate inventory levels to NSRWA.

212.     In early April 2013, Relator researched several orders of aircraft parts.  When Relator tried to track these orders and asked Julie Sorenson, Northrop's Logistics Manager in Kabul, about these delivery orders, she told him that Mr. Morales was in charge of those orders, and Relator should not dig into problems related to those orders.  In or around the same time, Ms. Sorenson and Randy Munger, Northrop's Deputy Project Manager, warned Relator to "leave it

alone."

213.     In Relator's experience on the CNGS project, Defendants' loss of accountability for Government-furnished aircraft parts under the CNGS Contract caused losses, wastage, and over-ordering of millions of dollars of aircraft parts, all paid for by the Government.

### 3.     Dyncorp Lost Track of Fuel Valued at Several Million Dollars

214.     DynCorp also failed to track another important material item:  fuel.  Under CNGS, DynCorp was responsible for procuring and tracking fuel for the use of U.S. personnel, or for specifically authorized Afghan MoI/MoD mission use.

215.     To procure fuel, DynCorp generated a purchase order through DynMRO and then purchased the fuel from a local vendor.  But DynCorp did not properly receive fuel.  DynCorp, in fact, put local nationals in charge of the "Fuel Farm," the area on the base where the gas was delivered, the base tanks were kept, and personnel fueled aircraft, vehicles, or other equipment.

216.     The local nationals failed to record the deliveries of fuel or log fuel when it was issued out to base personnel.  DynCorp failed to supervise them properly.  Supervision was so loose that DynCorp had no way of confirming even the receipt of the proper amount of fuel; it could not confirm, for example, that if it paid for 10,000 gallons of gas that the full amount was put into the tank.  Thus, DynCorp failed both to receive the fuel properly and to track it as required by FAR.

217.     The failure to track fuel caused a number of serious problems around the base.  First, since there was no tracking, it was difficult to detect theft, which became widespread.  There are no oil refineries in Afghanistan; fuel had to be trucked into the country (and the base).  As a result, fuel was highly sought after – and frequently stolen.  Afghan personnel frequently stole fuel directly from CNTPO aircraft parked on the flight tarmac or hangars by directly syphoning from the aircraft fuel tanks into five gallon open buckets and then carrying the fuel out of the CNTPO controlled

hangar doors unchallenged. They used the stolen fuel to fill their personal fuel tanks. Theft was so common that American personnel (military and contractor) were instructed to cut slits in their empty water bottles before throwing them away so that Afghan military members and local nationals would not use the water bottles to steal gasoline.

218.     Second, fuel shortages often affected flight operations.  The Air Force often had to curtail the number of missions – either training or drug interdiction flights – because of a lack of fuel, or fly with a smaller crew, less equipment, or at a lower altitude than planned to conserve fuel.

219.     Third, there were sizeable Government financial losses.  Of the fuel procured by DynCorp on the Government's behalf, only approximately half was documented as ultimately used for Government purposes.  (As with calling cards, since DynCorp had kept minimal logs regarding fuel disbursement, it had no way of actually showing that any of the fuel for which it had billed the Government had actually been used for the Government's benefit.)

220.     Given the scarcity of gasoline in Afghanistan, a gallon of gasoline cost the Government $12-$15.  Since DynCorp was procuring 70,000 to 100,000 gallons of gas every month, the Government was spending approximately $840,000 to $1.5 million per month on fuel ($10 million to $18 million per year).  Relator estimates that DynCorp's lax oversight allowed a considerable percentage of that amount to be diverted to other, unapproved uses.

## 4.     DynCorp Failed to Account for Surplus Property

221.     FAR provides requirements for a reclamation process for surplus property through the Defense Reutilization and Marketing Office ("DRMO").  The process is designed to ensure that surplus parts can be put to use on other programs; that unserviceable property is properly salvaged; and that sensitive items (even if they are no longer serviceable) do not fall into the hands of enemies.

222.    As part of the reclamation process, a contractor must first ascertain that equipment is surplus or unserviceable, and then verify that it is free of hazardous materials and safe for salvage. The relevant Government contracting officer then determines whether the Government can use the property as part of another Government program.

223.    During Relator's tenure with DynCorp, Defendants never followed the procedures for reclaiming surplus property.

224.    During his time in Kabul, Relator noticed a large pile of equipment that grew by the weeks.  The pile consisted of surplus and unserviceable equipment that base personnel were simply jettisoning.

225.    The pile grew much larger after the completion of the G-222 contract, another DynCorp government contract that operated from Kabul, and then again when DynCorp began inventorying items in February and March 2013.

226.    Defendants never processed the vast majority of these items for reclamation, as required by the Contract and federal regulations.  Towards the end of Relator's tenure – and at the direction of Relator – a few initial batches of unserviceable equipment, mainly printers and small equipment components, were processed for DRMO.  However, no other surplus or unserviceable equipment was processed.  The total value of the unprocessed items of surplus and unserviceable equipment was approximately $3-4 million.

## VIII.   DEFENDANTS DELIBERATELY CONCEALED FROM THE GOVERNMENT THEIR LOSS AND WASTAGE OF MILLIONS OF DOLLARS OF GOVERNMENT PROPERTY

### A.    DynCorp and Northrop Thwarted Relator's Efforts to Correct Deficiencies in Defendants' Property Management System and to Honestly Account to the Government for Missing Property

227.    In late November and early December 2012, as Relator learned of the scope of the

property management deficiencies in Defendants' CNTPO operations, he began talking about these deficiencies with various individuals at DynCorp and Northrop.  From these discussions, Relator learned that there was widespread knowledge within both companies of the lack of property management in the CNTPO program in Afghanistan, yet no one was willing to take responsibility for correcting the problems.

228.    At DynCorp's corporate office, Relator reported his concerns over property management issues to Becky McClendon, Melissa Smith, Ray Nelson, Rhonda Dodson and Guy Frazier, among others.  Although they acknowledged "issues" in property management, and even acknowledged that DynCorp had failed to perform many important property management functions over the previous five years, they tried to downplay the seriousness of the issues.

229.    During weekly senior management meetings and other conversations in late November and early December 2012, Relator relayed the problems that he was finding in the property management system to Northrop's team in Afghanistan, including Deputy Project Manager Randy Munger and Logistics Managers Julie Sorenson and Jose Rodriguez.  It was also clear to Relator that DynCorp personnel were relaying his conversations with DynCorp personnel back to Northrop managers.

230.    On December 8, 2012, Northrop formally placed Relator in charge of the property book office (i.e., the office responsible for property accountability issues).  In that capacity, Relator recommended that Defendants prepare a Corrective Action Plan to address the property management deficiencies and identify losses to the Government.  Officials at Northrop and DynCorp initially agreed to the recommendation; however, as explained below, the companies ultimately sabotaged Relator's efforts and refused to report the losses to the Government.

### 1. Relator Prepared a Proposed Corrective Action Plan Designed to Address Property Management Deficiencies and Identify Losses to the Government

231.     In December 2012, DynCorp and Northrop officials agreed that when Relator returned to the United States for his 30-day, contract-mandated R&R, which was scheduled to begin on December 15, 2012, he would do temporary duty ("TDY") in Fort Worth to work with Ms. Smith on a Corrective Action Plan.

232.     Just before Relator was scheduled to leave for the United States, Northrop's Randy Munger instructed Relator to inform DynCorp senior management back in the United States that "DynCorp is directly responsible for any Government property that cannot be properly accounted for and they better be ready to write a check for anything they can't locate, and it looks like it's going to be a big check."

233.     While still technically on R&R, Relator drafted a Corrective Action Plan in late December 2012 and early January 2013, and worked with Ms. Smith to finalize it prior to his return to Afghanistan.  The intent of the Corrective Action Plan was to submit it to Northrop, and for Northrop to submit it or a somewhat amended version of it to the Government, thus acknowledging to the Government Defendants' property management deficiencies and informing the Government of Defendants' plan to correct the deficiencies.  The important points of the proposed Corrective Action Plan were:

(1)     The Corrective Action Plan recommended, first, that DynCorp ensure that the data in its record-keeping system was "complete and accurate" and, second, perform a physical inventory against that data.  This would allow DynCorp to identify items missing from inventory, which represent "loss" to the Government.  The Corrective Action Plan established a way to ensure that such Government losses would be identified and disclosed to the Government, pursuant to the Contract and federal law, and to simultaneously provide

SECOND AMENDED
COMPLAINT

the Government with a measurable and accountable timeline of corrective steps to remedy the deficiencies.

(2)    In terms of Contractor Acquired Property (CAP), the Corrective Action Plan required updating the information already in DynCorp's record-keeping system (such as procurement orders and any other available information) to ensure that it was current and specified the location of the item, as well as entering any missing information (such as serial number, model number, value, condition, etc.).

(3)    In terms of GFE, the Corrective Action Plan recommended that DynCorp request from NSRWA a list of all GFE that the Government had provided to Northrop or DynCorp as part of the CNTPO program.

(4)    The Corrective Action Plan also recommended the completion of a full, blind FAR-compliant inventory of all CAP and GFE.

(5)     The Corrective Action Plan allowed three to four weeks for data cleanup (i.e., determining what property DynCorp was supposed to have and thus what the inventory would look for), and then called for the inventory to begin on or about February 22, 2013.

234.    By late December 2012, Ms. Smith and Relator agreed that it would require fourteen personnel (not including Relator) in the Property Book Office to maintain ongoing, compliant property accountability functions, without even taking into account the temporary "surge" of personnel needed to clean up the problems created by DynCorp's failures over the previous years. Although Project Manager Mark Fisher indicated that he thought DynCorp might approve five or six permanent personnel, DynCorp never approved any.

235.    In early January 2013, Ms. Smith and Relator agreed that 8-10 personnel from the Buffalo Group -- an independent company that provides temporary inventory personnel to United



SECOND AMENDED
COMPLAINT

States government contractors -- working on a short-term basis of ninety days, were critically necessary to assist DynCorp in cleaning up the existing problems.  On January 8, 2013, DynCorp executives Ray Nelson and Mark Fisher informed them that this was "impossible because there is no funding available, Northrop will not pay for it and Northrop says we cannot bill the Government for it either."

236.     On January 21, 2013, Relator returned to Afghanistan.  In late January and early February 2013, he had a number of meetings regarding the proposed Corrective Action Plan with Northrop officials Doug Burpee, Julie Sorenson, and Jose Rodriguez.  During the first meeting, Mr. Burpee and Ms. Sorenson indicated that they believed the Corrective Action Plan was "excellent" but asked for a more detailed task list regarding how the Corrective Action Plan could be accomplished, in a FAR/DFARS compliant manner, by September 30, 2013.  They asked for semi-weekly update Project Management ("PM") meetings.

237.     Following the meeting, Relator developed a "Gantt Chart."  A Gantt Chart is a tool of Microsoft Project software that details a project schedule, including the tasks, timing, resources and predicates required to complete a project task by an assigned deadline.  After reviewing the chart, Doug Burpee and Julie Sorenson described it as "an excellent breakdown" and said, "we wish we had seen this a month ago, then we would not have been so concerned since it was under control."

238.     Although Mr. Burpee, Ms. Sorenson, and Mr. Rodriguez agreed with many parts of the proposed Corrective Action Plan, Mr. Burpee expressed concern with making disclosures about the property management deficiencies to the Government.  Mr. Burpee wanted to wait to disclose the Corrective Action Plan to NSRWA until Northrop and DynCorp were "farther down the road" to fixing the issues.  Mr. Burpee also wanted to keep discussions about the issues between those

with a "need to know" basis, not including anyone outside property management.

**2.      Northrop and DynCorp Corporate Leadership Refused to Pay the Nominal, Additional Costs Necessary to Implement the Corrective Action Plan**

239.      During the same time as the meetings were taking place in Kabul, the leaders of Northrop and DynCorp were meeting in the United States to address the enormous property management deficiencies.

240.      In early January 2013, Relator learned from Ray Nelson (DynCorp Aviation Program Director) that James Myles (Senior Vice President of DynCorp Aviation) and Scott Rauer (DynCorp Vice President of Military Aviation) had held conversations with their counterparts at Northrop, including Darrell Allman, Northrop's Director of Aviation Operations.  They had decided that, despite Northrop's earlier statements that DynCorp was going to have to "write a check" for any losses, the two companies were "in this together" and that Northrop could not just blame DynCorp.  Mr. Nelson said that Northrop acknowledged that both companies were responsible.  He said that "both companies have known" of the serious property management deficiencies "for years" and had failed to address the problem.

241.      Then, in a series of meetings during January and February 2013, company leaders debated how to resolve the property management deficiencies.  For Northrop, Scott Wagner, the Program Manager (and Mr. Burpee's boss), and Mr. Allman were involved in the discussions.  For DynCorp, Mr. Fisher, Mr. Fix, Mr. Nelson, as well as Scott Rauer and James Myles, were involved in the discussions.  Relator heard about these discussions from several of the participants.

242.      The companies disagreed about who would pay the additional costs outlined in the proposed Corrective Action Plan – namely, the $100,000 that it would cost to bring on the Buffalo Group.  DynCorp initially refused to cover these costs and suggested that Northrop submit a

contract modification to the Government and obtain its authorization to hire the necessary

personnel.  Northrop rejected this suggestion.  Northrop believed that it could not bill these costs to

the Government since Northrop had been billing the Government for property management for the

previous five years, and to hire outside personnel would have alerted the Government that there

were serious problems.

243.     Thus, on a contract on which both Northrop and DynCorp had made tens of millions

of dollars in profit, senior leadership of both companies proceeded to debate, tooth and nail, who

would pay for an additional $100,000 cost necessary to bring in 8 to 10 temporary employees to

bring some semblance of accountability into the property management system and to assess the

losses caused by the contractors' own failures.

244.     Northrop claimed that DynCorp's profit margin on the Contract was so large that it

should pay for correcting all of the inventory issues out of its "overhead."  DynCorp responded that

Northrop had underbid the amount of personnel required to perform the property management

duties called for by the Contract and that DynCorp had delivered precisely the number of staff bid

by Northrop.

245.     Discussions about the proposed Corrective Action Plan were cut short, however,

when Northrop's Deputy Project Manager Randy Munger returned to Afghanistan from the United

States in February 2013 and gutted the necessary remedial steps called for by the Corrective Action

Plan.

> **3.     Northrop Gutted the Necessary Remedial Steps Called for by the Corrective Action Plan and Substituted a Whitewash "Inventory" in Place of the Plan**

246.     In early February 2013, by the time of the fourth semi-weekly property management

meeting, Mr. Munger returned to Afghanistan.  Relator briefed him on the proposed Corrective



Action Plan and the Gantt Chart that Mr. Burpee and Mr. Rodriguez had approved.  Mr. Munger said, "This is making my head hurt."  Conveying the message that he had received from Northrop corporate leadership in the United States, he said there was no way that Northrop would "devote the time and resources of manpower" that the plan would require.  He said, "I never want to see this chart again."

247.     Relator asked, at a minimum, that Northrop request a full list of GFE from NSRWA. This was the critical first step delineated in the Corrective Action Plan for identifying what property Northrop and DynCorp had received from the Government that should have been accounted for during the previous five years.  It was the critical step necessary for identifying those items that Northrop and DynCorp could no longer find and that would have to be identified as lost property to the Government (for which the contractors would be responsible).

248.     When Relator raised the idea with Mr. Munger, however, Mr. Munger rejected the idea outright, as he did not want to do anything that might reveal to the Government that Defendants were not accounting for the GFE that had been entrusted to Defendants.  Mr. Munger's rejection of this request was significant.  Without a list of the GFE , there was no existing record against which to reconcile existing inventory, and thus no way to determine how much property had been lost.  Indeed, without such a list, inventory personnel would not even know what items of GFE to look for in the first place.

249.     With regard to CAP, during a meeting during this same period, Relator informed Mr. Munger that the data in DynMRO with regard to CAP was incomplete and inaccurate, and that it would take a minimum of three weeks to clean it up before a compliant inventory could be begun.

250.     Mr. Munger responded by throwing a pencil across the room and slamming his hand on the table.  He said, "Oh Jesus."  Mr. Munger then abruptly ended the meeting.  In addition to

SECOND AMENDED
COMPLAINT

Relator, others present at this meeting were Ron DiLorenzo (DynCorp QA Compliance Manager) and Doug Burpee (Northrop's Project Manager).

251.    Relator knew that his boss, Mark Fisher, would be meeting with Northrop officials shortly and, therefore, informed him of what he had told Mr. Munger.  Mr. Fisher said that he "wished [Relator] had not done that" (i.e., told Mr. Munger about the DynMRO data issues).

252.    On February 5, 2013, Mr. Burpee and Mr. Munger approached Relator in his office. Mr. Munger indicated that the full accountability inventory envisioned in the Corrective Action Plan – i.e., a complete inventory of all Contractor Acquired Property and Government Furnished Property – was not possible.   He said that "Northrop has decided" on another approach.

253.    The approach Mr. Munger described was designed not to identify property losses, but rather to conceal them.  He instructed Relator to generate inventory sheets "as is" from DynMRO utilizing data already known to be incomplete and inaccurate, without any effort to correct or update the accuracy of the database information, and to send them out to "every CNTPO department" so that each department could "conduct their own inventories." Relator was directed to do this by the close of business the same day.  In effect, Mr. Munger was asking every CNTPO department to audit themselves, without any experienced or trained property management personnel involved in the inventory.

254.    Mr. DiLorenzo (DynCorp's QA Compliance Manager) supported Relator and told the Northrop managers that from the vantage point of DynCorp's Compliance Department, the proposed "Munger inventory" would not be compliant with FAR/DFARS.   Nevertheless, Northrop disregarded the Compliance Department's view and went ahead with the Munger inventory.

255.    Mr. Munger's plan was a complete departure from the letter and spirit of the proposed Corrective Action Plan and in direct conflict with acceptable property management



procedures.  The proposed Corrective Action Plan had contemplated a comprehensive remediation of DynCorp's property management deficiencies.  It had not only suggested a complete inventory as a way to identify items of loss to the government but also increased staffing and enhanced training to ensure that, going forward, DynCorp's receiving and tracking procedures were followed and compliant with Government regulations.

256.    The "Munger inventory" jettisoned all of these corrective actions, and fixated only on creating the appearance of progress in accounting for inventory, while minimizing and hiding the identification of loss to the Government.

257.    First, and most importantly, Mr. Munger abandoned the first step of "verifying" (i.e., reviewing and correcting) the data that comprised the existing record of property.  This first step is necessary to validate the data in the system to ensure its accuracy before any physical inventory is started.

258.    Second, an inventory compliant with FAR must be "blind," i.e. the count of items is supposed to be done not by the custodian of the property (i.e., the person legally responsible for safeguarding the item), but by an independent member of the property management staff. Importantly, not even the independent counter is allowed to know how many items of property are contained in the existing inventory record.  Rather, the individual conducts the count for a location and then the reported "count" of items is compared to the count in DynMRO.  If the quantity in existence does not match the DynMRO record, a second count must be conducted for that location by a completely different team.  If the second count still does not match the DynMRO record, a third and final count is conducted.  If that does not match, an automatic "loss" or "gain" is triggered in the system for disclosure to the Government.

259.    By sending inventory sheets to the custodians of the property – and by revealing the

quantity of items the custodian was supposed to have in his or her possession – Mr. Munger was ensuring that the people responsible for the items knew how many they were supposed to find. Given human nature, the likelihood of a false verification process was all but certain.

260.    Additionally, Mr. Munger wanted the inventories to be conducted by people with no experience in property management who had other required full-time duties to occupy them, further degrading the integrity of the inventory procedures and taking away personnel from their mission essential duties.  Northrop billed the Government for their labor based upon each employee's official "assigned" duties and Government charge codes, even though their labor was redirected to this non-permissible purpose.

261.    Finally, in a FAR-compliant inventory, the physical location of the inventory must be "locked down" during the inventory.  This requirement ensures that no property is moved (or added) until the inventory is done for each particular location.  Mr. Munger refused to permit this.

262.    Relator was stunned by how brazenly non-compliant Mr. Munger's plan was.  At its very core, Mr. Munger's approach was intended to hide the losses that had resulted to the Government from Northrop and DynCorp's failure to track property for five years.  It was a whitewash.

263.    Relator protested Mr. Munger's so-called "inventory" and advised Mr. Burpee and Mr. Munger that it was not compliant with FAR/DFARS.  Mr. Munger and Mr. Burpee rejected Relator's protests.  They told Relator that if Relator did not begin this "inventory" by the close of business that day, "then we will replace you with someone who will."

264.    Given no other choice, Relator began generating inventory sheets from DynMRO. By the close of business that day, he sent out sheets to three or four of the thirty five or forty CNTPO departments in Afghanistan.



265.     In the days following Mr. Munger's announcement of his plan, Relator continued to protest the ways in which the plan was not compliant with FAR/DFARS.  Both Mr. Munger and Mr. Burpee freely acknowledged that Mr. Munger's plan was not compliant with either the Contract or federal law but said that they could not dedicate the resources required to comply with the proposed Corrective Action Plan.

266.     On a number of occasions during this period, Mr. Munger and Julie Sorensen (Northrop Logistics Manager) instructed Relator and members of his staff (including Antonio Bryant and Luis Duque) not to report anything concerning the Munger inventory to the NSRWA. contracting office representative or the contracting officer.  Mr. Munger told Relator and others that anyone who did so would immediately be terminated.

### 4.     The Whitewash Inventory Predictably Concealed the Government's Actual Losses

267.     From early February to late March 2013, DynCorp departments conducted the "Munger inventory" of their CNGS property.  Because neither Northrop nor DynCorp would authorize the hiring of additional personnel, Relator had to pull people from other departments in Afghanistan.

268.     During the so-called "inventory," Mr. Munger consistently expressed frustration with Relator for raising compliance issues and for trying to conduct the inventory in compliance with FAR/DFARS and Contract requirements.

269.      On March 21, 2013, Relator had on his desk a copy of the Northrop Code of Business Ethics, with the top page reflecting the Northrop Grumman "Ethics Hotline" phone number.  Mr. Munger came into Relator's office, noticed it, and told him angrily: "This is not going to happen."  He then rolled the document into a tube and left with it.  Relator informed his superiors of this event in an email later that same day.



270.     By March 30, 2013, almost all of the departments had responded, but data on the inventory indicated that the results simply were not reliable.  First, as expected, not one inventory sheet identified a "loss" of property (i.e., nobody admitted that they did not have in their possession all of the property items for which DynCorp records listed them as responsible).  Every department's "inventory" purported to reconcile perfectly with the inventory sheets they had been provided.

271.     Relator knew that this could not be true.  During the Munger inventory, he had witnessed numerous departments come through Relator's office to count the same chairs, when they were missing the ones for which they were ostensibly responsible, leading to double, triple, and quadruple counting of specific items.

272.     Second, although Relator had instructed the departments to include on the list any items in inventory in excess of the quantities listed on the inventory sheets, only forty to fifty such items were ultimately listed.  From experience, Relator knew that was a number that should have been in the thousands.

273.     Third, many of the inventory reports did not contain items that Relator and others knew to be in existence.  There was no body armor or Kevlar vests included on the inventory sheets (or in DynMRO), even though anyone on the base could observe personnel working on CNTPO wearing such equipment on a daily basis since operations were in a defined combat zone.

274.     In the end, the Munger whitewash wasted a considerable amount of time and resources billed to the Government that could have been used instead to begin to bring DynCorp's property management system into compliance with the Contract and federal regulations.

**B.      Defendants Knowingly Provided the Government With an Incomplete and Misleading Property Book to Conceal Defendants' Loss of Millions of Dollars of Government Property**



SECOND AMENDED
COMPLAINT

**1.  After the Government Announced That It Was Going to Recompete the CNGS Contract, Defendants Were Required to Produce a Property Book**

275.    On or around March 15, 2013, NSRWA issued a pre-solicitation (i.e., a notice that it would be releasing a Request for Proposals) for the CNGS contract.  Northrop and DynCorp had known that NSRWA was going to rebid the CNGS contract since it had issued a pre-solicitation in July or August 2012, but that pre-solicitation had not led to the issuance of an RFP.

276.    Northrop and DynCorp were caught off guard by the timing of the announcement of this pre-solicitation, as well as its substance.  First, NSRWA announced that the recompete would occur under FAST2, an expedited award process.  Under FAST2, from the date that NSRWA issued the RFP, companies would have thirty days to submit a bid.  Thirty days after that, NSRWA would award the contract.  Second, the recompete was going to more than double the value of the CNGS Contract.  The aircraft involved in the Contract were going to increase from thirty to sixty and NSRWA was adding a fixed-wing element of approximately twenty-six aircraft (an entire squadron).  The new contract was also longer in duration than the original contract, three years with up to three one-year extensions.

277.    DynCorp viewed winning the recompete as critical to its business since the size and scope of its other contracts had been reduced over the previous years.  From the pre-solicitation the previous summer, DynCorp knew that there were twelve approved "prime" bidders but did not know who all of them were.  Although DynCorp had already decided not to team exclusively with Northrop, it was not clear that all the teams bidding on the recompete would include DynCorp.  DynCorp knew that it could potentially lose its role on the CNGS Contract completely.

278.    The pre-solicitation had immediate implications for DynCorp's treatment of its property management (and other supply chain) deficiencies.  Now that NSRWA was going to rebid the contract, the current contract would close at the end of the current period of performance (PoP),

which was September 30, 2013.  At that time, the Defense Contract Audit Agency ("DCAA")

would perform an accountability audit on the program, including its property management.

279.     The DCAA, which operates through the office of the Under Secretary of Defense

Comptroller, provides audit and financial advisory services to DoD.  The DCAA audit would

happen regardless of whether NSRWA awarded Northrop or DynCorp part of the rebid contract.

280.     In principle, the DCAA audit is supposed to be a full accountability account.  In that

case, DCAA would want confirmation from Northrop and DynCorp that any items for which the

contractors had billed the Government had, in fact, been used for the Government's benefit or were

still in inventory.  Thus, DCAA could require property records (including logs and hand receipts)

for any items of property in the program.  All existing records would then be provided to the next

contractor, who would complete an immediate inventory to determine whether the accountability

records were accurate (before agreeing to take over custody of the property).  Northrop and

DynCorp knew that they were unlikely to pass this type of audit.

281.     At the same time, Northrop and DynCorp knew they would have several months

before the DCAA audit.  Contracting regulations require that the Government provide the

"incumbent" prime contractor 90 days' notice that it is being replaced, plus another 90 days to

transition off the contract.  That would mean that, from the day that Northrop lost the contract (if it

lost the contract) it would have six months to take care of any deficiencies.  (It would also have

access to an additional thirty day extension.)

282.     Second, and more immediately, Northrop and DynCorp realized that before NSRWA

issued the RFP, it would need a complete Property Book so that it could identify what property the

Government would be providing to the contractors who were awarded the contract.  (The bidders

would also need to know this information in order to prepare accurate bids.)



SECOND AMENDED
COMPLAINT

283.     Under FAR, the Property Book refers to the items of government property that are expected to "survive" the program and thus be turned over (either to the Government or to the next contractor) at the end of the contract.  Generally, the Property Book refers to items of Equipment, which are defined as "durable" (and not "consumable"), although FAR also requires that other items of property, including sensitive items, items subject to ITAR, and mission-essential items, be listed in the Property Book.  Together, these items tend to represent the highest value and highest risk items in a government program.

284.     Ideally, in a functioning electronic property management system, the Property Book is simply a subset of data already in the computer system and thus the computer system should be able to produce the Property Book as a discrete report in a matter of minutes.

285.     As expected, on or around late March 2013, NSRWA requested the Property Book from Northrop as the Prime Contractor; Northrop in turn forwarded the request to DynCorp.

286.     Given the widespread problems in DynCorp's property management system, Northrop and DynCorp could not produce a Property Book from its electronic records.  Rather than disclose this inability to the Government, Northrop stalled NSRW.

287.     Mr. Burpee and Mr. Munger (Northrop's Project Manager and Deputy Project Manager, respectively in Afghanistan) spoke with Richard Trudeau, the Contracting Officer for NSRWA, and convinced him to give them more time to produce the Property Book.  They informed Mr. Trudeau that Northrop and DynCorp were performing an inventory right then and thought the NSRWA would want the most current data possible.  They said they needed to conduct some final "checks and verifications" on the data.

288.     In late March 2013, NSRWA agreed to allow Northrop and DynCorp until June 30, 2013 to produce a Property Book.



**2.    DynCorp Devised a Plan to Produce a Property Book That Would Conceal Lost Government Property**

289.    After the announcement of the impending RFP, and NSRWA's request for the Property Book, producing a compliant Property Book took on critical importance.  During a series of meetings and conference calls in March 2013, DynCorp came up with a plan to produce a document that was meant to appear to be a compliant Property Book but was actually designed to conceal the property for which Defendants could not account. Although Relator was on R&R in the United States, he participated in these discussions and worked TDY to DynCorp Fort Worth corporate for over two weeks.

290.    Within Northrop and DynCorp, everyone seemed to realize that the Munger inventory, which was still going on, was largely useless.  Although the Munger inventory was completed in late March 2013, it played no role in DynCorp's new plan to produce a Property Book. Thus, ultimately, the only thing the Munger inventory achieved was to waste two months of effort and government expense.

291.    DynCorp put Joan Albaugh in charge of producing a Property Book.  Ms. Albaugh had developed a reputation within DynCorp for making property management problems "disappear."  (Only a few weeks before the pre-solicitation, she had falsified "estimated delivery dates" in DynMRO to inflate the delivery statistics reported to the Air Force and NSRWA.  *See* ¶ 191 above.)

292.    During multiple conference calls and meetings to address the Property Book issues, Ms. Albaugh strongly and repeatedly suggested that because of the inaccuracy of all hand receipts within DynMRO, that her best course of action was to "nuke" all existing hand receipts by eliminating their existence out of DynMRO and "starting from scratch" building new hand receipts. Relator firmly refused to approve that approach because compliance procedures required the

contractor to provide the best available data, and eliminating all of the hand receipt records would instantly and irrevocably relieve all custodians that had been issued Government property of any accountability and responsibility for lost Government property.

293.     At the time of the discussions about the Property Book, DynCorp understood that there were severe problems pertaining to both GFE and CAP.  However, there was a difference in the level of concern between the two.

294.      DynCorp understood that if NSRWA found out that it had not been tracking GFE for five years, it could lead to large financial losses for DynCorp and also cause DynCorp to lose the award of the recompete.  These were significant concerns.  But the problems with CAP – and more specifically with the woeful state of the data in DynMRO – could endanger *every* contract that DynCorp had with the government if DynMRO were decertified as a non-compliant property management system.  Accordingly, DynCorp's largest concern was addressing those issues and, when it became clear that they would not be able to address them, hiding the problems from NSRWA.

### a. DynCorp Intended to Produce a Property Book That Would Conceal Lost GFE

295.     In the discussions about the Property Book in late March 2013, Relator again raised the issue of requesting a list of all GFE from NSRWA (as originally called for in the January proposed Corrective Action Plan).  This would provide DynCorp with a record of all GFE that it should have been accounting for the previous five years.  It could then conduct a compliant inventory against that record and identify items of loss (for which it would be responsible, unless granted a relief of responsibility from the Contracting Officer).

296.     DynCorp management rejected Relator's suggestion.  Rather than request a list of all GFE from NSRWA, DynCorp decided that in the Property Book the only GFE listed would be GFE

SECOND AMENDED
COMPLAINT

that could be found in inventory.  Such a Property Book, by design, can never identify missing items.

297.    When he returned to Afghanistan, Relator learned from his boss Mark Fisher that Northrop and DynCorp officials had had conversations with NSRWA officials and believed that the Government's records on GFE might even be worse than DynCorp's own, so there was a possibility that DynCorp could pull the wool over the Government's eyes and get away with NSWRA not detecting lost items of GFE.

298.    There had been considerable turnover within NSRWA, and Contracting Officer Richard Trudeau was scheduled to leave the program in June or July 2013.  Northrop and DynCorp believed that they could get away with the deficiencies because Mr. Trudeau was leaving permanently, and a new contracting officer would be easy to fool.  Julie Sorenson (Northrop Logistics Manager) and Mr. Fisher both expressed the view that if the Government was going to claim any losses from Northrop and DynCorp relating to GFE, "they're going to have to prove we ever had it."

299.    Relator protested that decision to Mr. Fisher, stating that the NSRWA might not notice the problems now but they would certainly notice at some point.  Mr. Fisher said that Relator did not need to "worry" about producing a compliant Property Book since the NSRWA was unlikely to know the difference.

300.    Relator was present during a conference call when Mr. Fisher joked with his superiors, Ray Nelson (DynCorp Aviation Program Director) and Scott Rauer (VP of DynCorp Military Aviation), about NSRWA's lack of records.  DynCorp leaders were fully aware and approved of the decision not to produce a fully compliant Property Book.

### b.  DynCorp Intended to Produce a Property Book That Would Conceal Lost CAP

301.    Unlike with GFE, DynCorp understood that CAP had an existing "paper trail."  In theory, NSRWA would be able to prove what DynCorp was supposed to possess because Northrop had billed the Government for these specific items.  Accordingly, DynCorp understood that it would need to correct the data regarding CAP in DynMRO before doing an inventory and identifying (and disclosing) particular items of loss to the Government.

302.    Cleaning the data in DynMRO would require both correcting data that was already in the system and ensuring that all items that had been procured were added to the system.  The only viable means of accomplishing the latter would be to have DynCorp finance personnel review the original purchase orders for individual CAP items and then update the system with information that had been missing.

303.    Once the data in DynMRO was updated, DynCorp could perform a proper inventory and identify any items of loss.

304.    It quickly became apparent, however, that DynCorp was not willing to commit enough staff to clean up DynMRO.  Although Ms. Albaugh had been promised a great deal of support, it never materialized.

305.    Meanwhile, Relator was still discovering greater and greater problems within DynMRO.  For a number of days in mid April 2013, Relator worked to expedite the data correction occurring within DynMRO.  He exported an Accountability Report (i.e., a full listing of all property, not just Property Book items, in DynMRO) into an Excel spreadsheet.  It included all items for which DynCorp was accountable that actually appeared in DynMRO.  The value of this property was approximately $180 million (although this did not include the vast majority of GFE, which had never been in DynMRO).

306.    The spreadsheet was 86,000 lines, each with fifteen to twenty columns of data.

Relator went through the spreadsheet and noted, corrected, and highlighted the errors that were plain on the face of the entries.  For example, on items that had been billed to the Government and delivered, he changed the "ownership" data to "GFE."  For items that did not have a value listed, he would add a value to the extent it was readily discernible. Or, if an item had a blank for the manufacturer, but the manufacturer of the item was obvious, he would add the name into the blank.

307.     A particularly important (and numerous) change that Relator made involved the classification of whether an item was equipment or material.  For example, in the case of a firearm, Relator would adjust the classification to equipment.  This was important because this classification governed whether an item would be listed in the Property Book at all.

308.     The misclassification of items originated with catalogers on DynMRO working in Fort Worth.  Importantly, the catalog is not program specific; the catalog is used for *every* DynCorp program that utilizes DynMRO on government contracts.  Thus, a change in how one item is catalogued changes that item for *every* DynCorp program.

309.     During the process of identifying errors that needed to be corrected, Relator discovered that DynCorp cataloguers had been misclassifying a great number of items.  In the course of doing these updates, Relator changed approximately 4,000 items from "property book – yes" to "property book – not" and 8,000 items in the opposite direction.  That meant that DynCorp cataloguers had misclassified approximately one in every seven items as to their property book status, a mistake that plagued not only CNTPO but *every* government program which uses the item.

310.     Additionally, the cataloguers had given a great number of items inaccurate descriptions.  For example, in some cases, a rifle scope might be improperly described as a holographic camera.  The impact of this problem is that it makes it impossible to confirm what items have been delivered (because the supply officer will not understand why a rifle scope has

been received instead of a camera) and also makes it impossible to conduct an inventory of items (because the person doing the inventory will be looking for a camera not a rifle scope).

311.     Of the approximately 86,000 items in the catalogue, Relator estimated that as many as 26,000 had inaccurate descriptions.  Relator attempted to correct all of the descriptions that he could.

312.     Ultimately, on April 25, 2013, Relator sent more than 100,000 updates to Ms. Smith and Ms. Albaugh for updating in DynMRO.  But in the following days and weeks, Relator noticed that Ms. Smith and Ms. Albaugh were not entering the updates in DynMRO.  They informed Relator that it would take at least six to nine months to get the system updated.  Ms. Albaugh intended instead to move forward with the inventory without the updates.

313.     Thus, Ms. Albaugh changed the original plan from data cleanup followed by an inventory to a simultaneous data cleanup and inventory during April and May, and then "reconciliation" during the month of June 2013.  Altering the steps was not compliant with FAR (which requires an existing, verifiable record to be complete before an inventory can be taken).

314.     Relator protested this approach, noting that the cataloguing problems were so widespread that any inventories based on (non-updated) data in DynMRO would not be able to verify the property that DynCorp was supposed to be accountable for.  Relator repeatedly tried to prevent Ms. Albaugh from using these inventory sheets until proper corrections had been made.

315.     Over time, it became clear that Ms. Albaugh was delaying the updates because she did not want to add any items to DynMRO unless she knew that such items could be found.  This was a deliberate strategy to reduce the number of losses that DynCorp would have to disclose to the Government.

316.     In the coming weeks and months, Northrop and DynCorp officials, including Mr.

Burpee (Northrop Project Manager), Mr. Munger (Northrop Deputy Property Manager), and Mr. Fisher (DynCorp Project Manager) told Relator not to update the system to include items that DynCorp could not locate.  Their position was that the Government "did not know any better than we do" what property Northrop and DynCorp were supposed to have.

317.     In May and June, Ms. Albaugh instructed the inventory personnel that they were only to use inventory sheets from her (i.e., the uncorrected inventory sheets).

318.     In the meantime, Mark Fisher instructed Relator to draft a Memorandum of Record for Northrop to present to NSRWA requesting a Property Book threshold of $400.  Under FAR, the Contracting Officer must approve the use of a threshold amount below which it is not necessary for the contractor to include items in the Property Book.  (The threshold will not apply to items that are sensitive, classified, or mission essential, which have to be included in the Property Book regardless of value.)  A $400 threshold would remove from the Property Book approximately half of the items of equipment that otherwise would be included in it.

319.     Relator drafted the formal request memorandum for Mr. Fisher, who forwarded it to Northrop, who submitted it to NSRWA.

320.     In the ensuing weeks, DynCorp and Northrop officials decided to proceed on the assumption that NSRWA would approve the $400 threshold request – with complete knowledge that it had not been approved by the Contracting Officer.  Defendants proceeded in this manner despite protests from Ms. Smith (the DynCorp Aviation Property Management Manager) that without the Contracting Officer's approval, "there is no threshold."

> **3.     DynCorp Began to Doubt It Could Produce Even a Flawed Property Book by the Deadline and Directed Relator to Put Together a Manual Property Book**

321.     Relator knew that Ms. Albaugh's insistence on conducting inventories based on

inaccurate data in DynMRO essentially guaranteed that she would be unable to produce a compliant

Property Book by June 30, 2013.  Despite these problems, Ms. Albaugh continued to send reports to

DynCorp leadership stating that she could produce a compliant Property Book by the deadline.

322.     Relator objected to these reports.  He wanted Ms. Albaugh to disclose the problems

to senior officials in the hopes that would cause DynCorp's leadership to provide the necessary

personnel to meet the deadline in a more compliant manner.  But, eager to impress her superiors,

Ms. Albaugh continued to send the overly optimistic reports.

323.     In an email in early May 2013, however, Ms. Albaugh took the position that

NSRWA would accept a "good faith effort" to comply by June 30, 2013.  Mr. Nelson responded by

telling Ms. Smith and Ms. Albaugh that this was wrong – producing the Property Book was a "no

fail effort."  They viewed Ms. Albaugh's "good faith" effort email as an admission by Ms. Albaugh

that she could not meet the deadline.

324.     In mid May 2013, DynCorp VP Scott Rauer, Ray Nelson, and Mark Fisher instructed

Relator to begin preparing a "Manual" Property Book ("MPB").  Mr. Nelson and Mr. Fisher wanted

to have "something to deliver" to NSRWA in the event that Ms. Albaugh produced nothing.

325.     An MPB is not produced electronically but rather in a simple Excel spreadsheet.  The

appeal of the MPB was that it could be corrected and updated more quickly than DynMRO.   As a

certified, auditable government system, DynMRO could not be changed without creating a

permanent record of the changes (when, who, and why a change had been made).  To change an

item in DynMRO, the proposed change would have to be sent to the Catalog Review Committee,

and only an individual with proper authorization could go into DynMRO and manually make the

change.  By contrast, an MPB could be changed by anyone working on the relevant Excel

spreadsheet.



326.     Additionally, because DynMRO exports to an Excel spreadsheet, an MPB (created in Excel) would look exactly the same as a compliant Property Book to a third-party who did not know how it was produced.

327.     The proposed MPB was blatantly non-compliant with FAR/DFARS.  Most importantly, any changes made to the MPB would not be tracked and auditable, as required for a certified government system.  Additionally, Mr. Rauer, Mr. Nelson, and Mr. Fisher were willing to carry over the problems inherent in the original project.  That is, the MPB would not contain the vast majority of GFE and it would use the $400 threshold.  (The $400 threshold was ultimately rejected by NSRWA.  *See* ¶ 352 below.)

328.     Relator was aware of these issues and had never previously prepared an MPB.  No one else at DynCorp had previously produced an MPB because this is a non-compliant method.  But Relator was also aware that the Property Book that Ms. Albaugh was producing was not going to be FAR-compliant, either.

329.     Given the pressures of the impending deadline, Relator agreed to begin working on a MPB.  Relator delayed his own R&R from on or around June 20, 2013 to mid-August 2013 to work on the MPB.

330.     DynCorp's request that Relator complete an MPB essentially put the company's efforts on two tracks:  Ms. Smith and Ms. Albaugh continued to work on producing their non-compliant Property Book and, unbeknownst to them, Relator began work on an MPB.

331.     Over Memorial Day Weekend 2013, Relator began his work.  He exported an accountability report (i.e., a list of all items of property currently in DynMRO, not just Property Book items) into an Excel spreadsheet and incorporated his previous updates, which Ms. Albaugh had not entered into DynMRO, into the spreadsheet.  He removed materials items, which are not

listed in the Property Book.  And he removed items whose ownership had been identified as CAP (i.e., items that were still in the process of being procured).  He also excluded items beneath the $400 threshold.  He also reviewed and included items that were ITAR, sensitive, or mission essential (which required some correspondence with managers responsible for the items).  He removed data columns not required for a Property Book.

332.     Relator knew that his MPB was not even a remotely complete record of everything that NSRWA had entrusted to DynCorp – or that DynCorp had procured on NSRWA's behalf – but he believed that the MPB was the best he could do, given the incomplete information available.  He also knew that it would be much more accurate than anything Ms. Albaugh produced (or did not produce).

> **4.      While Relator Worked on the Manual Property Book, DynCorp Officials Falsified Data in DynMRO and Took a Number of Other Desperate and Non-Compliant Actions in Their Attempt to Produce a Property Book That Minimized Losses**

333.     By late May and early June 2013, Ms. Albaugh was still insisting that DynCorp could produce a Property Book by June 30, 2013.  But, in her desperation to meet the deadline, she also intentionally took a number of actions designed to fraudulently minimize reported losses to the government.

334.     During late May and early June 2013, Ms. Albaugh regularly encouraged DynCorp personnel to use "wild ass guesses," or "WAG's," on various issues.  For example, she told inventory personnel that if they did not have time to do a proper inventory count, they should just make a "WAG" on how many items were in existence.  Or, within DynMRO, if a shipping date was missing, she encouraged personnel to input a "WAG."

335.     In late May or early June 2013, while reviewing changes in the Property Book, Relator also noticed that someone had changed blanks in the "acquisition cost" (valuation) column

for thousands of items to read "one cent" (i.e. $0.01).  Relator had first noticed the blanks in

February 2013 in reviewing a list of items procured under the Contract.  At that time Relator had

submitted updated, accurate pricing data to Ms. Albaugh to allow her to update DynMRO.

336.     In early April 2013, as part of DynCorp's attempt to clean up DynMRO data,

Melissa Smith (Property Management Manager for DynCorp Aviation) suggested to Ms. Albaugh

and Relator during a conference call that, to make these blanks disappear, DynCorp simply insert a

value of "one cent" as the "acquisition cost" for the 4,000 items that had a blank in that column.

337.     Relator explained to Ms. Smith that she could not do that.  He explained that, under

FAR, DFARS and internal DynCorp policies, the column for "acquisition cost," in the absence of

actual purchase order cost data, should be filled in with the "fully burdened estimate" of the cost to

acquire an item (i.e., both price and the cost of shipping) or, in the case of items of GFE (for which

there is no acquisition cost), the column should still be filled with a good-faith estimate of the

item's "fully burdened" value.

338.     Acquisition cost is an important piece of information because the Government uses it

to determine the total value of the property being used as part of a contract, and because the

Government uses the individual values to determine a contractor's liability in the event of loss.

Moreover, the total value of all the property – i.e., the sum of the "acquisition cost" of each item –

was an important figure for NSRWA to include in the RFP.  The value of the items in the Property

Book has a direct impact on the bidding for the subsequent contract.  Since the Property Book

contains items that the next contractor will not just manage but also use in performing the contract,

if the Property Book understates the items in the program, contractors will have to increase their

bids in order to account for the items of property that they will need to purchase to perform the

contract.


SECOND AMENDED
COMPLAINT

339.     Thus, Ms. Smith was suggesting that, in order to camouflage the fact that 4,000 entries did not list an acquisition cost, DynCorp simply input an arbitrary value (one cent). Ms. Smith's intention was also to minimize the supposed value of these losses, by falsely assigning the lowest possible acquisition value to each item of property. Additionally, although there was a box to check on DynMRO for whether the value used was "estimated" or "actual," Ms. Smith wanted to check the box for "actual."

340.     Relator was adamant that Ms. Smith could not insert a false value into the blanks. At the time, Ms. Smith did not challenge what Relator said. In the weeks following the exchange, Relator went back and made good-faith, fully-burdened acquisition cost estimates and inserted them into the asset value column. He did this only for the MPB; he made no actual changes within DynMRO because he did not have those user rights.

341.     But then, in late May or early June 2013, it appeared that someone had disregarded his compliance concerns and used one-cent entries to fill in blanks for "acquisition cost." When he followed up with her, Ms. Albaugh claimed that Ms. Smith had instructed IT personnel to write a "script" to fill in these blanks with one cent entries.

342.     During this same timeframe, Relator also discovered that Ms. Albaugh was making "inventory adjustments" to DynMRO. An inventory adjustment is a way to make a discrepancy (loss) between an existing property record and a physical inventory count disappear. For example, if DynMRO shows that 10 helmets should be on the shelf but a physical inspection reveals only 6, there is a discrepancy of 4, which represent missing items. Rather than locate the missing items or report the loss to the Government, in instances like that, Ms. Albaugh went into DynMRO and simply changed the inventory number downward to 6, to make the discrepancy disappear.

343.     Under FAR/DFARS, an inventory adjustment is permissible in only very limited

circumstances.  As DynCorp's designated Program Property Manager (PPM) for the CNTPO

program, Relator was the only person authorized to approve an inventory adjustment.  Relator

denied each adjustment request because such adjustments were only permitted after a complete

inventory and based upon specific criteria that had not been met.

344.     In July 2013, Relator discovered that Ms. Albaugh was also directing Ben Solis, the

DynCorp PMO Logistics Analyst, to make inventory adjustments in order to make inventory losses

disappear.  That is, she was directing him to alter the data in DynMRO to reduce the inventory

count in the system of record, and thus make the discrepancy (loss) disappear.

345.     Mr. Solis informed Relator that he feared losing his job if he made the inventory

adjustments, which was why he notified Relator.  Relator told Mr. Solis not to make the adjustments

unless Relator directed him to.  Relator reported this to his boss Mark Fisher and to Brian Benton

(DynCorp QCC Supervisor in Fort Worth).  Ms. Albaugh responded by making the adjustments

herself, despite the fact that she should not have had such privileges. Guy Frasier, IT Project

Manager, had given Ms. Albaugh these privileges in violation of internal company policies.

346.     As with items of equipment (for which she made inventory adjustments), Ms.

Albaugh also eliminated discrepancies in material items.  As the inventories came in, Ms. Albaugh

realized that there were many discrepancies between items of materials in DynMRO and what had

been found on the shelves.  With regard to large categories of material, she removed these

discrepancies by falsely altering the data in DynMRO to indicate that these items had been "issued

out" to base personnel (and thus no longer needed to be tracked).

347.     By early June 2013, Ms. Albaugh was thus doing precisely the opposite of a

compliant inventory.  Rather than cleaning up the data to make an accurate existing record, and then

counting items of property against the record, Ms. Albaugh was manipulating DynMRO to match

the counts taking place on the ground in order to conceal property losses from the Government.

348.     Within DI, there was great concern about the Government learning of the one cent entries, inventory adjustments, and "issuing out" entries, since one requirement of a certified property management system is that it be auditable (i.e., not subject to untracked changes) which the one-cent entries, inventory adjustments, and issue-outs demonstrated that DynMRO was not.

349.     DynCorp's biggest fear was that if the Government learned of these issues, it could "decertify" DynMRO, which would be the death knell for the majority of DynCorp's contracts. Melissa Smith and Rhonda Dodson, among others, expressed these concerns.

350.     In early June 2013, Relator also discovered data manipulation involving the "ownership" column of information.  Under FAR, there were only two proper types of ownership: GFE or CAP.  In the process of reviewing Mr. Fix's list in February 2013, and again in doing his data updates in April 2013, Relator had noticed that DynCorp had nine separate categories.  Now, Relator discovered a more recent addition: "DI," the acronym for DynCorp

351.     Relator went into DynMRO and learned that Ms. Albaugh had created this category and changed approximately 10,000 items from GFE to "DI."  Ms. Albaugh's changes had the effect of removing these items from the Property Book.  Since these were all items that could not be found, Ms. Albaugh was clearly trying to hide items of property that DynCorp would have to show as a loss.

## 5.     DynCorp Decided to Submit a Non-Compliant Manual Property Book and Northrop Approved the Decision

352.     On June 7, 2013, NSRWA issued the RFP.  Pursuant to the FAST2 expedited schedule, the RFP set a bid deadline of July 7, 2013 (which was later extended to July 24, 2013).

353.     In early or mid-June 2013, the Contracting Officer, Mr. Trudeau, denied Northrop's request to use a $400 threshold in the Property Book.  Mr. Trudeau explained that he was not

comfortable at this late stage of the contract approving such a threshold.  According to the

Contracting Officer Representative, the threshold should have been established at the beginning of

the program contract, not in the months before the contract ended.

354.     After NSRWA rejected the request for a $400 threshold, Mr. Nelson and Mr. Fisher

instructed Relator to nevertheless continue using the threshold in the MPB, thus excluding from the

Property Book thousands of items of property which the Government had not approved to be

excluded from the Property Book.  Northrop executives Mr. Burpee and Mr. Munger agreed with

this decision.

355.     Shortly thereafter, Ms. Smith and Ms. Albaugh finally admitted that they were not

going to be able to produce a Property Book by June 30, 2013.  On or about June 12, 2013, Ms.

Albaugh noted in an email that "the stress of trying to meet the deadline was making [her]

physically ill" and "[she] was not being provided any of the required manpower/resources necessary

to get DynMRO updated/corrected."  She said, "I have washed my hands of it."  Between this time

and Relator's delivery of the MPB, she did not respond to emails or phone calls about the Property

Book.  As Relator had known for months, Ms. Albaugh could not meet the June 30, 2013 deadline.

356.     Now, finally, DynCorp's senior leadership realized that the company was not going

to be able to produce even a marginally compliant Property Book by the deadline.  Billy Harlin, for

example, who was the Director of Procurement and Supply Chain Management in Fort Worth, now

asked why it had cost so much money to complete the Property Book and why so little had been

accomplished.

357.     Ralph Peters (DynCorp Aviation Senior Program Director) and VP Scott Rauer now

joined Mr. Nelson and Mr. Fisher in believing that the only option was for DynCorp to produce an

MPB.  DynCorp's Corporate leadership decided to bifurcate the plan:   first, DynCorp would



produce a MPB by June 30, 2013; and second, by September 30, 2013 (the end of the performance

period), it would clean up the DynMRO data, perform a reconciliation (identifying losses to the

Government), and produce a compliant Property Book.

358.    DynCorp officials also indicated that to the extent that the property management

system was not compliant by this new deadline, it would issue a new Corrective Action Plan,

identifying the remaining deficiencies to NSRWA and recommending steps to address them.  Mr.

Fisher confirmed that intention to Relator.

359.    Mr. Fisher began to check in constantly with Relator regarding the status of the

MPB.  On a number of occasions, Mr. Fisher asked Relator questions about the appearance of the

MPB.  He wanted to confirm that, right down to the font size, the spreadsheet that DynCorp

produced would *appear* the same as the spreadsheet that was exported from DynMRO.

360.    DynCorp also informed Northrop of its plan to produce a MPB that would look like a

compliant electronic Property Book, even though both companies were aware that the MPB would

not represent a compliant Property Book.  Northrop did not object to this revised plan, even though

it was clearly non-compliant.  Northrop also agreed that a new Corrective Action Plan would be

issued in the event that DynCorp could not produce a compliant Property Book by the September

30, 2013, deadline.

361.    The two companies agreed, however, that no Corrective Action Plan would be

submitted to NSRWA until NSRWA had made the recompete award, thus ensuring that the

problems would not interfere with either company's chance of securing the new contract.  In sum,

by September 30, 2013, all of the property management issues within CNTPO would supposedly be

remedied or disclosed to NSRWA.

362.    DynCorp now began referring to the June to September 2013 period as a



SECOND AMENDED
COMPLAINT

"reconciliation," i.e., the process of comparing the cleaned up DynMRO record to the inventory sheets to determine what would have to be identified to the Government as loss.

> **6.      DyncCorp Delivered the Non-Compliant Manual Property Book to the Government in a Format Designed to Look Like a Compliant Property Book**

363.     On June 30, 2013, Relator delivered the MPB to Mr. Nelson and Mr. Fisher, who delivered it to Northrop, who then provided it to NSRWA.  Ultimately, the MPB consisted of 13,600 lines (as required by FAR, each line represented one item), with 15 columns of data.  The MPB encompassed only 10-15% of the items that should have been included, but it was as accurate as Relator could make it, within the non-compliant parameters that he had been given.

364.     Northrop and DynCorp did not tell NSRWA that this was an MPB instead of a Property Book generated by DynMRO.  Relator is informed and believes that to this day, NSRWA believes that Northrop and DynCorp provided it with a Property Book that was generated by a certified, automated, auditable electronic system.

365.     Even after delivering the MPB, and despite the new "plan" to take steps to produce a compliant Property Book by September 30, 2013, DynCorp (again) did not commit manpower to the effort.  As of July 3, 2013, DynCorp had exceeded its $150,000 budget for the Buffalo Group personnel.[6]  Relator made a request to expand the available funds, but Mr. Rauer never responded, and DynCorp sent the Buffalo Group personnel home.

366.     Additionally, DynCorp no longer committed stateside personnel to the project, even

---

[6] Following the discussions between Northrop and DynCorp referenced in ¶¶ 241-243 above, DynCorp agreed to pay the Buffalo Group up to $150,000 out of DynCorp's overhead.  By agreeing to pay 100% of these costs, DynCorp retained complete control over inventory data produced by the Buffalo Group, which enabled DynCorp to avoid disclosing damaging information to Northrop and the Government.

on a temporary basis.  Only two people, Ms. Albaugh and Mr. Solis, were purportedly updating

DynMRO, but Mr. Solis was also performing his full-time logistics position and Ms. Albaugh was

resigned to not producing a compliant Property Book by June 30, 2013.  Even a few months later, of

the 100,000 updates that Relator had forwarded to Ms. Smith and Ms. Albaugh in late April 2013,

only five percent had been changed in the system.

367.    More than six months after discovering massive deficiencies in its property

management and logistics system, Northrop and DynCorp still refused to disclose any problems to

the United States Government.

## IX.    DEFENDANTS ARE LIABLE TO THE GOVERNMENT UNDER THE FCA IN THE AMOUNT OF SEVERAL HUNDRED MILLION DOLLARS FOR MISMANAGING THE GOVERNMENT'S PROPERTY IN THE CNTPO PROGRAM

368.    As set forth above, Defendants knowingly failed to manage the Government's

property in the CNTPO Program in the manner required by the Contract and federal regulations.

369.    Each voucher or invoice that Defendants submitted or caused to be submitted to the

United States claiming costs associated with property management was an affirmative false

statement that such costs were payable pursuant to the terms of the prime Contract and task orders

thereunder, and the FAR/DFARS provisions referenced therein, and each such statement therefore

was material to a false claim for payment.

370.    Defendants submitted these false and fraudulent claims with the knowledge and

intention that such claims would be presented to officers and employees of the United States

Government for payment or approval.  Defendants did so with actual knowledge of the falsity of

each claim, reckless disregard for the truth and falsity of each claim, or deliberate indifference to

the truth or falsity of each claim.

SECOND AMENDED
COMPLAINT

371.     As a result of Defendants' false and fraudulent claims and statements, the United States paid substantially in excess of the amounts it owed under the Contract and task orders thereunder.

372.     Pursuant to FAR 52.245-1, Defendants were responsible for the loss of any Government property in their possession that resulted from "willful misconduct or lack of good faith."

373.     The actions of Defendants in knowingly disregarding obligations under the Contract, federal regulations, and internal policies and procedures, and in making false statements to the Government to conceal their noncompliance with the above, establish lack of good faith and willful misconduct.  Accordingly, Defendants are liable for the full amount of the materials missing, wasted, or unaccounted-for in inventory, amounting to several hundreds of millions of dollars.  On the same basis, Defendants are also liable for the Government's losses attributable to Defendants' gross over-ordering of property and widespread failure to put needed property into use.

374.     Upon information and belief, the Contract also permits withholding of payments from the prime contractor if the Contracting Officer determines that there are significant deficiencies in the contractor's Material Management and Accounting System (MMAS).  DFARS 252.242-7004 defines "significant deficiency" in the contractor's MMAS as follows:

> *"Significant deficiency"* means a shortcoming in the system that materially affects the ability of officials of the Department of Defense to rely upon information produced by the system that is needed for management purposes."

DFARS 252.242-7004(a)(5).

375.     DFARS 252.242-7005 provides for the withholding of up to 5% of payments for significant deficiencies.  Moreover, pursuant to 48 C.F.R. § 52.232-16(c), the Contracting Officer "may reduce or suspend progress payments" for the Contractor's "failure to comply with any

material requirement of [the] contract").  Maintaining proper inventory control is a material

requirement of the CNGS Contract.

376.     By concealing from the Government the lack of effective property management,

Defendants avoided the withholding, reduction or suspension of progress payments.

377.     Upon information and belief, the Contract requires the prime contractor to report

lost, damaged or destroyed property in a timely manner to the Contracting Officer, but no later than

the joint inventory at the end of the contract period; and if the prime contractor fails to report lost,

damaged or destroyed equipment or materials during the contract performance period, the prime

contractor shall be responsible for the replacement and/or repair of the equipment or materials.

378.     Because Defendants failed to report to the Contracting Officer lost, damaged or

destroyed materials in a timely manner, Defendants are fully responsible and liable for the value of

the missing property, amounting to hundreds of millions of dollars.


X.     **DEFENDANTS RETALIATED AGAINST RELATOR FOR HIS EFFORTS TO
       BRING DEFENDANTS' PROPERTY MANAGEMENT INTO COMPLIANCE
       WITH THE LAW**

   A.     **Relator Consistently Opposed, Protested, and Attempted to Stop Defendants'
          Violations of the FAR/DFARS and the FCA**

379.     Throughout his employment with DynCorp, Relator consistently opposed, protested,

and attempted to stop violations of FAR/DFARS and the FCA by Defendants.

380.     In late November and early December 2012, Relator protested Defendants' failure to

maintain compliant property accountability while they billed the United States Government for the

cost of a fully compliant property accountability system.  Relator opposed this conduct to DynCorp

managers including Mr. Fisher, Mr. Nelson, Ms. Fagan, Ms. Dodson, Ms. McClendon, and Ms.

Smith, and to Northrop managers including Mr. Burpee, Mr. Munger, Ms. Sorenson, and Mr.

Rodriguez.

381.     In late November and early December 2012, Relator reported to Defendants that DynCorp had not developed MIS and thus had not been tracking GFE within MIS during the life of the program, despite the fact that it had been billing the United States Government for a fully functional automated property tracking system.

382.     In December 2012 and January 2013, Relator drafted and distributed within DynCorp and to Northrop a Corrective Action Plan that detailed the extensive steps necessary to restore DynCorp's property management system to compliance with FAR/DFARS requirements. Relator emphasized within the Corrective Action Plan and in other communications to DynCorp and Northrop management the requirement that Defendants disclose to the United States Government any property that it could not account for.

383.     In December 2012 or January 2013, Relator informed DynCorp and Northrop management personnel that the Aircraft Supply Depot ("ASD"), the Class 9 warehouse that housed the program's aircraft parts, was not secure as required in FAR/DFARS.

384.     In late January or February 2013, Relator opposed Northrop's attempt to use a $250 minimum recording threshold for property recorded in its Property Book without first seeking government approval for such a threshold amount, as required by FAR/DFARS.  (Northrop's attempt to use a $250 threshold preceded by several months DynCorp's attempt to use a $400 threshold, discussed in ¶¶ 317-319 and 350above.)

385.     In late January or February 2013, Relator protested Northrop's refusal to request a full list of GFE from NSRWA as a way to determine what items of GFE Defendants could not account for.  Northrop's refusal to request the list was based on its fear that the request would tip off the Government to the massive property management deficiencies on CNGS.  In March 2013,

SECOND AMENDED
COMPLAINT

Relator similarly protested DynCorp's refusal to obtain such information based on its fear that the request for such information might alert the Government to its property management deficiencies.

386.     In February 2013, Relator opposed and protested the "inventory" plan developed by Mr. Munger, which did not represent a compliant inventory under FAR/DFARS, and which was purposefully designed to attempt to hide Defendants' massive property management failures from the United States Government.

387.     In February 2013, Relator refused a request by Mr. Fix and Mr. Nelson to alter estimated delivery dates on the EBSR as a way to make it appear that there were no delayed deliveries or problems in DynCorp's supply chain.  Relator also instructed his staff not to make these changes.

388.     On March 23, 2013, Relator wrote a "Memorandum of Record," which was signed by eleven DynCorp CNTPO management personnel, detailing Northrop's abusive treatment of DynCorp employees.  The Memorandum noted that Northrop had created an atmosphere in which DynCorp employees were scared to follow property accountability regulations because of fear of reprisal by Northrop.

389.     In the spring of 2013, Relator opposed Ms. Albaugh's proposal that DynCorp "nuke" all existing hand receipts in DynMRO – i.e., have DynCorp IT write a script that would change the entry for the relevant data field from "hand receipted to [Employee X]" to "In Stock" for all items in DynMRO.  Ms. Albaugh proposed that each employee could fill out a new hand receipt for property actually in his or her possession at the time – rather than the property that he or she was supposed to be accountable for – and that the system could start "clean" from there.  The purpose of Ms. Albaugh's proposal was to cover up the tremendous amount of property paid for by the United States Government that DynCorp could not account for.  Relator vehemently objected, stating that

SECOND AMENDED
COMPLAINT

Ms. Albaugh could not just destroy existing records and summarily relieve personnel of liability for items for which the hand receipts made them responsible.  Relator was able to prevent Ms. Albaugh from executing this plan.

390.    In April or May 2013, Relator sent more than 100,000 updates to Ms. Smith and Ms. Albaugh that were necessary to correct inaccurate data in DynMRO.  Relator repeatedly protested Ms. Albaugh's failure to have the updates incorporated into DynMRO, since the failure to make the updates meant that the sheets used to conduct the resulting inventory were inaccurate.  Relator further protested when Ms. Albaugh refused to make the updates when she expressed that she did not want to add to DynMRO items of property that could not be located.  Relator also protested when Mr. Burpee, Mr. Munger, and Mr. Fisher told him that they did not want him to update the system to include property that DynCorp could not locate.  Relator's protests were an attempt to make sure that DynCorp disclosed to the Government all items of property that it could not account for.

391.    Despite the fact that Mr. Burpee, Mr. Munger, and Mr. Fisher all told Relator that they did not want to list in DynMRO property that Defendants could not locate, Relator and his team tried to update DynMRO with information about push pack items, ultimately generating 20,000 additional line items that needed to be updated in DynMRO.  A number of the items that were updated pertained to material (and not equipment), and included items of material that were not found in the inventories.  Rather than permit this discrepancy in DynMRO, and disclose the items of loss to the Government, Ms. Albaugh falsified DynMRO by manipulating the data to indicate that these lost items had instead been "issued out" to various base personnel.  Ms. Albaugh's false entries represented that the items of material had been accounted for and used for the Government's benefit, when she had no way of knowing whether that was true or not.  She did

this against Relator's protests.

392.     With regard to items other than the push packs, in the spring and summer of 2013, Relator opposed Ms. Albaugh's attempts to retroactively and falsely "issue out" Material items that DynCorp could not account for and that had not, in fact, been issued out.

393.     Relator included in the Manual Property Book that he compiled for DynCorp items of property that DynCorp could not locate, despite instructions from Mr. Fisher and Mr. Nelson not to include such items.

394.     In the spring of 2013, Relator protested Ms. Smith's instruction that DynCorp insert "one cent" as the "acquisition cost" for items for which no acquisition cost or value was listed in DynMRO, a data manipulation that would falsify information in order to drastically reduce the value of lost property.  Relator insisted that, as required by FAR/DFARS, DynCorp use a good-faith "fully burdened" estimate of the property's actual value and that included shipping and handling costs in the value of the item.

395.     In the spring and summer of 2013, Relator opposed Ms. Albaugh's attempts to use "inventory adjustments" to hide property losses from the United States Government.

396.     In June 2013, Relator opposed Ms. Albaugh's attempts to manipulate the "ownership" category of data in DynMRO to remove items from the Property Book.

397.     In late July 2013, Relator reported to Mr. Peters, Mr. Rauer, Mr. Fisher, and others preliminary projections for the amount of loss that DynCorp would be required to report regarding items of property that it could not find.

398.     In the summer of 2013, Relator protested to Billy Harlin, Mr. Fisher, Mr. Nelson, Ms. Albaugh, and Ms. Smith that QCC personnel had falsified delivery information for avionics orders as a way to fraudulently expedite billing of the United States Government.

**B.      Defendants Repeatedly Retaliated Against Relator for His Attempts to Stop Defendants' Violations of the FAR/DFARS and the FCA**

399.      Throughout his employment, Northrop repeatedly threatened to terminate Relator for his attempts to stop violations of the FAR/DFARS and the FCA.

400.      For example, in February 2013, Mr. Burpee and Mr. Munger told Relator that if he did not conduct the (knowingly non-compliant) inventory as they wished, they would replace him with someone who would.  Around this same time frame, Mr. Munger told Relator that if Relator reported any of Defendants' violations to the NSRWA contracting officer representative, he would immediately terminate Relator's employment.

401.      Additionally, on March 21, 2013, Relator had on his desk a copy of the Northrop Code of Business Ethics and the Northrop "Ethics Hotline" phone number.  Mr. Munger came into Relator's office, noticed it, and told him angrily: "This is not going to happen."  He then rolled the document into a tube and left with it.  Mr. Munger's intention was to again threaten Relator not to report Defendants' fraudulent conduct.

402.      Northrop, and in particular Mr. Munger, created an atmosphere hostile to ensuring compliance with FAR/DFARS.  For example, Mr. Munger terminated another employee for having raised an unrelated compliance concern, Richard Werner (aka "Gator"), the Maintenance Lead for MoD.  Mr. Werner had reported deficiencies in his program to Joshua Morales, the NSRWA Contracting Officer Representative.  Mr. Munger observed Mr. Werner reporting deficiencies to Mr. Morales, and immediately removed him from CNTPO.  Relator learned from a number of people, including Mr. Fisher, Mr. Miller, and Mr. Werner, that Mr. Munger had conceded that the he had terminated Mr. Werner because Mr. Werner had reported these deficiencies.  Mr. Munger himself acknowledged that he would not "tolerate anybody talking to government representatives about deficiencies in the program."



403.     Northrop interfered with Relator's ability to apply for positions within DynCorp.   In late July or early August 2013, Relator applied for Mr. Nelson's former position as Program Director at DynCorp Aviation.  Mr. Rauer emailed Relator that the position would require Northrop's approval because it was a "key management position" on CNTPO, thus suggesting that Northrop would not approve Relator for the position.  Mr. Fisher stated flatly to Relator that Relator had "rocked the boat too much" for Northrop to approve him in Mr. Nelson's former position.  Mr. Fisher told him that DynCorp would not hire Relator for the position because Mr. Munger had said in early July 2013 that he "wanted [Relator] off the program."

### C.     Events Preceding DynCorp's Termination of Relator

404.     As of late July 2013, with the deadline for a compliant Property Book fast approaching, Relator tried to focus DynCorp leadership attention on the consequences of DynCorp's failure to correct issues by sending emails estimating the losses that DynCorp would be responsible for to the United States Government.

405.     In late July and early August 2013, Relator sent out spreadsheets with estimated loss numbers.  The losses were based on a reconciliation that Relator performed between the inventory sheets from Ms. Albaugh's team and count 3 close-outs that Ms. Albaugh had performed for three to five departments.  (Those closeouts were performed against data in DynMRO, which included approximately 5% of Relator's updates and very little GFE).

406.     Relator's email indicated a possible loss of $1.9 million on just those limited close-outs.  Even this figure was well below the actual loss since DynMRO included a number of "one cent" entries.  If the Government used the real acquisition cost of these items, the total loss would be considerably higher.  Extrapolating this figure, which constituted less than 5% of the whole program, would increase the loss to $40 million, not including shipping costs.



407.     Even this figure was very conservative, since there were almost no aircraft parts in DynMRO.  A reconciliation against Relator's MPB would have shown considerably higher loss since the MPB had excluded items of material as well as items below an unapproved value threshold, and included equipment items (which were must larger in value).

408.     In or about early August 2013, Relator sent the spreadsheets to Mr. Peters {DynCorp Aviation Senior Program Director), Mr. Rauer (VP of DynCorp Military Aviation), and his boss Mr. Fisher (DynCorp CNTPO Project Manager).  Mr. Rauer responded by asking Relator how he was "defining loss."  After Relator explained his calculations, Mr. Fisher said to Relator: "We don't want any more email traffic on that topic."  Communications regarding the possible loss then came to an abrupt end.

409.     Relator continued to try to persuade DynCorp to correct the problems in DynMRO. Relator was scheduled to begin R&R (which he had delayed from late June 2013) on or around August 13, 2013.  As directed by Mr. Fisher, Relator was planning to work a large portion of this period.

410.     As of the first week of August 2013, the plan was that Relator would TDY to Fort Worth to work with Ms. Smith and Ms. Albaugh finalizing updates so that the Property Book could be finalized by September 30, 2013.

411.     Relator knew that Ms. Smith and Ms. Albaugh had not been updating DynMRO and that the September 30, 2013 deadline was unrealistic.  But he was willing to work on the project during R&R.  He hoped that when he was in the United States, he could pull people from other departments to have them help update the system.  Relator believed that DynCorp was still planning to submit a compliant Property Book, disclose any remaining deficiencies, and identify losses to the Government in an Accountability Report.

412.     Additionally, during a call the first week of August 2013, Mr. Rauer and Mr. Fisher directed Relator to work with Ms. Albaugh to prepare two Corrective Action Plans for delivery no later than September 18, 2013.  Although Relator believed that DynCorp still intended to fully disclose any remaining deficiencies with property management, it was also clear that the Corrective Action Plans had a "strategic" component in terms of the impending contract award.

413.     Mr. Fisher, with Mr. Rauer present on the conference call, explained that Relator should draft one Corrective Action Plan for DynCorp to submit in the event that Northrop (with DynCorp) won the re-bid, and another one for DynCorp to submit in the event that Northrop (with DynCorp) lost the re-bid but another prime (with DynCorp) won the award.  The former would minimize criticism of Northrop for the property management deficiencies while the latter would blame Northrop completely by highlighting Northrop's insistence that property management personnel report to Northrop, thus interfering with DynCorp's ability to direct personnel.  Mr. Fisher said that, in the event Northrop lost the contract, DynCorp would "burn them" and "throw them under the bus."

414.     Because Relator would be flying directly from Kabul to Fort Worth to TDY there, Mr. Fisher said that DynCorp would pay for his flight.  Relator would then pay for any travel between Fort Worth and Arkansas (his residence of record) during the R&R period.  Mr. Fisher directed Relator to book the flight through DynCorp's American Express travel agency, which he did.

415.     During the first week of July 2013, Mr. Nelson and Mr. Fisher informed Relator that Northrop had hired Honeywell to take over property management of GFE.  Northrop was paying Honeywell separately, not out of Contract funds.  Relator estimated that this amounted, on an annualized basis, to three to four million dollars.  Northrop was not billing the Government for


SECOND AMENDED
COMPLAINT

Honeywell's services, except for its work replacing MIS.  This reflected Northrop's level of

concern.  In January 2013, Northrop had refused to pay $100,000 to bring in Buffalo Group

personnel to remediate problems.  Now, it was willing to pay millions of dollars to have someone

manage GFE.

> **D.     When Northrop and DynCorp Learned That the Government Was Going to Audit CNGS Property Management, DynCorp Abruptly Changed Its Strategy, Stopped Its Corrective Efforts, and Terminated Relator**

416.     During the first week of August 2013, NSRWA notified Northrop that the Defense

Contract Management Agency ("DCMA") was going to audit CNTPO property management on

October 7, 2013.

417.     In contrast to the full accountability audit performed at the close of the Contract by

DCAA, which is financial in nature, the DMCA audit would focus on whether Northrop and

DynCorp were following property management procedures.  The DCMA would audit a random

10% of the Property Book.  Property management personnel would be sent to verify that the items

existed and were in the location listed in the Property Book.  In addition, DCMA would also select a

sample of the Property Book items for DynCorp to document the procurement history in order to

verify "cradle to grave" accountability. The *sine qua non* of the DCMA audit is an accurate

Property Book, which DynCorp still did not have.

418.     Relator assumed that news of the audit might finally force DynCorp leadership to

expedite the corrective actions required to produce a compliant Property Book, the same efforts for

which Relator was scheduled to fly to Fort Worth to work on during the next month.  But DynCorp

made other plans.

419.     On or around August 7th, Mr. Fisher informed Relator that DynCorp would not pay

for his flight from Kabul to Fort Worth.  Mr. Fisher referred to this as a "cost cutting" decision.



Because of the delay in learning of this decision, Relator had to pay $3,500 for a ticket that would have cost him only $1,200 a week or two before.  Relator informed Mr. Fisher that, if that was the case, then he wished to fly home first before heading to Fort Worth to TDY.  He said that he planned to work from home.  Mr. Fisher indicated that he would be in touch with Relator to "firm up" the dates for when he would be "needed in Fort Worth."  He told Relator to "await word" on that issue.

420.     The night before Relator left for R&R, he had dinner with Mr. Fisher.  On the way back to the barracks, Mr. Fisher informed Relator that he had talked to Mr. Burpee regarding Relator's position in light of the arrival of Honeywell.  Previously, Relator had asked Mr. Fisher how Honeywell's arrival would impact him.  Mr. Fisher indicated that he told Mr. Burpee that Relator was vitally necessary to DynCorp's operations in Kabul and that he was "the man with the knowledge" regarding property management.  Mr. Burpee had said that Relator was "golden" and would continue to be needed in Kabul.  Mr. Fisher said that Relator did not need to "worry" about his position.

421.     On or around August 13, 2013, Relator left for his home in Arkansas.

422.     After Relator left for Arkansas, Mr. Fisher never contacted him with "firmed up" plans for him to TDY in Fort Worth.  In marked departure from the previous weeks, Relator heard very little from Mr. Fisher about the status of the Property Book and the corrective action plans.  In fact, all of a sudden, no one was asking Relator for updates on the progress of the compliance efforts.

423.     Ms. Albaugh also confirmed that there was a sudden "silence" regarding the issues and that no more updating work was being done.  It appeared that the compliant Property Book and the Corrective Action Plans were no longer a priority with DynCorp.  Ms. Albaugh indicated that

she was not even sure if she had a job with DynCorp anymore.

424.    On September 8, 2013, as Relator was packing his bags to return to Kabul, Mr.

Fisher sent an email to Relator in which he informed Relator that his "position had been

eliminated."  Accordingly, his contract was not going to be renewed; his last day of work would be

September 30, 2013.  All other DynCorp CNTPO personnel that were subject to non-renewal of

their contracts had all been advised 90-days earlier of their contract non-renewal.

425.    Mr. Fisher said that Northrop, and specifically Randy Munger (who was promoted to

Northrop Deputy Project Manager effective September 1, 2013, following the resignation of Doug

Burpee), had directed that DynCorp terminate Relator because of "the whole property mess."  Mr.

Fisher told Relator that Mr. Munger had made the decision to fire him because of "all the conflict

[he] and [Mr. Munger] had over property management."

426.    During the same time frame, DynCorp informed Ms. Albaugh that it was moving her

to a different DynCorp program and she would not be involved with CNTPO after September 30,

2013.

427.    After the call, Relator continued to work hard to complete the two Corrective Action

Plans that Mr. Fisher had assigned him.

428.    On September 15, 2013, during a phone conversation with Mr. Fisher, Relator

mentioned that he was working on the two Corrective Action Plans.  Mr. Fisher immediately

apologized.  He said that he had "forgot[ten] to tell" Relator the previous week that DynCorp was

not going to use the Corrective Action Plans.  He said that Northrop had decided not to follow

through on the Corrective Action Plan idea (and thus would not disclose any of the property

management issues to the Government).  Because Northrop was not going to submit a Corrective

Action Plan to the Government, DynCorp would not submit one to Northrop.



429.     In fact, Mr. Fisher explained, DynCorp was going to stop its efforts to clean up the data in DynMRO and would not be producing a compliant Property Book on September 30, 2013. Mr. Fisher explained that, instead, on October 1, 2013, a week before the expected DCMA audit, Honeywell would be doing a "floor to ceiling" inventory of all property (GFE and CAP) and would generate a Property Book from that.  Honeywell would build a Property Book "from the ground up" (i.e., the Property Book would consist simply of what Honeywell found during its count of existing property).  Mr. Fisher explained that Honeywell would not have access to DynCorp's records, other than the MPB list, or to DynCorp's personnel.

430.     Relator understood the implications of this decision, and was stunned.  By having Honeywell build a property book "from the ground up," Northrop and DynCorp were abandoning the plan to produce a compliant Property Book.  Rather, they were going to produce a Property Book that, by definition, matched the items of property currently able to be physically located in Afghanistan.  In other words, they were going to present to the auditors a Property Book that intentionally excluded (and hid) from the auditors items for which they were accountable but could not account for.  Northrop and DynCorp had decided to "bury" all evidence of items of lost property to the Government.

431.     The decision was not temporary.  Mr. Fisher further explained that, as of October 1, 2013, Honeywell would be taking over property management (receiving, tracking, and inventories) of both GFE and CAP.\ As a result, when the DCAA and/or DCMA performed the full accountability audit at the close of the contract (or six to nine months after that), Honeywell could assert that all of the property for which it took over accountability was GFE (i.e., it had not procured the items in question and thus did not possess the records sought in the accountability audit).  Nor could it get those records from DynMRO, since DynCorp considered that data to be proprietary.

Although Northrop and DynCorp were assuming that the DCAA/DCMA would not audit DynCorp's records, they knew that it would be very difficult for the DCAA/DCMA to discover whether or not there were items of property beyond the Property Book that Honeywell gave it.

432.    In effect, Northrop and DynCorp were gambling that NSRWA would not have – and the DCAA/DCMA would not request from DynCorp – records that would reveal the true scope of what Northrop and DynCorp had lost.  According to Mr. Fisher, the Government would have to "prove" that there were items of property that Honeywell should have had that it did not.  These decisions by Northrop and DynCorp basically "cemented in" all of the omissions from the Property Book that DynCorp had produced.  After nine months of giving lip service to various corrective actions and then failing to implement them, DynCorp had made a last, final decision to bury the past.

433.    Once Northrop and DynCorp made that decision, DynCorp had removed Relator from the program so that he would not disclose to the DCMA the rampant property accountability issues in CNTPO for the previous five years.

434.    The planned DCMA audit, scheduled for October 7, 2013, was halted by the Government shutdown in early October.  Upon information and belief, the DCMA had not yet rescheduled the audit as of the date of filing  of the First Amended Complaint in this action.

435.    Relator later learned that Honeywell was going to have sixteen people handling its property management responsibilities, compared to the three who performed them for DynCorp, thus confirming the understaffing that caused the massive deficiencies.

**E.    Defendants Further Retaliated Against Relator by Refusing to Hire Him as the Senior Logistics Manager for DynCorp Aviation, and Failed to Address His Allegations of Retaliation**

436.    During the September 8, 2013, conversation in which Mr. Fisher discussed

DynCorp's termination of his employment, Mr. Fisher told Relator not to worry because Mr. Fisher

had spoken with Mr. Rauer, who had indicated that Relator was "slated to be hired" as the Senior

Logistics Manager for DynCorp Aviation.  Messrs. Peters, Fisher, and Nelson, as well as Mr.

Burpee, had told Relator that he would be an excellent fit for that position.  At the end of July 2013,

Mr. Burpee told Relator that because of the friction between him and Mr. Munger regarding

property accountability issues it would be better if Relator worked out of DynCorp's Huntsville

base rather than to continue to work alongside Mr. Munger in Kabul.  Mr. Burpee explained that

Relator's insistence that things be done in compliance with FAR/DFARS had made him "the face"

of property management problems in Mr. Munger's eyes.

437.    After initially telling Relator to prepare to fly to Huntsville to interview for the

position, Mr. Fisher informed Relator that Mr. Rauer had decided not to open the Senior Logistics

Manager position for hiring at all.

438.    After the non-renewal of his contract and DynCorp's refusal to hire him for the

position of Senior Logistics Manager, Relator emailed Mr. Rauer, stating that he believed he had

been retaliated against because of his opposition to Defendants' handling of property management

issues.  He did not receive a substantive response from Mr. Rauer.  Relator also emailed Mr. Myles

and copied Russ Fatum, the Vice President of DynCorp Human Resources, reasserting his

allegations of retaliation.  Mr. Fatum told Relator that he needed to apply for open  DynCorp jobs in

order to be reconsidered, and that he would personally ensure that Relator's application would get

in front of hiring managers and that he would have the "highest visibility" for the positions together

with with Mr. Fatum's positive recommendation.  In the coming weeks, Relator applied for

approximately thirteen different positions within DynCorp.  Although he had excellent

qualifications for each of the positions, he never received a single interview for any of the openings,

SECOND AMENDED
COMPLAINT

despite the purported sponsorship and recommendation of the Vice President of Human Resources for a company with approximately 27,000 employees.

439.     On multiple occasions, a DynCorp recruiter contacted Relator about an open position, telling Relator that he or she had done so because Relator's qualifications were such a good match for the position.  On each such occasion, Relator expressed interest in the position, and the recruiter forwarded Relator's resume to the final hiring manager, a step typically taken only at the final hiring stage.  Each time, however, Relator heard nothing further.

440.     In late September or early October 2013, despite what Mr. Fisher had previously told him, DynCorp did open the position for hiring and post the Senior Logistics Manager position. Neither Mr. Rauer nor Mr. Fisher contacted Relator to alert him to the news, but Relator quickly saw the posting and applied for the position.  Afton Hicks, a senior recruiter from World-Wide Recruiting Services (a division of DynCorp) and  the recruiter assigned to hire for this position, then contacted Relator and stated in an email that Relator was "a perfect match for this position."  She said that she would immediately forward his application to Mr. Rauer, who was serving as the hiring manager.  Less than an hour later, the recruiter called back and informed Relator that DynCorp had "decided to go a different direction" and had already selected another candidate to fill the position.  Several weeks later, however, Relator noticed that DynCorp was still seeking applicants for the position on its website.

441.     Relator also reported the retaliation, in writing, to Steven Schorer, the President of DynCorp Aviation, and to Scott Wagner, Program Manager at Northrop.  In response, a DynCorp compliance investigator only interviewed Relator once, for fifteen minutes, by phone.  The investigator explained that this was a "preliminary call" for the investigator to make introductions and obtain a brief summary of Relator's allegations of retaliation.  The investigator explained that

SECOND AMENDED
COMPLAINT

this would be followed by a second call which would likely be "very lengthy" in order to allow

DynCorp to learn all the details of the allegations of retaliation from Relator.  After that first

preliminary call, however, the compliance investigator never contacted Relator again.  Neither

DynCorp nor Northrop responded in any other way to Relator's written reports of retaliation.

## STATEMENT OF CLAIMS

## CLAIM ON BEHALF OF THE UNITED STATES OF AMERICA:

### Count I
### (Against All Defendants)
### False Claims Act
### 31 U.S.C. §§ 3729(a)(1)(A), (B), (C), (D), (G)

442.     Relator realleges and incorporates by reference the allegations contained in

paragraphs 1 through 441 of this Second Amended Complaint.

443.     This is a claim for treble damages and penalties under the False Claims Act, 31

U.S.C. § 3729, *et seq.*, as amended.

444.     By virtue of the acts described above, Defendants knowingly presented or caused to

be presented false or fraudulent claims, and knowingly failed to disclose material facts, to officers,

employees, or agents of the United States Government for payment or approval within the meaning

of 31 U.S.C. § 3729(a)(1)(A).

445.     By virtue of the acts described above, Defendants knowingly made, used, or caused

to be made or used, false or fraudulent records and statements, which also omitted material facts, to

get false claims paid and that were material to false or fraudulent claims within the meaning of 31

U.S.C. § 3729(a)(1)(B).

446.     By virtue of the acts described above, Defendants knowingly had possession,

custody, or control of property used or to be used by the Government and knowingly delivered, or

causing to be delivered, less than all of that money or property 31 U.S.C. § 3729(a)(1)(D).

447.     By virtue of the acts described above, Defendants knowingly avoided or decreased

an obligation to transmit money or property to the United States Government within the meaning of

31 U.S.C. § 3729(a)(1)(G).

448.     By virtue of the acts described above, Defendants knowingly conspired to commit a

violation of the FCA within the meaning of 31 U.S.C. § 3729(a)(1)(C).

449.     Relator cannot at this time identify all of the false and fraudulent claims that were

caused by Defendants' conduct.  Documentation of such claims is in the possession of the

Government and the Defendants, and Relator has no access to such records.

450.     The Government, unaware of the falsity of the records, statements and claims made

or caused to be made by the Defendants, paid and continues to pay the claims that would not be

paid but for Defendants' unlawful conduct.

451.     By reason of Defendants' acts, the United States has been damaged, and continues to

be damaged, in substantial amount to be determined at trial.

452.     Additionally, the United States is entitled to the maximum penalty of $11,000 for

each and every false and fraudulent claim made and caused to be made by Defendants arising from

their unlawful conduct as described herein.

### CLAIMS ON BEHALF OF RELATOR FRED MAXEY CLONINGER:

### COUNT II
### (Against DynCorp)
### Violations of the False Claims Act
### 31 U.S.C. § 3730(h)

453.     Relator realleges and incorporates by reference the allegations contained in

paragraphs 1 through 441 of this Second Amended Complaint.

454.     Under 31 U.S.C. § 3730(h)(1), it is unlawful to discharge, demote, threaten, harass,

or otherwise discriminate against an employee, contractor, or agent in the terms and conditions of employment "because of lawful acts done by the employee, contractor, or agent" in furtherance of a *qui tam* suit or "other efforts to stop 1 or more violations of" the FCA.

455.    For purposes of 31 U.S.C. § 3730(h)(1), Relator was an employee of DynCorp.

456.    Relator had a reasonable belief that Defendants were not complying with numerous FAR/DFARS requirements regarding property accountability, were defrauding the United States Government in violation of the FCA, and were engaged in active and intentional efforts to hide this unlawful conduct from the United States Government.

457.    Relator engaged in protected activity under 31 U.S.C. § 3730(h)(1) when, by lawful acts, he consistently and repeatedly opposed, protested, and attempted to stop Defendants' violations of the FAR/DFARS and of the FCA.

458.    Relator took these actions in furtherance of a *qui tam* suit and in an effort to stop one or more violations of the FCA.

459.    DynCorp knew that Relator had engaged in these instances of protected activity.

460.    DynCorp retaliated against Relator for engaging in these instances of protected activity by refusing to hire him for the position of Program Director at DynCorp Aviation, by not renewing his employment contract and thus terminating his employment as Logistics Manager, and by refusing to hire him for the position of Senior Logistics Manager or the number of other open positions to which he had applied and for which he was well-qualified.

461.    DynCorp's actions have caused and will continue to cause Relator substantial economic loss, including lost salary, benefits, and bonus payments, and damage to his career prospects and earnings potential; damage to his professional reputation; humiliation; emotional distress; and pain and suffering.



462.    By these actions, DynCorp has violated 31 U.S.C. § 3730(h)(1).

463.    Pursuant to 31 U.S.C. § 3730(h)(2), Relator is entitled to all relief necessary to make him whole for DynCorp's retaliation, including reinstatement (or front pay, in lieu of reinstatement), two times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees.

## COUNT III
### (Against Northrop Defendants)
### Violations of the False Claims Act
### 31 U.S.C. § 3730(h)

464.    Relator repeats and realleges each and every allegation contained in paragraphs 1 through 441 above as though fully set forth herein.

465.    Under 31 U.S.C. § 3730(h)(1), it is unlawful to discharge, demote, threaten, harass, or otherwise discriminate against an employee, contractor, or agent in the terms and conditions of employment "because of lawful acts done by the employee, contractor, or agent" in furtherance of a *qui tam* suit or "other efforts to stop 1 or more violations of" the FCA.

466.    Northrop hired DynCorp as a subcontractor on CNGS.  Relator was an employee of DynCorp assigned to work on CNGS.  For purposes of 31 U.S.C. § 3730(h)(1), Relator was a contractor of Northrop.

467.    Relator had a reasonable belief that Defendants were not complying with numerous FAR/DFARS requirements regarding property accountability, were defrauding the United States Government in violation of the FCA, and were engaged in active and intentional efforts to hide this unlawful conduct from the United States Government.

468.    Relator engaged in protected activity under 31 U.S.C. § 3730(h)(1) when, by lawful

SECOND AMENDED
COMPLAINT

acts, he consistently and repeatedly opposed, protested, and attempted to stop Defendants'
violations of the FAR/DFARS and of the FCA.

469.    Relator took these actions in furtherance of a *qui tam* suit and in an effort to stop one
or more violations of the FCA.

470.    Northrop knew that Relator had engaged in these instances of protected activity.

471.    Northrop retaliated against Relator for engaging in these instances of protected
activity by causing DynCorp to refuse to hire him for the position of Program Director at DynCorp
Aviation, by causing DynCorp to refuse to renew his employment contract and thus terminating his
employment as Logistics Manager, and by causing DynCorp to refuse to hire him for the position of
Senior Logistics Manager and for other open positions to which he had applied and for which he
was well-qualified.

472.    Northrop's actions have caused and will continue to cause Relator substantial
economic loss, including lost salary, benefits, and bonus payments, and damage to his career
prospects and earnings potential; damage to his professional reputation; humiliation; emotional
distress; and pain and suffering.

473.    By these actions, Northrop has violated 31 U.S.C. § 3730(h)(1).

474.    Pursuant to 31 U.S.C. § 3730(h)(2), Relator is entitled to all relief necessary to make
him whole for Northrop's retaliation, including reinstatement (or front pay, in lieu of reinstatement),
two times the amount of back pay, interest on the back pay, and compensation for any special
damages sustained as a result of the discrimination, including litigation costs and reasonable
attorneys' fees.

SECOND AMENDED
COMPLAINT

## COUNT IV
## (Against DynCorp)
## Wrongful Discharge in Violation of Virginia Public Policy

475.     Relator repeats and realleges each and every allegation contained in paragraphs 1 through 441 above as though fully set forth herein.

476.     Virginia law recognizes an exception to the doctrine of employment-at-will based upon an employer's violation of public policy in the discharge of an employee.  An employer may not terminate an employee when an employee exercises his right to oppose or refuse to participate in violations of Virginia law.

477.     Section 18.2-178 of the Virginia Code makes it a felony to "obtain, by any false pretense or token, from any person, with intent to defraud, money, a gift certificate or other property that may be the subject of larceny . . ."

478.     DynCorp terminated Relator's employment by not reviewing his employment contract.

479.     DynCorp terminated Relator's employment because he opposed and refused to assist DynCorp in violating § 18.2-178 by providing false information to the United States with the intent to defraud the United States.  *See, e.g.*, ¶¶ 190-192, 229-267, 344-45, 381, 411-412 *supra*.

480.     Significant aspects of DynCorp's fraud of the United States took place in Virginia. Defendant DynCorp International Inc. and Defendant DynCorp International LLC are headquartered in Virginia.  Defendants Northrop Grumman Corporation, Northrop Grumman Systems Corporation, and Northrop Grumman Technical Services, Inc. have their principal places of business in Virginia.  *See* ¶¶ 25-31 *supra*.  The money obtained by DynCorp through false pretenses passed through Virginia, and fraudulently benefitted these Virginia-based companies.  Relator was

SECOND AMENDED
COMPLAINT

trained by DynCorp in Virginia, and his written employment agreement with DynCorp was governed by Virginia law.  The Department of Defense, the federal agency from whom DynCorp obtained money by false pretenses, is also headquartered in Virginia.

481.    In addition, DynCorp's misrepresentations to the United States were made in Virginia.  The false representations and promises made to the United States within the initial and renewed CNGS Contract, Task Orders, and Statements of Work were reviewed and agreed to at Northrop and DynCorp's Virginia locations.  The United States held regular Performance Management Reviews in Virginia, attended by DynCorp management personnel and United States representatives.  At these meetings, DynCorp made false representations about its past and future performance under the CNGS Contract.  Further, DynCorp's internal compliance investigator charged with investigating Relator's claims of retaliation worked out of and reported to DynCorp's Virginia office.  DynCorp's perfunctory investigation and failure to address the issues raised by Relator's claims allowed DynCorp to continue to conceal its fraud against the United States.

482.    In wrongfully discharging Relator in violation of public policy, DynCorp acted with malice or with reckless disregard for Relator's rights.

483.    As a direct and proximate result of the foregoing, Relator lost the benefits and privileges of employment, and has suffered additional economic and non-economic damages, and irreparable harm to his career.

### COUNT V
### (Against Northrop Defendants)
### Tortious Interference with Contract under Virginia Law

484.    Relator repeats and realleges each and every allegation contained in paragraphs 1 through 441 above as though fully set forth herein.

485.    Relator had a valid employment contract with DynCorp.

SECOND AMENDED
COMPLAINT

486.     Northrop was aware of the employer/employee relationship between DynCorp and Relator.  Northrop was also aware that the parties expected their relationship to continue and for DynCorp to renew Relator's employment contract.  *See ¶¶* 420, 425 *supra*.

487.     Northrop intentionally interfered with the contractual employment relationship between Relator and DynCorp by causing DynCorp to terminate Relator's employment as Logistics Manager.  *See ¶* 425 *supra*.

488.     Northrop used improper methods to interfere with Relator's contractual relationship with DynCorp.  It retaliated against Relator for engaging in protected activity under 31 U.S.C. § 3730(h)(1), in violation of that statute.  *See ¶¶* 465-474 *supra*.  Northrop's managers directed DynCorp to terminate Relator because of Relator's opposition to Defendants' fraud against the United States and his efforts to end Defendants' fraudulent scheme.  *See, e.g., ¶¶* 425 *supra*.

489.     In wrongfully discharging Relator in violation of public policy, Northrop acted with malice or with reckless disregard for Relator's rights.

490.     As a direct and proximate result of the foregoing, Relator lost the benefits and privileges of employment, and has suffered additional economic and non-economic damages, and irreparable harm to his career.

## PRAYER

WHEREFORE, Relator prays for judgment against Defendants as follows:

1.   That Defendants cease and desist from violating 31 U.S.C. § 3729, *et seq.*;

2.   That this Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained because of defendants' actions, plus interest and a civil penalty of not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729;


SECOND AMENDED
COMPLAINT

3.     That Relator be awarded the maximum amount allowed pursuant to § 3730(d) of the False Claims Act;

4.     That this Court enter judgment against Defendants for Defendants' retaliation against him, wrongful termination of his employment, and tortious interference with his employment contract, by awarding reinstatement (or front pay, in lieu of reinstatement), two times the amount of back pay, interest on the back pay, compensation for any special damages sustained as a result of the retaliation, punitive damages, and any other amounts necessary to make Relator whole;

5.     That Relator be awarded all costs of this action, including attorneys' fees and expenses; and

6.     That Relator recover such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands trial by jury.

Date:   October 9, 2018                Respectfully submitted,

                                         /s/ Charles J. Cooper
                                         Charles J. Cooper (Bar No. 248070)
                                         David H. Thompson (Bar No. 450503)
                                         Vincent J. Colatriano (Bar. No. 429562)
                                         Harold S. Reeves (Bar No. 459022)
                                       Davis Cooper (Bar No. 1034231)
                                       COOPER & KIRK, PLLC
                                       1523 New Hampshire Avenue, NW
                                       Washington, DC 20036
                                       Tel: (202) 220-9600
                                       Fax: (202) 220-9601

                                       Colette G. Matzzie (Bar No. 451230)
                                       PHILLIPS & COHEN LLP

SECOND AMENDED
COMPLAINT

2000 Massachusetts Avenue, NW
Washington, DC 20036
Tel: (202) 833-4567
Fax: (202) 833-1815

Larry P. Zoglin (Bar No. 298620)
PHILLIPS & COHEN LLP
100 The Embarcadero
Suite 300
San Francisco, CA 94105
Tel: (415) 836-9000
Fax: (415) 836-9001

Avi Lev Kumin (Bar No. 475761)
Adam Herzog (Bar No. 1022990)
KATZ, MARSHALL & BANKS, LLP
1718 Connecticut Avenue, NW
Sixth Floor
Washington, DC 20009
Tel: (202) 299-1140
Fax: (202) 299-1148

*Attorneys for Plaintiff-Relator*

SECOND AMENDED
COMPLAINT